价值 627 多万美元的货物作为退货退给亚美柯公司。该《协议》签订后，亚美柯公司无理拒收退货，造成第一被申请人在 2006 年 9 月 23 日至 2008 年 5 月又为亚美柯公司不合格产品支付滚动的维修费、人工费及仓储费共计 2,291,985.24 美元（其中包括修理费 77,135.66 美元、人工费 231,373.34 美元及租金 234,925.75 美元）。被申请人为此提供了八千多页的票据凭证，证明其为有质量问题的货物支付的修理费、运费及仓储费。第一被申请人同时认为，2007 年 7 月 26 日《协议书》所称的"在履行中发生的纠纷"包括协议双方对该协议效力、内容等方面不同意见的纠纷，包括双方对申请人是否有权追索 600 多万美元不同意见的纠纷，当然也包括双方对这 600 多万美元的货物是否存在质量问题，及是否给第一被申请人造成损失、是否应该赔偿等不同意见的纠纷。因此，仲裁反请求属于双方仲裁条款对于仲裁事项的约定，应属于仲裁范围。

申请人则认为，被申请人在仲裁反申请书中多处提及申请人供给被申请人的产品存在质量问题，但被申请人至今未按《协议书》约定提交产品质量不合格的证明及美国有关产品质量监督检测部门出具的检测报告，所谓的质量问题均为被申请人的单方陈述，申请人对此均不予认可。被申请人提交的八千多页的票据凭证均是其单方制作的，这样的材料不具有可信度，申请人对此也同样不予认可。2006 年 9 月王国

庆先生赴美的身份是常州亚美柯集团有限公司法人代表，而非亚美柯公司法定代表人。被申请人所谓的仓储费等均是其自身经营行为产生的经营成本，与申请人无涉，而且该项所谓的修理费、仓储费及人工工资等费用与本案争议无关，不在本案的仲裁管辖范围内，该等费用与本案争议产品也无必然的对应关系，被申请人不能证明这些费用的发生是用于本案争议的产品，退一步说，如果被申请人所谓的修理费、仓储费及人工工资等损失存在且应由申请人承担，被申请人也只能依照中国的法律规定以向申请人申报债权的方式主张权利，而不是在本案仲裁中提出。

仲裁庭经审理查明，本案系争的 2007 年 7 月 26 日《协议书》第四条约定："甲方所提的乙方所供产品的质量问题，甲方应在 2007 年 9 月 10 日前向乙方提交产品质量不合格的证明，甲方并应在 2007 年 11 月 30 日前向乙方提交美国有关产品质量监督检测部门出具的检测报告。"然而，第一被申请人既未按照《协议书》的约定提交产品质量不合格的证明，亦未提交美国有关产品质量监督检测部门出具的检测报告，显然不符合《协议书》约定的第一被申请人就产品质量问题向申请人索偿的条件。与此同时，尽管第一被申请人就其主张的修理费（含运费）、仓储费及人工费提交了八千多页的票据凭证，但是仲裁庭难以认定这些票据凭证所载明的相关费用发生于《协议书》项下存在质量问题的货物的修理费（含

运费）、仓储费及人工费。仲裁庭注意到，在庭审中，被申请人称其已就亚美柯公司货物的质量问题在美国法院提起诉讼，且美国法院已受理了此案。申请人也当庭提交了编号为 CNRS907770 的美国加利福尼亚州相关法院（SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF SAN BERNADINO，RANCHO CUCAMONGA DISTRICT）的司法文书，该司法文书显示的原告为本案第一被申请人，被告为本案申请人。仲裁庭同时注意到，第一被申请人在知晓亚美柯公司已经宣告破产的情况下尚未根据《中华人民共和国企业破产法》的规定，就本案所涉修理费（含运费）、仓储费及人工费向法院申报债权。综上，仲裁庭认为，第一被申请人的该项仲裁反请求依据不足，仲裁庭难以支持。

　　3、关于第一被申请人的第三项仲裁反请求

　　第一被申请人的该项仲裁反请求是裁决申请人向第一被申请人返还已向申请人支付的 65 万美元。鉴于仲裁庭认定《协议书》已经生效，对双方当事人具有约束力，并裁决第一被申请人履行《协议书》约定的支付欠款及出资款的义务、第二被申请人履行《协议书》约定的连带责任的义务，而第一被申请人该项反请求所主张的已向申请人支付的 650,000 美元已从第一被申请人应支付申请人的欠款中扣除，为此，仲裁庭对第一被申请人的该项仲裁反请求不予支持。

　　4、关于第一被申请人的第四项仲裁反请求

第一被申请人的该项仲裁反请求是裁决反请求仲裁费由申请人承担。鉴于第一被申请人的全部仲裁反请求未得到支持，仲裁庭对第一被申请人的该项反请求不予支持。

## 三、裁　决

（一）第一被申请人应向申请人支付欠款 5,622,641 美元以及本金为 5,622,641 美元的利息，利息计算的起始日为 2008 年 5 月 8 日，第一被申请人应按每日万分之二点一的利率向申请人支付自起始日起至实际付清之日的利息；

（二）第一被申请人应向申请人支付 200,000 美元出资款以及本金为 200,000 美元的利息，利息计算的起始日为 2008 年 5 月 8 日，第一被申请人应按每日万分之二点一的利率向申请人支付自起始日起至实际付清之日的利息；

（三）第二被申请人对第一被申请人上述第（一）、（二）项裁决项下的支付义务承担连带清偿责任；

（四）本案仲裁请求的仲裁费人民币 591,640 元，申请人应承担 20%，即人民币 118,328 元，两被申请人应承担 80%，即人民币 473,312 元。申请人已预缴本案仲裁费人民币 591,640 元，两被申请人应将其应承担的仲裁费人民币 473,312 元支付予申请人；

（五）本案反请求仲裁费人民币 661,197 元，由第一被

（此页无正文）


首席仲裁员：

仲　裁　员：

仲　裁　员：

2009 年 12 月 29 日于上海

# EXHIBIT  B

China International Economic and Trade Arbitration Commission
Arbitration Award

**Applicant (Counterclaim Respondent):** Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Bankruptcy Administrator
**Address:** A4 Area, Xinggang Road Zhonglou Economic Development Zone, Changzhou City, Jiangsu Province, China
**Legal Representative:** Dai, Xuchu (Director of the Bankruptcy Liquidation Group)
**Arbitration Representative:** Yang, Bin (Attorney of Jiangsu Liansheng Law Firm Changzhou Office)

**First Respondent (Counterclaim Applicant):** U.S. Eastern Tools and Equipment Inc.
**Address:** 1040 S Rockfeller Ave Ontario, CA 91761, U.S.A
**Arbitration Representative:**
Miao, Jie (Attorney of Beijing Huifeng Law Firm)
Guo, Lei (Attorney assistant of Beijing Huifeng Law Firm)

**Second Respondent:** Fan, Guoxiang (Chen, Guoxiang)
**ID Number:** 320622196302157656
**Address:** North Street #11, Shi Zhuang Town, Ru Gao city, Jiangsu Province
**Arbitration Representative:**
Miao, Jie (Attorney of Beijing Huifeng Law Firm)
Guo, Lei (Attorney assistant of Beijing Huifeng Law Firm)

Shanghai

December 29th 2009

1

**Arbitration Award**
[2009] CIETAC No.508

WHEREAS the Litigant, Changzhou AMEC Eastern Tools and Equipment Co., Ltd., (herein after "AMEC") had been adjudicated bankrupt by the "Civil Judgment" (2007 CMPZ No.3-1) issued by the Intermediate People's Court of Changzhou City, Jiangsu Province, China (herein after "Changzhou Intermediate Court") on February 7,2007. Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Insolvency Administrator (Counterclaim Respondent, herein after the "Applicant") had applied for the arbitration by China International Economic and Trade Arbitration Commission Shanghai Branch (herein after "Arbitration Commission") on May 8th 2008. The China International Economic and Trade Arbitration Commission Shanghai Branch, in accordance with Article 25 of the "Enterprise Bankruptcy Law of the People's Republic of China" (herein after "Enterprise Bankruptcy Law") and also the arbitration terms under the "Agreement" (herein after "Agreement (July 26, 2007)" signed between AMEC, First Applicant Eastern Tools & Equipment Inc. (who is also the Respondent, herein after "First Applicant"), and Second Applicant Fan, Guoxiang (also known as Chen, Guoxiang) (herein after "Second Applicant"), accepted the arbitration case under the above mentioned Agreement ( July 26, 2007) on May 16, 2008 after the Applicant had followed the related procedures. AMEC. The number of the case is SX2008043. The procedure of this arbitration case shall be in accordance with the "China International Economic and Trade Arbitration Commission Rules" (the "Arbitration Rules") adopted on May 1, 2005.

On May 16, 2009, the Secretariat of China International Economic and Trade Arbitration Commission Shanghai Branch (the "Secretariat") had mailed the Arbitration Notice, "Arbitration Rules" and "List of Arbitrators" to the two respondents and forwarded the application letter and attachment submitted by the Applicant to the two respondents.

On July 3, 2008, the First Respondent motioned for arbitration counterclaim and handled the relevant procedures. China International Economic and Trade Arbitration Commission Shanghai Branch accepted the Respondent's application for counterclaim on August 18th and merged the two cases for one trial.

According to Article 20 of the "Arbitration Rules", the Arbitration Court shall consist of three Arbitrators. The Applicant appointed Sun, Nanshen to be Arbitrator; the two Respondents appointed Zhang, Yuqing to be Arbitrator; since the Applicant and the two Respondents failed to mutually appoint or commission the additional Arbitrator as required under the "Arbitration Rules," the Director of the Arbitration Commission appointed Mr. Ding, Wei as the chief Arbitrator in accordance with Article 22 of the "Arbitration Rules". The above mentioned three Arbitrators had signed the "Arbitrators Acceptance/Appointment Announcement," and on August 22, 2008, the Arbitration Court had been set up to arbitrate the case.

2

On December 17, 2008, the Secretariat received via facsimile the "Case Acceptance Notice of Intermediate People's Court of Nantong City, Jiangsu Province" [(2008) TZMSZ No.0003] and the conformed copy of the "Application" of invalidity of the Arbitration Provisions submitted by the Second Respondent. On December 18, 2008, the Intermediate People's Court of Nantong City, Jiangsu Province (herein after "Nantong Intermediate Court) notified the secretariat of China International Economic and Trade Arbitration Commission Shanghai Branch in writing that the Second Respondent had applied for confirmation of the invalidity of the Paragraph 7 of the "Agreement (July 26, 2007)" on December 12, 2008, which the Intermediate People's Court of Nantong City, Jiangsu Province had accepted the application. The Arbitration Procedure shall be suspended. On December 18, 2008, the Secretariat had mailed notice of the aforesaid to Applicant, two Respondents, and the Arbitration Court and informed them that the Arbitration Procedure had been suspended and the original trial date of December 21st 2008 had been cancelled.

On May 4, 2009, the Secretariat received, via facsimile, the "Civil Judgment of Intermediate People's Court of Nantong City, Jiangsu Province" [(2008) TZMSZ No.0003]. On that same day, the Secretariat mailed the above mentioned Civil Judgment to the two Respondents and the Arbitration Court, furthermore, the Secretariat informed the parties that the arbitration procedure shall resume beginning the issue date of this notice.

On June 19, 2009, the Arbitration Court Secretariat the decided, to begin trial on July 7, 2009.The Secretariat was to deliver the "Hearing Notice" to the parties on June 19, 2009.

On July 17, 2009, the Arbitration Court began the hearing at the Arbitration Commission, Shanghai Branch. The Arbitration Representatives of the Applicant and the two Respondents attended the hearing, stated the details and issues of the case, examined the evidence, answered the questions by the court, engaged in discussions and made closing statements. The two Respondents confirmed in open court that they will no longer challenge the jurisdiction of China International Economic and Trade Arbitration Commission Shanghai Branch on the case. During the hearing, the court chaired the reconciliation negotiation with the agreement of the parties. In open court, the Applicant and the two Respondents signed the "Reconciliation Agreement" with provisions of the court.

On July 22, 2009, the Secretariat received the notice submitted by the representatives of the two Respondents. The notice indicated that the two Respondents agreed with the provisions of the "Reconciliation Agreement" and accepted the terms hereof.

On August 7, 2009, the Secretariat received Applicant's "Letter on the Reconciliation Agreement". The Applicant stated that since the time which the two Respondents

3

submitted the written notice to the court had exceeded the deadline, July 20, 2009 as specified in Paragraph 6 of the Reconciliation Agreement and other issues, the Applicant decided not to submit the Reconciliation Agreement to the meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. for approval and requested the Arbitration Court to issue a judgment.

On September 2, 2009, the Secretariat received Representatives' Statement submitted by the Applicant on September 2nd 2009.

On September 14, 2009, the Secretariat received the Answer and the Response Opinion submitted by the two Respondents.

Due to the complexity of the case, and the Second Respondent's prior request to confirm the invalidity of the arbitration provision submitted to the Intermediate People's Court of Changzhou City, the arbitration court is unable to issue a judgment within six months of formation. Therefore, the Arbitration Court had requested the arbitration committee to extend the arbitration deadline. With approval by the director of the arbitration committee, the arbitration procedure deadline is extended to January 9th 2010.

All legal documents, notices and materials shall be delivered to the Parties and the Arbitration Court by the Secretariat subject to Article 68 of the "Arbitration Rules".

Hearing for this case ended. The Arbitration Court hereby issues judgment base on the written materials and the proved facts offered in open court. The statement of facts, opinion of the Arbitration Court and the adjudication are as follows:

## I. Statement of Facts

**The Applicant applied for the arbitration and alleged that:**

AMEC started a business relationship with the First Respondent since the date of its establishment in December of 2003. Upon insolvency of AMEC, First Respondent owed a total of 6,272,641 US dollars to AMEC. According to the Joint Venture Constitution and the Joint Venture Contract, the intellectual property rights (evaluated to be 200,000 US dollars) provided by First Respondent in the Joint Venture Constitution and Agreement as investment had not been actually invested. The Applicant accounted for the debts and assets of AMEC and negotiated with the First Respondent and the Second Respondent, representative of the First Respondent, on April 26, 2007 and arrived at an agreement [herein after "Agreement (April 26, 2007)"] on the untrue investment issues. The First Respondent paid the first 300,000 US dollars subject to the agreement; however, the "Agreement (April 26, 2007)" failed to become effective because it was not approved by the first meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Thereafter, the

4

Applicant and the two Respondents made the "Agreement (July 26, 2007)" on July 26, 2007. On December 27, 2007, AMEC called the second meeting of Creditors of Changzhou AMEC Eastern Tools & Equipment Co., Ltd. and approved the "Agreement (July 26, 2007)". The Applicant noticed the First Respondent to perform the obligations on payment on December 29, 2007 and January 7, 2008 and also noticed the Second Respondent to warrant the payment obligations of the First Respondent and to assume joint liability. Thereafter, the First Respondent only paid 250,000 US dollars to the Applicant on February 5, 2008 and the Second Respondent did not perform obligation of warranty. Therefore, the Applicant requested the Arbitration Commission Shanghai Branch to issue judgment for the following:

1. First Respondent shall pay 5,622,641 US dollars and 123,979.23 US dollars in interest (the number is tentatively calculated to the date of application for arbitration, the actual amount shall be calculated to the date complete payment is made; it shall be calculated by two point one in ten thousand each day);

2. The First Respondent shall pay 200,000 US dollars and 5,376 US dollars in interest (the number is calculated to the date of application for arbitration, the actual amount shall be calculated to the date complete payment is made; it shall be calculated by two point one in ten thousand each day);

3. The Second Respondent shall assume joint liability for the above mentioned payments.

4. The two Respondents shall pay RMB 500,000 Yuan to the Applicant as a reasonable cost for the arbitration.

5. The arbitration fee shall be assumed by the two Respondents.


**The two Respondents' replies are as follows:**

The First Respondent, U.S. Eastern Tools & Equipment Inc., has the "EPA" Certification by US Federal Environmental Protection Agency and the Emissions Permits by the California Air Resources Authority on its small diesel engines and low-noise diesel engine group. The "ETQ" brand products has legitimate trademark in the United States with high market reputation, with a fixed number of major clients such as Wal-Mart and a complete sales and after-sales service network. On or about the end of 2003, Changzhou AMEC Group Inc. invited the First Respondent and its two subsidiaries to jointly incorporate Changzhou AMEC Eastern Tools and Equipment Co., Ltd. The stockholders of the corporation are: Changzhou AMEC Machinery and Equipment Co., Ltd. (holding 30% of the shares), Changzhou AMEC Machinery and Equipment Import and Export Co., Ltd. (holding 30% of the shares) and the First Respondent (holding 40% of the shares, including intellectual property

5

rights worth 200,000 US dollars, and 200,000 US dollars in cash).

Since 2004, the products of AMEC began to be sold to the U.S.A. Due to the market reputation and client recognition, AMEC used the "ETQ" trademark on its products as OEM with the First Respondents' permission and illustrated that AMEC was the producing base of the First Respondent in China and the after-sales services shall be provided by the First Respondent in the U.S.A. In the beginning, the First Respondent placed order with AMEC and AMEC organized the production and thereafter delivered the goods to the First Respondent, and then the First Respondent delivered the goods to the customers. Later, due to serious quality problems with the equipment, U.S. Eastern Tools and Equipment Inc. noticed AMEC to stop delivering goods to the U.S.A. However, AMEC not only refused to comply with the notice to stop delivery, AMEC also signed sales contracts directly with the customers and delivered machinery and equipment on various specifications and models. However, there were severe quality problems in this machinery and equipment. Although the business relationships between AMEC and the customers were unrelated to the First Respondent, there was negative impact to the market reputation of the products due to the use of the "ETQ" trademark. The First Respondent urged the Applicant to come to the U.S.A and deal with the problem as soon as possible.

In order to solve the above mentioned problems, Mr. Wang, Guoqing, chaiman of Changzhou AMEC Group inc., went to the U.S.A on September 2006 to inspect the returned products and relevant documents. Therefore, the parties signed the "Agreement". The parties agreed: First, the goods backlogged in the warehouse of U.S. Eastern Tools and Equipment Inc. worth 6,272,641 US dollars shall be returned to AMEC. Second, the parties agreed that Mr. Xia, Xichu, chief manager of AMEC should be in charge of the matter aforesaid. The goods should not be returned if Mr. Xia Xichu deemed that the goods could nevertheless be sold in the U.S.A. market. However, after that, AMEC did not actually perform the obligations under the agreement. The First Respondent, Changzhou AMEC Machinery and Equipment Co., Ltd., Changzhou AMEC Machinery and Equipment Import and Export Co., Ltd. and AMEC drafted an "Agreement" on December 5 in Beijing. In this "Agreement", the First Respondent agreed to pay 2,000,000 US dollars to AMEC and should be liable for the backlogged goods if AMEC acknowledged the quality problem, assumed all losses of the U.S. Eastern Tools and Equipment Inc. and would not require any further payments from the First Respondent to AMEC. However, the Agreement was not signed because the parties were both busy at the end of the year.

American attorney of the First Respondent replied to Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Insolvency Administrator on March 26, 2007 that the "Debt Settlement Notice" was not in accordance with the provisions on international delivery of documents under the "Hague Convention", and further claimed that the 6,526,121 US dollars' debt did not comport with the truth and required the Applicant to provide relevant evidence. It is also claimed that the First Respondent had started to

calculate the loss caused by the quality problem and was going to register as a Creditor. On April 17, 2007, Fan, Guoxiang (also the Second Respondent) the Legal Representative of the First Respondent was taken away by Changzhou Public Security Bureau for involvement in fraud in Changshu while meeting with a foreign merchant. Mr. Fan, Guoxiang was taken to Changzhou and was held in custody in a hotel room without freedom. On April 26, while still in custody, AMEC provided an "Agreement" to Second Respondent and forced him to sign the "Agreement and wire 300,000 US dollars to the Applicant on April 27. The Applicant provided another "Agreement" on July 26, 2007 because the old one had not been approved by the meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. The "Agreement (July 26, 2007)" was signed by the three parties and to become effective. However, the Applicant breached Paragraph 1 of the agreement and entrusted China Export Trust Insurance Co., Ltd. to claim 4,231,436.70 US dollars owed to the First Respondent on August 13, 2007.

The Respondent believed that subject to Article 94 of the "Contract Law of the People's Republic of China" (the "Contract Law"), the contract could be terminated under certain conditions, among which: (2) the party unequivocally states or expresses by actions that it would not perform obligations before the expiration of the performance period. In the present case, the only obligation of AMEC the Bankruptcy Group is to submit the agreement to meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. for approval. However, the actions of the Applicant in seeking to claim the 4231436.70 US dollars debt in the U.S.A violated the principle tenets of the "Agreement" and further indicated that the Applicant had decided not to perform the obligations under the Agreement. Accordingly, the First Respondent shall have the right to unilaterally terminate the "Agreement (July 26, 2007)". Therefore, Mr. Cao Jianhua, the American attorney of the First Respondent replied stating that the First Respondent did not owe debt to AMEC; further the First Respondent expressed refusal when the Bankruptcy Group delivered Notice requesting payment on December 29, 2007

The First Respondent also claimed that since September 23, 2006 to May of 2008, it advanced 2,291,985.24 US dollars of repair fee (including transportation fee), storage fee and labor fee for the returned goods. Additionally, the First Respondent's investment of intellectual property rights to AMEC had been verified by Changzhou Yanling Accounting Firm. Liquidation Group's accusation against First Respondent for untrue investment had no proof. The First Respondent did not have any obligation to pay 200,000 US dollars to the Bankruptcy Group.

The First Respondent maintained that, according to Article 97 of the "Contract Law", upon termination of a contract, a performance which has not been rendered is discharged; if a performance has been rendered, a party may, in light of the degree of performance and the nature of the contract, require the other party for restitution or otherwise remedy the situation, and is entitled to claim damages. According to the

abovementioned facts and the legal provisions, the First Respondent submitted arbitration counterclaim and requested restitution and damages.

**The First Respondent's arbitration counterclaims are summarized as follows:**

1. The "Agreement" signed by the Applicant, the First Respondent and the Second Respondent on July 26, 2007 shall be terminated.

2. The Applicant shall pay the First Respondent 2,291,985.24 US dollars for repair fees (including transportation fee), storage fees and labor fees, which were advanced by the First Respondent for the Applicant.

3. The Applicant shall refund the 650,000 US dollars, which was paid to the Applicant by the First Respondent.

4. The counterclaim fee shall be assumed by the Applicant.

**The Applicant made written statements regarding the arbitration requests, and hereby answers the Respondent's counterclaims as follows:**

1. On July 26, 2007, this case's Applicant and Respondents established the "Agreement" as a manifestation of true intent of the three parties after full negotiations. Moreover, the July 26, 2007 "Agreement" signed by the parties was printed after the parties agreed on the provisions and signed by the two Respondents; the Respondent even handwrote the word "notice" on the second item in the Paragraph 3 of the "Agreement". Subject to Paragraph 1 of the agreement, the second meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Bankruptcy Liquidation Group had approved the "Agreement" in the court of Intermediate People's Court of Changzhou City on December 27th 2007 at 2 P.M.; the Agreement became effective on December 27, 2007. Moreover, the Respondents had partly performed their payment obligations (including 300,000 US dollars on April 28 and 250,000 US dollars on February 5, 2008), which constitutes the performance of the Agreement. However, the Respondent failed to fully perform the entire obligations subject to the "Agreement". Therefore, the Respondent shall not have the right to terminate the agreement unilaterally without full performance of the Agreement and the entire payment.

Secondly, the Applicant did not entrust any entity or person, including China Export Trust Insurance Co., Ltd and Attorney George R. Hicks Jr., to claim payment outside of the "Agreement". All the evidence provided by the Respondent had no relation to the Applicant. Moreover, the claim sought by the third party was not the same one and completely unrelated to this case.

2. The Respondent had mentioned the quality problem on the products provided by

the Applicant many times in the arbitration counterclaim; however, the Respondent has not yet provided certificates to prove the quality problem, as required under the Agreement, or provided any inspection report issued by the relevant American quality supervision and inspection department. All the alleged quality problems were just based on unilateral statements by the Respondent. Applicant does not recognize these allegations. All the material provided by the Respondent to prove the quality problems are created by the Respondent, which could not have credibility and would not be recognized by the Applicant either. In addition, the products provided by the Applicant are machinery equipment. Proper operation and maintenance were essential and any improper operation and maintenance would cause serious consequences (the quality problems alleged by the Respondent). Moreover, all the expenses such as the storage fee are the operation expenses of the Respondent, not the Applicant. All the so called repair fee, storage fee and labor fee are not related to the dispute in this case and should not be within the jurisdiction of this arbitration. Such expenses had no absolute concern with the products in dispute. The Respondent could not prove that such expense was incurred for the products in the present case. Even if such repair fee, storage fee and labor fee should be assumed by the Applicant, the Respondent could only claim as a creditor subject to the Chinese laws and should not be discussed in this arbitration.

3. The 550,000 US dollars of the 650,000 US dollars paid by the Respondent is performance under the agreement signed by the parties and the Respondent's liability. Therefore it shall not be refunded. The other 100,000 US dollars was also a normal payment for merchandise, which shall not be refunded either.

4. As for the untrue investment issue, according to Article 28 of the "Corporation Law", "the transfer procedure shall be performed if the investment is by non-currency". However, the Respondent had not actually transferred the property rights to Applicant and performed the transfer procedure. The verification report submitted by the Respondent was not proof of property right transfer, but an independent assessment report by a third party. According to the Evidence 16 provided by the Respondent, the investment of the Respondent should be patent technology.  As with Respondent's patent, according to Article 151 of the US Patent Law, only the certificate issued by the United States Patent and Trademark Office is the valid proof of property rights of patents. However, the printed materials online submitted by the Respondent questionable evidence in form, whose credibility cannot be confirmed. To say the least, even assuming the printed materials online were true, they could only prove that the invention had apply to the United States Patent and Trademark Office for patent and had been initially assessed and published.  Whether the patent was granted still remains to be prove by the patent certificate, which the Respondent had not provided such certificate. Therefore, Respondents could not have transferred the property rights to the patent that it had yet to receive in the beginning of 2004. Furthermore, the Respondent admitted to the untruthfulness of the investments mentioned in the Agreement signed on July 26, 2007.  Such fact could

9

also be proved by pleading submitted by Applicant to the Intermediate People's Court
of Changzhou City, Jiangsu Province.

**The Respondent's supplemental reply after the hearing in the court of
representatives' statement regarding the present arbitration request and
counterclaim:**

I. Supplemental statement regarding Applicant's arbitration request

The Respondent maintained that all the arbitration requests issued by the Applicant
were not based on facts or legal provisions, and should not receive support from the
arbitration court.

1. The July 26, 2007 "Agreement" was signed by the Second Respondent under
duress. Without this "Agreement," there would not be any debt dispute between the
parties.

The relationship between the First Respondent and AMEC should be consignment and
should not be considered as sales contract. The First Respondent has the "ETQ"
trademark and the related patent on the products, EPA certificate, emission certificate,
high market reputation and a fixed number of major clients to sell these products. The
objective for the establishment of AMEC was to utilize the advantages aforesaid,
which is best illustrated in the "Joint Venture Agreement" signed by Changzhou
AMEC Machinery and Equipment Co., Ltd., Changzhou AMEC Machinery and
Equipment Import and Export Co., Ltd. and the First Respondent on August 11, 2003.
Paragraph 14 of the "Joint Venture Agreement": 98% of the products of the joint
venture shall be sold abroad. The Paragraph 15 of the "Joint Venture Agreement":
98% of the products of the joint venture shall be sold abroad by Party C (the First
Respondent) and shall not exclude entrusting other client with better conditions. The
relationship between the First Respondent and AMEC had been defined as
consignment in the "Joint Contract". In fact, the parties also developed the business
relation with each other according to the consignment business practice "Rights and
Obligations of the Supplier and the Seller". It could be seen from mails sent by
AMEC and the packages of the products provided by AMEC that AMEC was in
charge of the production and delivery subject to the agreement and the First
Respondent was in charge of the sales. The First Respondent made profit by the price
differentials and shall return the rest of the money to AMEC. The First Respondent
only had obligations to pay AMEC for the sold goods and did not have obligations to
pay in advance. The goods in dispute in the case were not even sold by the First
Respondent. The demand letter sent by American attorneys, representatives of China
Export Trust Insurance Company, was attached with ten contracts. From the content
of these ten contracts, the parties of the sales contracts were AMEC (the Seller) and
US. Gardner Co. (the Buyer). There were also invoices issued by AMEC directly to
US. Gardner Co. attached to the end of each contract. Those ten contracts had

absolutely no relation to the First Respondent. Although the Applicant pleaded to the Arbitration Court that the First Respondent should pay Applicant, it cannot provide any sales contract between First Respondent and Applicant for any products, which is proof that there had never been any contractual relationship between the First Respondent and AMEC. There would not be any debt dispute between the parties if the "Agreement" signed on July 26, 2007 did not exist.

The reason for dispute between the parties was the serious quality problem of the products provided by AMEC. On September 23, 2006, the parties signed an agreement to return the goods, valued at over 6,270,000 US dollars to AMEC, which shall not be the First Respondent's liability. In fact, the goods provided by AMEC had quality issues from the beginning. Starting 2005, the quality problems became more serious. Because AMEC Company's products used First Respondent's "ETQ" trademark and the First Respondent was the specified Seller and the after-sale service provider, American clients demanded the First Respondent to repair the products, and requested returns of the goods in large quantities to the First Respondent, and even terminated the agreement with the First Respondent. This not only caused  a large number of goods backlogged in First Respondent's storage unit, but also negatively impacted First Respondent's market share and reputation. In order to solve the problem, the First Respondent urged AMEC to make proper action as soon as possible. Mr. Wang, Guoqing, the chairman and the legal representative of AMEC at that time, went to the U.S.A for the issue on September 2006. Wang, Guoqing inspected and confirmed many of the returned products and signed an "Agreement" on September 23. The agreement stipulated: "Party A alleged that there were problems on the products provided by the joint venture to Party A, the allegation  was confirmed by Party B's March inspection of  the products in stock; this caused customer returns, claims for compensation and contract cancellations, which made the products unmerchantable and created a huge backlog in Party A's warehouse. Party A was unable to recuperate its capital for a substantial period of time and sustained enormous loss as a result … both parties agreed to return the products remained in Party A's warehouse to the joint venture." "Both parties agreed that Mr. Xia, Youchu should be responsible for the joint venture's products stored in Party's A's warehouse. Party A should provide positive assistance but shall not utilize the information and the brand of Party A. Party A will not assume any liability for these products…" The Respondent reckoned: the abovementioned details proved that AMEC admitted that the products had serious quality problems and accepted the products as returned. Therefore, the First Respondent shall not assume any obligation because the First Respondent did not have any fault on the issue. Both parties shall deal with the quality issues and all related problems based on the rights and responsibilities between the Supplier and the Seller.

AMEC had not complied with the September 23, 2006 "Agreement" to solve the dispute. On the contrary, the Applicant forced the Second Respondent to sign a new "Agreement". The "Agreement" signed on July 26, 2007 contained the exact same

11

content as this "Agreement," which was a continuation of the state of duress the Second Respondent had been under. The Respondent claimed that after both parties signed and negotiated a fair and reasonable Agreement on September 23, 2006, AMEC had not performed the agreement; instead, the Applicant forced the Second Respondent into signing a new "Agreement" by force and illegitimate means, which under untrue and involuntary conditions. On April 17, 2007, Second Respondent was taken by Changzhou Public Security Bureau while meeting foreign merchants in Changshu;  Second Respondent's forced capture after being taken to Changzhou, was not held in residential surveillance, as claimed after the fact by the Changzhou Public Security Bureau in the "Residential Surveillance Deactivation Decision." Instead, he was held in custody in a hotel room without freedom. After ten days in custody on April 26, AMEC provided a draft of another "Agreement" to Mr. Fan, Guoxiang and demanded his signature and required Second Respondent to be the guarantor, not one word of the draft was allowed to be changed. Contents in this "Agreement" were the opposite of the September 23, 2006 "Agreement" and required the First Respondent to pay 2,500,000 US dollars to the Applicant and additional 200,000 US dollars to supplement the "untrue investment". The Second Respondent was threatened that he would not be released until he had signed the "Agreement". Under duress and without personal freedom, Second Respondent signed the "Agreement." Also under duress, on April 27, the Second Respondent noticed the First Respondent to wired 300,000 US dollars to AMEC from the U.S.A. and the Second Respondent was released from custody on April 28th. The "Agreement" had not yet been approved by the meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Then on July 26, 2007, the Applicant requested the Second Respondent to sign another "Agreement" with the same contents to the last "Agreement". Although the Second Respondent was not in custody at that time, the other party threatened him by saying, "We can take you again just easily as we released you." The Second Respondent had reason to believe that he could be detained again for any make belief allegation as described above if he refused to sign. Therefore, the Second Respondent signed the "Agreement" under duress again.

2. The July 26, 2007 "Agreement" was not only signed by the Second Respondent under duress, the allegations contained in the "Agreement" were also untrue. The "Agreement" stated that "Party A, Party B and Party C had made an agreement on the debt between Party A and Part B. Party A had already paid 300,000 US dollars subject to the agreement. However, the agreement had not become effective since the agreement had not been approved by the first meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd." In fact, the 300,000 US dollars was wired from the U.S.A by the First Respondent under the instruction of the Second Respondent while the Second Respondent was in custody by Changzhou Public Security Bureau. The Second Respondent was released on the day after the 300,000 US dollars was wired. The 300,000 US dollars were definitely not paid "subject to the agreement" as stated in the Agreement. Moreover, the "Agreement" had been invalid since it was not approved by the meeting of Creditors of Changzhou AMEC Eastern

Tools and Equipment Co., Ltd. Paragraph 4 of the "Agreement" stated that Party A shall provide to Party B proof of the quality problem before September 10, 2007. In fact, AMEC and the Applicant had always acknowledged the quality problem. There was no need for the First Respondent to provide any further proof. Paragraph 5 of the "Agreement" stated that the intellectual property rights (evaluated to be 200,000 US dollars) provided by Party A in the Joint Venture as investment had not been invested because it had been found untrue. Therefore, Party A shall pay 200,000 US dollars to supplement the registered capital which it shall pay before January 1, 2008. In fact, the intellectual property rights provided by Party A as investment had always been true. Otherwise, AMEC could not have produced any products in ETQ brand to export to the U.S.A. There had always been serious quality problem with the products provided by AMEC and both the Applicant and AMEC had always acknowledged this fact. If there were no quality problems with these products, there would not be any dispute between the parties. This case would also not exist. The First Respondent submitted some of the mail correspondences between the First Respondent and AMEC from 2004 to 2005. From the parties' correspondence, it is apparent that the main contents involve First Respondent repeatedly reflected to AMEC the quality problem of the products. These mails proved that the First Respondent had been trying to communicate with AMEC on the quality problem and AMEC had always recognized that there were quality problems on the products. The Respondent believed that Xia, Youchu, the chief manager of AMEC, had maintained in his correspondence that "The failure rate of the DG6LER delivered from the factory to TUFF U.S.A has been 17%..., I think it should be caused by the quality inspection and the defect of my work... The occurrences of these problems required that we should establish complete quality system... I hope our factory could make things right as soon as possible... Now we will provide the support of parts as possible. At the same time, we hope you can give us the detailed report and believe that we could try and make things right." According to the December 6, 2005 request in the mail by Xia, Youchu, the First Respondent had submitted relevant report on quality problem to AMEC as early as February 2006. On the basis of the two reports, the First Respondent signed the "Agreement" with AMEC on September 23, 2006. The chairman of AMEC Wang, Guoqing, personally went to the U.S.A and inspected the goods with quality problem in the First Respondent's warehouse. After witnessing the quality problems of the products first hand, Wang, Guoqing signed the September 23, 2006 "Agreement" with the First Respondent. Paragraph 1 stated that the quality problems was approved by Wang Guoqing, that is, "Party A stated that the products provided by the joint venture to Party A had quality problems, and shall be confirmed by Party B in the test of the products in the storage in March." Moreover, Applicant submitting for arbitration under the July 26, 2007 "Agreement" and the April 26, 2006 "Agreement" also indicated that AMEC Liquidation Group's recognition of the quality problems had been approved by the Applicant. This is because Paragraph 1 of the two agreements stated that "Party A shall pay 6272641 US dollars to Party B for goods. Because Party A brought up the issue of product quality problems, Party B, after negotiation with Party A, agreed that Party A shall pay 2,500,000 US dollars to

Party B for one time resolution." First Respondent submitted demands letters and ten attached contract that were mailed by American attorneys entrusted by China Export Trust Insurance Co., Ltd. to First Respondent. These ten contracts are also part of the business contracts in dispute in the current arbitration, the seller was AMEC Company but the buyer is U.S. Gardner Company.   Further, the invoices were directly issued by AMEC to US. Gardner Inc. Those ten contracts had no relation to the First Respondent at all. However, because AMEC's product quality problems, the Gardner Co., an American company, request to return the goods directly to the First Respondent since the "Contact" listed on the bill of lading was the Second Respondent and the products sold to the American company by AMEC also used the ETQ brand. When problems of product quality arose, Gardner directly returned the products to First Respondent. This is also direct proof of the seriousness of these quality problems on AMEC's products. The Applicant's request for the test reports were for the deduction of tax purposes. It could be seen from the record of the second meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. that Dai, Xuchu, the director of the Applicant clearly expressed at the meeting of Creditors on December 27, 2007 that "It was for the deduction of tax that we required for the test reports." It is clear that the request for the test report by the Applicant was motivated neither by its original intention nor to prove the quality problems. There is no dispute that the products of AMEC had quality problems. Other than the food and drug administration, there were no government agencies to test general products in the U.S.A. To avoid disputes, the attorney for the First Respondent had claimed in the January 23, 2008 reply   that the First Respondent had provided the test report on quality for many times and requested AMEC to provide the "name, address and contact of certain testing organization" for repeated testing; however, Applicant provided no response. Applicant believed that claim that the product quality issues occurred "because of the improper operation and maintenance" cannot be established. First, if the quality problem is caused by improper use by the user, the final customer of the goods, the first Respondent would not assume liability on the repair or compensation and the damages caused by the customers themselves. Second, the statement by the Applicant was a complete conjecture without evidence.

Without even examining the evidence in court, the representative for the Applicant alleged that Evidence 15, the invoices provided by the First Respondent, were made unilaterally by the First Respondent; this cannot be established. These invoices were issued by third parties and are true and valid checks paid when the First Respondent paid for repair fees, transport fees and storage fees for the quality problems. Such statement by the Applicant was a complete conjecture without evidence.

The intellectual property rights provided by First Respondent as investment are true. Otherwise, AMEC could not have produced any "ETQ" product for sale to the U.S.A. and this case would not occur. The "Audit Report" issued by the verification agency could prove that the First Respondent had performed its obligations on investment. For the establishment of AMEC, First Respondent invested 400,000 US dollars,

14

including 200,000 US dollars cash and U.S. intellectual property rights, related EPA certification and the ETQ trademark evaluated to be 200,000 US dollars. To this regard, the verification report in the "CYWY (2004) No.4" ("Capital Verification Report")issued by Changzhou Yanling Accounting Firm along with the end of the financial statements of AMEC in 2004 could also prove that the First Respondent had performed its obligations on investment completely. The Accounting Firm, as the legally appointed capital verification agency is a trustworthy and neutral agency; the "Capital Verification Report" issued by them, is the most reliable proof to evaluate whether the shareholders for the establishing company in fact made true investments. The relevant procedures for the establishment of AMEC had been handled by the other two shareholders. Even though there were no License Agreement between the First Respondent and AMEC, the party at fault shall be Changzhou AMEC Group Co., Ltd. and Changzhou AMEC Machinery and Equipment Co., Ltd. Paragraph 13 of the agreement claimed that "The obligations of Party A and Party B (Changzhou AMEC Group Co., Ltd. and Changzhou AMEC Machinery and Equipment Co., Ltd.) shall be as follows: 2. the relevant work on application, registration and collection of the business license to the relevant Chinese authorities." The abovementioned agreement had proved that the procedures of the establishment of AMEC shall be performed by the two companies. The First Respondent had been utilizing the EPA trademark as early as August 1, 2003, which is trademark protected by the US laws. The Second Respondent himself had got the relevant patent on March 19, 2003. The relevant products had been approved for the EPA certificate on February 2002. All these dates are earlier than the establishment date of AMEC. Therefore, even though the Second Respondent had not signed agreement on such license, the party at fault shall still be Changzhou AMEC Group Co., Ltd. and Changzhou AMEC Machinery and Equipment Co., Ltd.

AMEC had in fact utilized the First Respondent's patent, EPA certificate and the ETQ trademark. Otherwise, AMEC could not have produced any "ETQ" product for sale in the U.S.A. This case would never occur. Regardless of whether Second Respondent failed to sign any License Agreement, the First Respondent in fact had been sending technicians to instruct AMEC to set up the production lines and to produce all kinds of machinery equipment according to the Second Respondent's patent. First Respondent's supplement Evidence 8 was the package, the brand, the "Manual" and the "After-sale Service Manual" of the products sold by AMEC. It is apparent that AMEC had manufactured the products according to the patent of the First Respondent and branded the products with ETQ.

The Applicant had no evidence to prove its statement on the "untrue investment" of the First Respondent. The (2007) CMESZ No.3 "Civil Mediation Book" issued by the Intermediate People's Court of Changzhou City and the (2007) CZ No.32-1 "Civil Judgment" issued by the Applicant could only illustrate that AMEC, Changzhou AMEC Group Co., Ltd. and Changzhou AMEC Machinery and Equipment Co., Ltd. confirmed the "untrue investment" unilaterally to the third party, which had no

relation to the First Respondent. Therefore, it cannot be considered as evidence to prove the untrue investment. Applicant's argument of untrue investment cannot be established merely because it was unclear on whether Second Respondent received the patent during the establishment of AMEC and therefore cannot complete the patent transfer procedure. First, the Second Respondent had already obtained multiple patents on inventions when AMEC was established— Chinese translation of Respondent's U.S. invention patent information. We can see from the pages that there are 8 patents that belong to the Second Respondent. The twelfth page was just some information about the application of the Non-road Engines Exhaust Filter System that the Second Respondent applied for patent. This file was dated March 2003, much earlier than the Establishment Date of AMEC. Second, subject to Article 22 of the "Sino-Foreign Joint Venture Law Implementation Regulations", the investor could invest by technology such as industrial property and patent technology. To say the least, even assuming that when AMEC was establishing, the patent of the Second Respondent was still in notice period, he at the very least had the technology and could invest by the patent; moreover, Second Respondent already had the EPA certification. The facts and the material from company registration both consistently indicate that Changzhou AMEC Machinery and Equipment Co., Ltd. and Changzhou AMEC Machinery and Equipment Import and Export Co., Ltd. should be liable. Thirdly, industrial property rights include trademark rights. At that time, the Second Respondent had already been utilizing the EPA trademark. Moreover, the U.S.A is a country that protects trademark utilization. Therefore, when establishing AMEC the Second Respondent had the right to sign license agreement on the trademark. At the very least, even if the Second Respondent had not obtained the trademark right, he could also invest the technology as industrial property rights. This further proves that the above mentioned argument by Applicant's representative cannot be established. Fourth, the Applicants' statement about the "transfer procedure" was not in accordance with the law. The investment of trademark right or the patent was a license for utilization, not a transfer of the right. The Article 43 of the "Sino-Foreign Joint Venture Law Implementation Regulations" provided that a technology license contract shall include the "Technology Use Fee" and "Generally, the duration of the license agreement shall be in no more than ten years". From the above regulation, "technology transfer agreement" means "license to use agreement" and not the "transfer" as suggested by Applicant's representatives. Fifth, subject to Article 43 of the "Sino-Foreign Joint Venture Law Implementation Regulations", the technology license contract shall be submitted to the authority for approval. If the First Respondent had not signed any technology license agreement with AMEC, AMEC could not have been established.

The AMEC Liquidation Group entrusted China Export Trust Insurance Co., Ltd to claim for the same subject again to the First Respondent on August 13, 2007. The "Agreement" signed on July 26, 2007 had been unilaterally terminated by the Respondent's action in repeatedly claiming payment. Therefore, the "Agreement" had never been effective at all. Paragraph 1 of the "Agreement" claimed that "The

agreement shall become effective after approval by the meeting of Creditors of
Changzhou AMEC Eastern Tools and Equipment Co., Ltd. with the signatures or seals
by Party A. Party B and Party C." That is, although the "Agreement" had been signed
on July 26, 2007, it had never become effective. The Applicant did not submit the
"Agreement" to the meeting of Creditors of Changzhou AMEC Eastern Tools and
Equipment Co., Ltd. for discussion and approval but entrusted China Export Trust
Insurance Co., Ltd to make claims on the same subject and sought payment of
4,231,436.70 US dollars from First Respondent only two weeks after signing the
agreement, that is August 13, 2007, and violated the core tenets of the Agreement
(which was First Respondent paying AMEC a one-time payment of 2,500,000 U.S.
dollar).. On December 5, 2006, the parties drafted, but failed to sign, "Agreement,"
which stated in item two point three that: "Upon this Agreement going into effect,
Party D shall not make any payment decisions regarding Party A; Party D (AMEC)
insurer under the insurance policy with the insured have the benefit of a waiver of
subrogation." The Second Respondent on April 26, 2007, under the conditions of
duress and limited personal freedom signed an "Agreement," and an additional
"Supplemental Agreement" stating that the remaining two shareholders, Changzhou
AMEC Machinery and Equipment Co., Ltd. and Changzhou AMEC Machinery and
Equipment Import and Export Co., Ltd. promised to revoke the claim entrusted by
China Export Trust Insurance Co., Ltd along with any other civil and criminal claims.
The Applicant argued during the hearing that it never entrusted any entity or person to
collect payment outside the agreement. The Applicant also argued that it did not
submit the Power of Attorney to China Export Trust Insurance Co., Ltd. However, the
"Inquiry Request Form" provided by the First Respondent recorded the statement that
the Creditor shall be AMEC, the statement that the Debtor shall be the First
Respondent and the signature "Lu Yue" of Changzhou AMEC at the end and dated
July 24, 2007 (after the bankruptcy of AMEC Co., ). It also claimed: we fully
authorize the above listed Trustee to collect the debt on our behalf. The Applicant then
claimed that the particular collection was unrelated to money being collected in the
current matter. Then, how come both the "April 26, 2007 Supplemental Agreement"
and "Agreement drafted on December 5, 2006" stated to "choose only one" collection
method   The First Respondent believed that the Applicant's action of repeated
recovery in varying amounts and its actions had in fact indicated that the Applicant
did not intend to perform its only obligations under the "Agreement," which was to
submit the "Agreement" to the meeting of Creditors, for approval; there was no intent
to accept the only agreement that First Respondent shall pay 2,500,000 for one time
resolution of this dispute. In fact, the Applicant had already breached the agreement
by its actions. Therefore, the Applicant on December 29 sent a "Notice" to the First
Respondent, requesting that First Respondent fulfill the agreement. The First
Respondent authorized its attorney to reply and refuse to perform the agreement on
January 23, 2008.

Other issues addressed during the arbitration court hearing:

1. The identity of Wang, Guoqing when he was signing the "Agreement" on September 23, 2006. The inscription of the "Agreement" signed on September 23, 2006 was First Respondent and Changzhou AMEC Group Co., Ltd.; the signers were the Second Respondent and Wang, Guoqing. Excluding First Respondent, the two shareholders of AMEC were Changzhou AMEC Machinery and Equipment Co., Ltd. and Changzhou AMEC Machinery and Equipment Import and Export Co., Ltd. and these two companies are subsidiaries of Changzhou AMEC Group Co., Ltd. Wang, Guoqing was the legal representative and chairman of Changzhou AMEC Group Co., Ltd.. Further, evidence submitted during the hearing from the First Respondent provided ample proof that Wang, Guoqing was also AMEC's legal representative and chairman during the same period of time. This "Agreement" was in fact a compromise on the problem by the three shareholders of AMEC. At the time Wang Guoqing was acting as the representative of the other two shareholders, he himself should be aware that he also represented AMEC. Therefore, the "Agreement" had effect on AMEC, the joint venture, because the content of the agreement addressed resolution of the problem between the First Respondent and the joint venture (which is AMEC Co.) The statement by the Applicant that "Wang, Guoqing was not the legal representative of AMEC because the registration of the company had not been changed" could not be established. Thus, the agreement was signed by the three shareholders inside the company and the fact that Wang Guoqing was the representative of AMEC was approved by shareholders, which is not affected by the business registration. The dereliction of duty in failing to change the registration cannot be the reason that AMEC failed to perform the obligations under the agreement.

2. The arbitration court asked the representative of the First Respondent a question in court: Was the "Supplemental Agreement" signed on April 26, 2007 based on the true intention of the First Respondent? The representative of the First Respondent answered "No". The First Respondent hereby withdraws the answer and the answer was a mistake and given under rushed conditions. At the time, the representative of the First Respondent was trying to illustrate the fact that the Second Respondent was taken in custody in the hotel and signed the "Agreement" on April 26, 2007. In the "Supplemental Agreement," AMEC waived the right to entrust China Export Trust Insurance Co., Ltd to collect from the Second Respondent was favorable to the Second Respondent. It could be seen that there were no expression of intent by the Second Respondent in the Supplemental Agreement. The Supplemental Agreement could only illustrate that the matter in the Supplemental Agreement was the same as the one in this case and AMEC Liquidation Group knew that it should not be collecting repeatedly. Of course, even with the Supplemental Agreement, the Applicant could not collect the same matter repeatedly; otherwise, this would not only be a breach of the parties' agreement but also behavior that violate the common sense and the laws of any country.

The First Respondent believes that the "Agreement" signed on April 26, 2007 is invalid. The Second Respondent, of course, should not assume any liability as a

guarantor. And the July 26, 2007 "Agreement" had been terminated after establishment and was never effective. Therefore, the Second Respondent should not assume any liability as a guarantor either.

## II. Supplemental opinion on arbitration counterclaim

The First Respondent believed that all the arbitration requests offered by the Applicant were not supported by facts or law. Changzhou AMEC and the Applicant had already caused great loss to the First Respondent.

1. There were severe quality problems on the equipment produced by AMEC.

2. It shall be considered that the agreement established between First Respondent and AMEC in fact obliged First Respondent to provide after-sales services such as to repair and to return the goods which had been produced by AMEC and sold to America by the First Respondent with the ETQ brand. Meanwhile, this obligation shall also be the legal obligation that the First Respondent shall assume. However, after assuming the obligation, the First Respondent of course has the right to recover the losses from AMEC and the Applicant. All of AMEC's products for sale in the U.S bear the ETQ brand on all the packages, the brands, the "Manual" and the "After-sale Service Manual" of the products and the guarantor was the First Respondent. It could also be seen on the homepage of AMEC that AMEC had been utilizing the sales and after-sales services network of the First Respondent to sell products in America and the First Respondent was its after-sales services provider as according to the parties' agreement. This illustrates that First Respondent assumed liability upon the request of AMEC according to their agreement. Therefore, the American customers requested that the First Respondent to provide after-sales services subject to the "Manual" and the "After-sale Service Manual" of the products or directly return the products to First Respondent. The First Respondent shall certainly have the right to recover the losses from AMEC after undertaking the repairs, replacement, return or compensation for damages subject to the agreement. Article 40 of the "Product Quality Law of the People's Republic of China" (the "Product Quality Law") provides that: "Sellers shall be responsible for repair, replacement or return and compensate for the damages done to end users or consumers if one of the following cases occurs:(1) Products do not have the property for use it should have and there is no advance disclosures;(2) The quality of products does not conform to the standards or to the standards specified in the packages;(3) The quality of products does not comply with the quality specified in the instruction for use or with the quality of samples provided. After the sellers undertake the repair, replacement, return or compensation for damages subject to the provisions of the preceding Paragraph, the sellers have the right to recover the losses from manufacturers or suppliers if the responsibility rests with the manufacturers or other sellers that provide the products. The ten contracts provided by the First Respondent had no relation to the First Respondent but the US Gardner Inc. still returned the goods with quality problems to the First Respondent. This indicated that

the First Respondent had to be liable not only for the goods sold by the First
Respondent itself but also for the goods sold directly by AMEC. The ten contracts
provided by the First Respondent could also prove that the goods sold by AMEC to
America (both to the First Respondent and to other American companies) were
utilizing the ETQ brand. Since AMEC utilizes the brand, AMEC should also assume
responsibility in assuring that the brand's quality guarantees are met. Article 40 of the
"Trademark Law of the People's Republic of China" (the "Trademark Law") provides
that:  "When using another's trademark with permission, the products bearing the
trademark must state the licenser's name and place of product origin. Licenser shall
monitor licensee's use of the trademark and its product quality. Licensee shall warrant
the quality of the products when using the trademark." If AMEC could not assume the
liability, the First Respondent shall certainly have the right to recover the losses from
AMEC after undertaking the repair obligations in order to protect its trademark.

The direct losses caused by the quality problems of the products to the First
Respondent were 2,291,985.24 US dollars (till May 2008). However, the indirect
losses to First Respondent's brand ETQ that was caused by the product quality
problems in terms of reputation and market share was immeasurable. AMEC shall at
least compensate the direct loss of the First Respondent and process the return of the
goods in stock. Since the First Respondent and AMEC commenced their business
relationship, the First Respondent undertook the repair, replacement, return or
compensation for damages subject to the agreement. Since 2005, however, the quality
problems became more serious, which lead to return, claim, cancellation of the
contract, unmarketable products backlogged in Party A's warehouse, and the
investment capital could not be recuperated; this caused massive damages.   This also
seriously influenced First Respondent's brand and market reputation. By the end of
2005, Mr. Wang Guoqing, chairman of AMEC at the time, went to the U.S.A for the
purpose of solving "AMEC's product quality problem causing damages to First
respondent" at First Respondent's urging. The parties signed the "Agreement" on
September 23rd 2006. The parties agreed in Paragraph 1 the agreement that: "Party A
claimed that there were problems on the products provided by the joint venture to
Party A, which had been confirmed by inspections of the products in stock. The
problems caused return, claim and the cancellation of the contract, which made the
products unmarketable and backlogged in Party A's warehouse. Party A's capital could
not be recuperated for an extended period of time causing great damages…" Further,
the attachment to the "Agreement," which is the "Return List," First Respondent
stated, "the exact number of abovementioned defective products is still being
tabulated."   These facts illustrate that AMEC recognized its serious product quality
problems and the substantial damage to the First Respondent as a result. The
"Agreement" also illustrated that the First Respondent would not claim damages by
AMEC for damages caused to First Respondent prior to September 23, 2006.
However the returned goods backlogged in the First Respondent's warehouse need to
be processed as returns and First Respondent would not assume any obligation.
However, after the "Agreement" was signed, AMEC refused to return the goods, and

caused the First Respondent to incur rolling repair fees, labor fee, and the storage fee totaling 2,291,985.24 US dollars between September 23, 2006 and May 2008 for the goods with quality problem. The loss to First Respondent's reputation and market brand from this incident cannot be evaluated.

The invoices submitted by First Respondent as evidence were repair fees, transportation, and storage fees incurred by First Respondent because of the product quality problems. This evidence was real, effective invoice issued by third parties and checks for rent payments. Without examining evidence in court, the statement by the representative of the Applicant that these invoices provided by the First Respondent were made unilaterally by the First Respondent was pure conjecture and without proof. The Applicant stated during the hearing that these payments were business activities in the U.S.A which had no concern with AMEC. However, there were lots of AMEC's defective goods backlogged in the First Respondent's storage, which had been inspected by Mr. Wang Guoqing, chairman of AMEC. The storage, transportation, and repair fees   were caused by the quality problems of AMEC's goods, not by the sales activities by the First Respondent. Therefore, the First Respondent shall have the right to recover these losses from AMEC. The Applicant shall at least pay 2,291,985.24 US dollars for direct damages to the First Respondent. Under the terms that AMEC pays damages, the First Respondent could return the goods to AMEC. However, AMEC shall assume the relevant expense.

Meanwhile, the First Respondent emphasized that AMEC had not noticed the First Respondent, who is one of the shareholders of the company, at the time of insolvency and the First Respondent applied for creditor's rights as soon as it found out about the situation on March 26, 2007. However, the Second Respondent was taking in custody and forced to sign the "Agreement" to solve the aforesaid problems on April 17, 2007; this caused First Respondent to fear reporting its creditors' rights. Therefore, the fault that the First Respondent had not applied for creditor's rights was on the Applicant and the Applicant should be held responsible for this The amount of 2,291,985.24 US dollars was calculated prior to arbitration; from May 2008 to December 2008 the First Respondent incurred an additional 543,434.75 US dollars for AMEC (including repair fee 77,135.66 US dollars, labor fee 231,373.34 US dollars and rent 234,925.75 US dollars).

The July 26, 2007 "Agreement" had been terminated. The First Respondent requested the arbitration court to make AMEC refund the 650,000 US dollars previously paid by the First Respondent. The statement by the Applicant that the 550,000 US dollars paid by First Respondent to AMEC was performance of the obligations under the July 26, 2007 "Agreement" had no bases for the following reasons: The first 100,000 US dollars, out of the 650,000 that First Respondent paid to AMEC, was paid on February 12, during the Spring Festival in China. To resolve AMEC's problem that its annual payments to the Accessory Factory for overtime was due at that time, it requested the First Respondent's rescue and wire emergency funds. According to AMEC's request,

21

the First Respondent loaned 100,000 US dollars to Changzhou AMEC Machinery and Equipment Co., Ltd. to resolve the pressing emergency. The second 300,000 US dollars was paid on April 27, 2007 by the command of the Second Respondent under duress of the Changzhou Public Security Bureau. The Second Respondent was released two days after the 300,000 US dollar was wired. This is absolutely not 300,000 U.S. dollars paid "according to agreement" by Party A as stated in the "Agreement." The third 250,000 US dollars was paid under the same conditions as the first 100,000 U.S. dollars, except more severe. It was during the Spring Festival in China and the workers at the Accessory Factory were demanding overtime; the matter escalated to the workers starting riots at the homes of AMEC's shareholders. At the request of AMEC's Liquidation Group, the First Respondent wired 250,000 US dollars as loan to help deal with the Accessory Factory's the annual overtime bonus emergency. The First Respondent now requests the Applicant to refund the three sets of payment, totaling 650,000 US dollars, to the First Respondent.

3. The arbitration counterclaim was regarding the jurisdiction of the parties' arbitration matters. The parties agreed in the July 26, 2007 "Agreement that: the Parties shall negotiate to solve any dispute arising from the agreement; if the Parties cannot reach an agreement the dispute shall be issued to China International Economic and Trade Arbitration Commission for arbitration;; arbitration location: Shanghai. The First Respondent believes that "arising from the agreement" shall include the dispute on validity and contents of the agreement, the dispute on whether the Applicant shall have the right to claim the over 600,000 US dollars, the dispute on whether there were quality problems on the goods, the dispute on whether there were losses to the First Respondent, and the dispute on whether the First Respondent shall be compensated. Because the arbitration counterclaim is from the First Respondent due to the dispute with the Applicant due to products, and the subject and legal fact of the counterclaim are same to the one in the arbitration request and cannot be severe from the "Agreement" signed on April 26, 2007, this matter shall be in the jurisdiction of the arbitration.

The First Respondent believes that the "Agreement" signed on July 26, 2007 shall be invalid because the "Agreement" was signed by the Second Respondent under duress and the "Agreement" had been terminated and never became effective. Therefore, the Second Respondent shall not assume any liability for guarantee.

## II. Opinions of the Arbitration Court

1. Regarding the jurisdiction of the arbitration court

The Applicant applied for the arbitration based on Paragraph 7 of the "Agreement" signed on July 26, 2007 by the Applicant and the two Respondents. The parties agreed in the paragraph: "the Parties shall negotiate to solve the dispute arising from this agreement; dispute shall be referred to China International Economic and Trade

Arbitration Commission for arbitration, if the Parties cannot reach an agreement; arbitration location: Shanghai." Subject to the agreement of the parties, the jurisdiction of the arbitration shall be limited on disputes from the performance of the July 26, 2007 "Agreement."

2. Regarding applicable law in this case

The arbitration court takes notice that the "Agreement" did not clearly provide for choice of law. However, the parties both quoted relevant opinions under Chinese laws during the arbitration. Whereas considering the "Agreement" was signed in China, which shall be the location with the closest contact and the parties had no problems on the other's quotation of the relevant opinions under Chinese laws, the arbitration court shall adjudicate this case under Chinese laws.

3. Regarding the legal validity of the July 26, 2007 "Agreement" in dispute in the current case

The parties held different opinions on the legal validity of the "Agreement" signed on July 26, 2007 during the arbitration. The Applicant maintained that the "Agreement", signed by the parties on July 26, 2007, was based on real intention of the three parties and signed after negotiation. Subject to Paragraph 1 of the contract, the second meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Bankruptcy Liquidation Group had approved the "Agreement"; moreover, the Respondent of this case had performed the obligation on payment, which should be considered as partial performance of the agreement. The Respondent reckoned that the "Agreement" signed on July 26, 2007 was signed by the second Respondent under duress. Further, only two short weeks after Applicant signed the "Agreement," meaning August 13, 2007, the Applicant violated the core tenets of the "Agreement," which is First Respondent pay AMEC 2,500,000 U.S. dollars for a one time resolution, and entrusted China Export Trust Insurance Co., Ltd to make the same claim against the First Respondent for 4,231,436.70 US dollars. First Respondent believed that such behaviors shall be deemed to be a breach of the core tenets of the "Agreement" and also an indication that the Applicant would not perform its obligations. Therefore the Respondent shall have the right to unilaterally terminate the agreement.

The arbitration court finds that the Second Respondent was under residential surveillance by Changzhou Public Security Bureau on April 17, 2007 was due to reasons outside of this case and was released on April 28, 2007. On April 26, 2007, the Applicant and the two Respondents signed the "Agreement". Paragraph 1 of the "Agreement" provides: "Party A (the First Respondent) shall pay 6272641 US dollars to Party B (the Applicant) for goods…", Paragraph 4 of the "Agreement" provides: "Party C (the Second Respondent) voluntarily warrant the performance of Party A and shall assume joint liability…" and Paragraph 5 of the "Agreement" provides: "This agreement shall become effective after approval by the meeting of Creditors of

23

Changzhou AMEC Eastern Tools and Equipment Co., Ltd...." The Applicant and the two Respondents made the disputed "Agreement" on July 26, 2007 because the last agreement had not been approved by the first meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Paragraph 1 of the "Agreement" provides: "This agreement shall be established after signature in recognition by Party A, B, and C. The agreement shall become effective after approval by the meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd." On December 27, 2007, the second meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. was held in the court of the Intermediate People's Court of Changzhou City on December 27, 2007 and had approved the "Agreement". The arbitration court finds that the disputed "Agreement" signed on July 26, 2007 conformed to the conditions which could make an agreement become effective.

The Respondent insisted during the hearing that the April 26, 2007 "Agreement" was signed by the Second Respondent under duress and the "Agreement" signed on July 26, 2007 was also signed by the Second Respondent under involuntary conditions and do not constitute a real agreement. The arbitration court takes notice that on April 27, 2007, which is the second day after the April 26, 2007 Agreement was signed, the First Respondent, as Party A, Changzhou AMEC Machinery and Equipment Co., Ltd., as Party B, and Changzhou AMEC Machinery and Equipment Import and Export Co., Ltd., as Party C, signed the "Supplemental Agreement." They agreed that: Party B and Party C promised to revoke the claim entrusted to China Export Trust Insurance Co., Ltd; Party C revoke the claim of the RMB 20,000,000 Yuan joint guarantee provided by Party A and Party C; Party A, Party B and Party C would no longer make claims against each other for civil and criminal accusation. The arbitration court finds that the "Supplemental Agreement," which stated that Part B and C shall revoke the claim by China Trust against First Respondent was favorable to the First Respondent without doubt. Meanwhile, the arbitration court takes notice that the Second Respondent had been released from residential surveillance for three months on July 26, 2007 when The Second Respondent signed the July 26, 2007 "Agreement." Moreover, during the signing, Paragraph 3 Provision 2 originally stated: "installment payments: shall begin on the opening date of Party B's meeting of creditors" but was changed to "installment payments: shall begin on the approval date of Party B's meeting of creditors." The arbitration court finds that the change made was also favorable to the First Respondent. The argument that the "Agreement" signed on July 26, 2007 was based on untrue intention of the Second Respondent was not supported by sufficient evidence. Meanwhile, the arbitration court also finds that the Respondent did not provide sufficient evidence to prove the accusation that the Applicant had entrusted China Export Trust Insurance Co., Ltd or any other entity to claim payment from Respondent. Whereas the Applicant had submitted the "Agreement" to the meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. for approval, even if the above mentioned facts were true, the effectiveness of the "Agreement" could not be jeopardized. Based on the facts and reasons aforesaid, the arbitration court maintained that the disputed "Agreement" signed on July 26, 2007

24

had been effective and had binding effects on the parties.

4. Applicant's Arbitration Requests

(1) Applicant's first arbitration request

The first arbitration request of the Applicant is that the First Respondent shall pay 5,622,641 US dollars and 123,979.23 US dollars in interest (the number is calculated to the application date and the actual amount shall be calculated to pay off date; it shall be calculated by two point one in ten thousand each day). The arbitration court finds that provision (1) in Paragraph 3 of the disputed July 26, 2007 "Agreement" provides: "Party A (the First Respondent) shall pay 6272641 US dollars to Party B (the Applicant) for goods. However, Party A maintained that the goods provided by Party B had product quality issues. Through negotiation between the parties, Party B agreed that Party A shall pay 2,500,000 US dollars (including the paid 100,000 US dollars and the 300,000 US dollars) to Party B for one time resolution due to the quality problems." The (3) in Paragraph 3 of the disputed "Agreement" signed on July 26, 2007 provides: "If Party A fails to pay the amount aforesaid on time, the total debt shall still be calculated by 6272641 US dollars." After the "Agreement" was signed, the First Respondent paid 250,000 US dollars to the Applicant on February 5, 2008. The arbitration court also finds that the First Respondent paid 100,000 US dollars to the Applicant on February 12, 2007. After the "Agreement" was signed on April 26, 2007, the First Respondent paid the first installment of 300,000 US dollars to the Applicant on April 27, 2007. After the disputed "Agreement" was approved by the second meeting of Creditors of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. and became effective, the Applicant gave notice requesting the First Respondent to perform the obligations on payment on December 29, 2007 and January 7, 2008. The Applicant also gave notice to the Second Respondent to provide performance guarantee for the liability on payment of the First Respondent and assume joint liability on December 29, 2007. However, the First Respondent only paid 250,000 US dollars to the Applicant on February 5, 2008. The Second Respondent did not provide performance guarantee.

The arbitration court finds that after signing the July 26, 2007 "Agreement," First Respondent has not fulfilled its obligations to fully pay the amount owed. Under provision (3) in paragraph 3, the amount owed by First Respondent shall be calculated according to 6,272,641 U.S. dollar, deducting 650,000 already paid. The First Respondent shall still pay 5,622,641 US dollars and the relevant interests after deduction of the paid 650,000 US dollars from the total amount 6,272,641 US dollars. Accordingly, the arbitration court supports the request of the Applicant on this issue.

(2) Applicant's second arbitration request

The second arbitration request of the Applicant is that the First Respondent shall pay

25

200,000 US dollars and 5,376 US dollars' interest (the number is calculated to the application date and the actual amount shall be calculated to the pay off date; it shall be calculated by two point one in ten thousand each day). During hearing, First Respondent maintained that he had already performed the duty of providing assets because his investment in terms of intellectual property was true.   Otherwise, AMEC could not produce any ETQ brand products for exporting to the U.S.A. The arbitration court finds that the question whether the investment was true was a dispute relating to the joint venture. However, the Applicant's request that the First Respondent shall pay the investment and relevant interests was based on Paragraph 5 of the "Agreement" signed on July 26, 2007. Therefore, this request shall be within the jurisdiction of the arbitration. According to Paragraph 5 of the "Agreement" signed on July 26, 2007, "Party A's intellectual property as registered establishment capital for Changzhou AMEC Eastern Tools and Equipment Ltd. Co. was untrue (evaluated at 200,000 U.S. dollars); Party had not in fact invested and shall pay 200,000 U.S. dollars by January 1, 2008."   The arbitration court finds that whereas the First Respondent failed to pay the investment by January 1, 2008, the request of the Applicant that the First Respondent shall still pay 200,000 US dollars investment and relevant interests is in accordance with the "Agreement" and is supported by the arbitration court.

(3) Applicant's third arbitration request

The third arbitration request of the Applicant is that the Second Respondent shall assume joint liability for the payment aforesaid. The arbitration court finds that subject to Paragraph 6 of the "Agreement", "Party C (the Second Respondent) voluntarily warrants the performance of Party A and shall assume joint liability." Whereas the First Respondent failed to pay the arrears and the investment, the arbitration court supports the request of the Applicant on this issue.

(4) Applicant's fourth arbitration request

The fourth arbitration request of the Applicant is that the two Respondents shall pay RMB 500,000 Yuan to the Applicant as reasonable costs for this arbitration. Whereas the Applicant had not provided enough evidence to prove such expense are reasonable, the arbitration court does not support the request of the Applicant on this issue.

(5) Applicant's fifth arbitration request

The fifth arbitration request of the Applicant is that the arbitration fee shall be assumed by the two Respondents. Subject to the obligation assuming condition, the arbitration court maintained that 20% of the arbitration fee shall be assumed by the Applicant and 80% of the arbitration fee shall be assumed by the two Respondents.

5. First Respondent's Arbitration Counterclaim Requests

(1) First Respondent's first arbitration counterclaim request

The First Respondent's first counter claim request is that the "Agreement" signed by the Applicant, the First Respondent and the Second Respondent on July 26, 2007 shall be invalidated. The arbitration court finds that there was insufficient evidence to support the statement that the disputed "Agreement" signed on July 26, 2007 was based on untrue intention of the Second Respondent. The arbitration court also finds that the Respondent did not provide evidence to prove the accusation that the Applicant had entrusted any entity or person to demand payment. Therefore the arbitration court holds that the disputed "Agreement" signed on July 26, 2007 had become effective and had binding effects on the parties. Meanwhile, the arbitration court adjudicates that the First Respondent shall perform the obligation on paying the arrears and the investment funds subject to the "Agreement"; the Second Respondent shall assume joint obligation. Therefore, the arbitration court does not support the counterclaim request of the First Respondent on this issue.

(2) First Respondent's second arbitration counterclaim request

The First Respondent's second arbitration counterclaim request is that the Applicant shall pay the First Respondent 2,291,985.24 US dollars of repair fee (including transportation fee), storage fee and labor fee which the First Respondent had advanced for the Applicant. The first Respondent maintained that there were quality problems on the products sold to the American company Gardner by AMEC. The ten contracts related to the sales of these goods had no relation to the First Respondent at all. However, Gardner Inc. returned the goods directly to the First Respondent because the "Contact" listed on the bill of lading was "Fan Guoxiang, U.S. Eastern" and the products sold by AMEC used the ETQ brand. Therefore, Mr. Wang Guoqing, legal representative and chairman of AMEC at that time, went to the U.S.A on September 2006 for the purpose of inspecting and checking the large quantities of returned products. On September 23, 2006, the parties signed the "Agreement" and agreed that the goods valued at over 6,270,000 US dollars shall be returned to AMEC. However, after the "Agreement" was signed, AMEC refused to accept the returned goods without justification. This caused the First Respondent to pay 2,291,985.24 US dollars for the repair fees, labor fees and storage fees for the goods with quality problem from September 23rd to May 2008 (including 77,135.66 U.S. dollars in repair fee, 231,373.34 U.S. dollars in labor fee, 234,925.75 in rent paid). The Respondent provided over eight-thousand pages of invoices and certificates to prove the repairs fee, labor fee and the storage fee. Meanwhile, the First Respondent also maintained that the "dispute arising out of the Agreement" shall include the dispute on validity and contents of the agreement, the dispute on whether the Applicant shall have the right to claim the over 6 million US dollars, the dispute on whether there were quality problems on the goods, the dispute on whether there were losses to the First Respondent and the dispute on whether the First Respondent shall be compensated. Therefore, all the counterclaims are the disputes between the First Respondent and the

Applicant, which shall be within the jurisdiction of the arbitration.

On the other hand, the Applicant replied that the Respondent had repeatedly mentioned the quality problems on the products provided by the Applicant. However, the Applicant maintained that the Respondent had yet to provide any certificates to prove the quality problem before and the test report issued by the relevant American quality supervision and inspection department. All the quality problems were just unilateral statements by the Respondent, as such they are unreliable and would not be recognized by the Applicant.   On or about September 2006, Mr. Wang, Guoqing went to the U.S.A as the legal representative of Changzhou AMEC Group Co., Ltd. not the legal representative of AMEC. All the expenses referred to by the Respondent, such as the storage fee, are the operation expenses of the Respondent, which should not be assumed by the Applicant. Further, all these so called repair fee, storage fee and labor fee are not related to the dispute in this case, which should not be in the arbitration jurisdiction of this case. Such expenses do not necessarily correspond to the products, as the Respondent could not prove that such expenses were used for the products in this case. To say the least, even assuming that such repair fee, storage fee and labor fee were to be assumed by the Applicant, the Respondent could only claim his rights as a creditor subject to Chinese laws and not arbitration in the present case.

The arbitration court finds that Paragraph 4 of the disputed July 26, 2007 "Agreement" provides: "Party A mentioned that products provided by Party B had quality problems. Party A shall provide proof of the quality problems before September 10, 2007 and Party A shall provide the test report issued by the relevant American quality supervision and inspection department before November 30, 2007." However the First Respondent provided neither certificates to prove the quality problem nor the test report issued by the relevant American quality supervision and inspection department, which is obviously not in accordance with the conditions set forth in the "Agreement" for claims against the Applicant. Meanwhile, although the First Respondent provided over 8,000 pages of invoices and certificates to prove the repair fee, labor fee and the storage fee for the goods with quality problems, it is difficult for the arbitration court to identify whether the cost recorded by those invoices and certificates were incurred for the goods with quality problems produced under the "Agreement" for repair fee, (including transportation fee), storage fee, and labor fee The arbitration court takes notice that during the hearing, the First Respondent claimed that it had sued in American court on the quality problems of the goods provided by the Applicant and the American court had accepted the case. The Applicant provided legal documents issued under case number CNRS907770 in the California courts (SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF SAN BERNADINO, RANCHO CUCAMONGA DISTRICT). The legal documents indicated that the Plaintiff was the First Respondent in this case and the Defendant was the Applicant in this case. The arbitration court also takes notice that the First Respondent has not claimed creditor's rights for the repair fee, storage fee and labor fee to the court after knowing the fact that AMEC has been adjudicated

28

Applicant, which shall be within the jurisdiction of the arbitration.

On the other hand, the Applicant replied that the Respondent had repeatedly mentioned the quality problems on the products provided by the Applicant. However, the Applicant maintained that the Respondent had yet to provide any certificates to prove the quality problem before and the test report issued by the relevant American quality supervision and inspection department. All the quality problems were just unilateral statements by the Respondent, as such they are unreliable and would not be recognized by the Applicant.   On or about September 2006, Mr. Wang, Guoqing went to the U.S.A as the legal representative of Changzhou AMEC Group Co., Ltd. not the legal representative of AMEC. All the expenses referred to by the Respondent, such as the storage fee, are the operation expenses of the Respondent, which should not be assumed by the Applicant. Further, all these so called repair fee, storage fee and labor fee are not related to the dispute in this case, which should not be in the arbitration jurisdiction of this case. Such expenses do not necessarily correspond to the products, as the Respondent could not prove that such expenses were used for the products in this case. To say the least, even assuming that such repair fee, storage fee and labor fee were to be assumed by the Applicant, the Respondent could only claim his rights as a creditor subject to Chinese laws and not arbitration in the present case.

The arbitration court finds that Paragraph 4 of the disputed July 26, 2007 "Agreement" provides: "Party A mentioned that products provided by Party B had quality problems. Party A shall provide proof of the quality problems before September 10, 2007 and Party A shall provide the test report issued by the relevant American quality supervision and inspection department before November 30, 2007." However the First Respondent provided neither certificates to prove the quality problem nor the test report issued by the relevant American quality supervision and inspection department, which is obviously not in accordance with the conditions set forth in the "Agreement" for claims against the Applicant. Meanwhile, although the First Respondent provided over 8,000 pages of invoices and certificates to prove the repair fee, labor fee and the storage fee for the goods with quality problems, it is difficult for the arbitration court to identify whether the cost recorded by those invoices and certificates were incurred for the goods with quality problems produced under the "Agreement" for repair fee, (including transportation fee), storage fee, and labor fee The arbitration court takes notice that during the hearing, the First Respondent claimed that it had sued in American court on the quality problems of the goods provided by the Applicant and the American court had accepted the case. The Applicant provided legal documents issued under case number CNRS907770 in the California courts (SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF SAN BERNADINO, RANCHO CUCAMONGA DISTRICT). The legal documents indicated that the Plaintiff was the First Respondent in this case and the Defendant was the Applicant in this case. The arbitration court also takes notice that the First Respondent has not claimed creditor's rights for the repair fee, storage fee and labor fee to the court after knowing the fact that AMEC has been adjudicated

28

bankrupt subject to the "Enterprise Bankruptcy Law of the People's Republic of China". To sum up, the arbitration court finds that there is not enough evidence to support the counterclaim request of the First Respondent on this issue, which cannot be supported by the arbitration court either.

(3) First Respondent's third arbitration counterclaim request

The First Respondent's third counterclaim request on arbitration is that the Applicant shall refund the 650,000 US dollars which had been paid to the Applicant by the First Respondent. Whereas the arbitration court had confirmed the effectiveness of the "Agreement" and had adjudicated that the First Respondent shall perform the obligation on paying the arrears and the investment subject to the "Agreement" and the Second Respondent shall assume joint obligation, the 650,000 US dollars which had been paid to the Applicant by the First Respondent shall be deducted from the arrears. Therefore, this arbitration counterclaim request of the First Respondent cannot be supported by the arbitration court.

(4) First Respondent's fourth arbitration counterclaim request

The First Respondent's fourth counterclaim request on arbitration is that the counterclaim fee shall be assumed by the Applicant. Whereas, none of the counterclaim requests on arbitration are supported, this arbitration counterclaim request of the First Respondent cannot be supported by the arbitration court either.

### III. Adjudication

1. The First Respondent shall pay 5,622,641 US dollars of arrears and certain interests (calculated based on the principal amount of 5,622,641 US dollars). The beginning day for calculation of interests shall be May 8th 2008. The First Respondent shall pay interests from the beginning date to the pay off date on the interest rate of two point one in ten thousand each day.

2. The First Respondent shall pay the principal and interest on the 200,000 US dollars investment capital, with the interest calculated based on the principal amount of 200,000 US dollars. The beginning date of calculation on the interests shall be May 8, 2008. The First Respondent shall pay interests from the beginning date to the pay off date, on the interest rate of two point one in ten thousand each day.

3. The Second Respondent shall assume joint liability on the payment in 1 and 2 aforesaid by the First Respondent.

4. The total arbitration fee in this case shall be RMB 591,640 Yuan. 20% of the arbitration fee, RMB 118,328 Yuan, shall be assumed by the Applicant; while 80% of the arbitration fee, RMB 473,312 Yuan, shall be assumed by the two Respondents.

29

The Applicant had paid RMB 591,640 Yuan in advance. Therefore, the two Respondents shall pay RMB 473,312 Yuan to the Applicant for their share of the arbitration fee.

5. The counterclaim fee of this case RMB 661,197 Yuan shall be assumed by the First Respondent, which shall be offset from the arbitration fee that the First Respondent already paid in advance.

6. Other requests of the Applicant are denied.

7. All the counterclaim requests of the First Respondent are denied.

The payments mentioned in above sections 1, 2, 3 and 4 shall be fully settled within 30 days after the adjudication becomes effective.

This adjudication shall be the final one, which shall become effective as soon as made.

(There are no main texts below)

(There are no main texts in this page.)

Chief  Arbitrator:    [Signature]

Arbitrator:         [Signature]

Arbitrator:          [Signature]

Shanghai, December 29th 2009
China International Economic and Trade Arbitration Commission [Seal]

## Abacus Consulting Services

401 N. Garfield Ave. Ste 1, Alhambra, CA 91801 Tel: 626-487-8909 Fax: 626-282-9252 Website:
http://www.certifiedjapanesetranslation.com/ Email: abacustranslation@gmail.com

### CERTIFICATION OF TRANSLATION

(Certified by Courts)

This is to certify under the penalty of perjury that I am a court certified interpreter in California with license number #301138 and I am fluent in Chinese (Mandarin) and English languages, that the document(s) listed as

1. Document Titled "Agreement (4.26.2007)"
2. Document Titled "China International Economic and Trade Arbitration Commission Arbitral Award (12.29.2009)"
3. Document Titled "Agreement (7.26.2007)"
4. Document Titled "Civil Judgment (7.21.2010"

is (are) complete and accurate translations of the original version to the best of my ability and knowledge

Signed on February 21, 2011in Los Angeles, California

Samuel Shen Chong
Federal Court Registered Interpreter (US District Courts)
CA Court Certified Interpreter (License No. 301138)
Abacus Consulting Services
401 N. Garfield Ave.
#1
Alhambra, CA 91801
Tel: 626-487-8909
Fax: 626-282-9252

# EXHIBIT  C

# 协 议 书

甲方：美国东方工具设备有限公司，住所地在美国加利福尼亚州 whittier Rivera 12220 号 B 座。

代表人范国祥（又名陈国祥）

乙方：常州亚美柯东方工具设备有限公司破产清算组（破产管理人），住所地在中国江苏省常州市钟楼经济开发区。

代表人戴旭初。

丙方：范国祥（又名陈国祥），身份证号：320622196302157656，住所地在中国江苏省如皋市石庄镇北大街 11 号。

　　甲乙丙三方于 2007 年 4 月 26 日就甲方欠乙方货款事宜达成协议书一份，甲方并已依该协议支付了 30 万美元，但由于常州亚美柯东方工具设备有限公司破产案第一次债权人会议讨论后表决未通过该协议，致该协议未生效。现经三方再次协商，就甲方欠乙方货款事宜达成协议如下。

　　一、本协议在甲乙丙三方签字认可后成立，在乙方将本协议提交常州亚美柯东方工具设备有限公司破产案债权人会议讨论、表决通过后生效、履行。

　　二、（1）债权人会议讨论、表决情况，由乙方在会议后五日内书面通知甲方和丙方。

　　（2）甲方和丙方确认通知地点等为：

甲方：地址 1040 Rockfeller Ave Ontario 、邮编 CA91761 、

电话 9093908989 、收件人 David Fan 、

丙方：地址 1040 Rockfeller Ave Ontario、邮编 CA91761 、

电话 9093908989 、收件人 David Fan 、

（3）乙方用特快专递（如上地址、邮编、收件人）书面发出通知后即视为甲方和丙方收到该通知。

（4）甲方和丙方如变更送达地址的，应当及时以书面方式告知乙方。因甲方和丙方提供、确认的上述送达地址不准确、送达地址变更未及时告知、受送达人本人或者受送达人指定的代收人拒绝签收，导致通知等文书未能被甲方和丙方实际接收的，退回之日视为送达之日。

上述（2）（3）（4）在本协议事项全部了结前有效。

三、

（1）甲方累计结欠乙方货款计 6272641 美元，由于甲方提出乙方原所供货物存在质量等问题，经甲乙双方协商，乙方同意由甲方支付 250 万美元后作一次性了结（该 250 万美元包括在此前已支付的 10 万美元、30 万美元）。

（2）上述 210 万美元由甲方分期支付。分期支付办法为：以乙方债权人会议召开日为基准日起算，第一、第二、第三、第四、第五第六个 30 日内各付 35 万美元。

乙方债权人会议召开日由乙方在上述二（1）中一并通知。

上述期间的期日起、止，如系法定假日、银行不营业日等均不顺

2

延，即如到期日为法定假日等甲方应在法定假日前支付到乙方（帐户）。

（3）如甲方不能按期足额支付上述欠款，则甲方所欠总额仍按6272641美元计算。

四、甲方所提的乙方所供产品的质量问题，甲方应在2007年9月10日前向乙方提交产品质量不合格的证明，甲方并应在2007年11月30日前向乙方提交美国有关产品质量监督检测部门出具的检测报告。

五、常州亚美柯东方工具设备有限公司注册成立时甲方作为出资的知识产权不实（原作价20万美元），甲方未实际投入，甲方应于2008年1月1日前支付20万美元，补足其应投入的注册资本金。

六、丙方自愿为甲方上述义务提供履约保证，承担连带责任。

七、本协议如在履行中发生纠纷，由三方协商解决；协商不成，则在中国国际经济贸易仲裁委员会仲裁，仲裁地：中国上海。

八、乙方收款帐户

户名：常州亚美柯东方工具设备有限公司破产清算组

开户行：工商银行常州武进区支行

帐号：1105021639001104661

（以下无正文）

甲方：

乙方：



3

丙方：

2007 年 7 月26日

# EXHIBIT D

# Agreement

**Party A:** U.S. Eastern Tools and Equipment Inc., located at 12220 Whittier Rivera Building B California, U.S.A
**Legal Representative:** Fan, Guoxiang (Chen, Guoxiang)

**Party B:** Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Bankruptcy Liquidation Group (Bankruptcy Administrator), located at Zhonglou Economic Development Zone, Changzhou, Jiangsu Province, China
**Legal Representative:** Dai Xuchu

**Party C** (Guarantor): Fan, Guoxiang (Chen, Guoxiang), ID Number: 320622196302157656, resides at 11, North Street, Shi Zhuang Town, Ru Gao, Jiangsu Province

On April 26th, 2007, Parties A, B and C made an Agreement regarding the monies owed by Party A to Party B for merchandise; Party A had also made a payment of US$300,000 according to the agreement. However, the Agreement was not approved at the First-Time Creditors Meeting of Changzhou AMEC Eastern Tools and Equipment Co., Ltd.'s Bankruptcy Case, which resulted in the ineffectiveness of the Agreement. After another negotiation by the three parties, the following Agreement was reached and approved by the First-Time Creditors Meeting of Changzhou AMEC Eastern Tools and Equipment Co., Ltd.'s Bankruptcy Case in terms of the monies owed by Party A to Party B for merchandise:

I. The agreement shall be established with joint signatures by Party A, Party B and Party C. Party B shall submit this Agreement to the Creditors' Meeting of Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Bankruptcy Liquidation Group for discussion and voting. When passed, the Agreement shall enter into effect and be performed.

II. (1) Party B shall notify Party A and Party C in written form of the results of the discussions and voting by the Creditors' Meeting within 5 days after the meeting.

(2) Party A and Party B confirm the notification addresses shown as follows:

Party A: Address: 1040 Rockfeller Ave, Ontario Zip Code: CA91761
Telephone: 9093908989                 Recipient: David Fan

Party C: Address: 1040 Rockfeller Ave, Ontario Zip Code: CA91761
Telephone: 9093908989                 Recipient: David Fan

(3) The notice shall be deemed to be received by Party A and Party C after Party B had delivered the notice by Express Mail (Address, Post Code and Recipient )

(4) In case Party A and Party C change the delivery addresses, Party B shall be notified in

1

writing. Since the abovementioned delivery address was provided and confirmed by Party A and Party C, the return date shall be deemed to be the delivery date if the notice had not been received by Party A and Party C due to incorrect addresses, changes to the addresses that were not received by Party C in time, or if the representative of the recipient refused to sign and receive the notice.

The abovementioned sections (2) (3) (4) shall be effective prior to the complete resolution of all other issues under the agreement.

III.

(1) Party A owed a total of US$6,272,641 to Party B for merchandises; since Party A put forth product quality issues regarding the merchandises provided by Party B, Parties A and B agreed after mutual negotiations that Party B shall conclude the matter after Party A shall make a payment of US$2,500,000 (including the payments of US$100,000 and the US$300,000 which had already been made).

(2) The abovementioned balance of US$2,100,000 shall be paid by installments. The installments shall be paid according to the following: starting from the ~~meeting date~~ approval date of the Creditors' Meeting of Party B, an equal amount of US$350,000 shall be paid in the first, second, third, fourth, fifth and sixth 30-day period.

The beginning date of Party B's Creditors' Meeting shall be notified by Party B in abovementioned section II (1).

The start and end of the abovementioned dates shall not be extended due to any legal holiday or the bank's non-business day, which means if the payment date is a legal holiday, Party A shall make the payment to Party B (bank account) before that holiday.

(3) If Party A fails to pay the complete amount according to the abovementioned terms, the total amount owed shall still be regarded as US$6,272,641.

IV.. Regarding the product quality issues put forward by Party A against Party B, Party A shall provide to Party B evidence of the merchandises' non-compliance before September 10th 2007; further Party A shall provide inspection reports issued by the relevant quality control and inspection department in the U.S. by November 30th 2007.

V. The intellectual property rights (originally evaluated at US$200,000) provided by Party A as investment as specified in the Joint Venture Constitution and Agreement were found untrue and was actually not invested accordingly. Therefore, Party A shall make a payment of US$200,000 before November 30th 2007 to supplement the registered capital that was supposed to be made.

VI. Party C voluntarily warrants Party A's performance of the agreement and

accordingly bears joint liabilities.

VII. The Parties shall solve any dispute through negotiation. If a settlement cannot be made through negotiation, the dispute shall be submitted to China International Economic and Trade Arbitration Commission for arbitration. The arbitration location shall be in Shanghai, China.

8. Party C's Receiving Account

Account Name: Changzhou AMEC Eastern Tools and Equipment Co., Ltd. Bankruptcy Liquidation Group

Bank: Industrial and Commercial Bank of China Changzhou New District Branch

Account: 1105021639001104661

(There is no main text below)

Party A: (Signature)

Party B: (Seal)

Party C: (signature)

July 26th 2007

3

## Abacus Consulting Services
401 N. Garfield Ave. Ste 1, Alhambra, CA 91801 Tel: 626-487-8909 Fax: 626-282-9252 Website:
http://www.certifiedjapanesetranslation.com/ Email: abacustranslation@gmail.com

### CERTIFICATION OF TRANSLATION
(Certified by Courts)

This is to certify under the penalty of perjury that I am a court certified interpreter in California with license number #301138 and I am fluent in Chinese (Mandarin) and English languages, that the document(s) listed as

1. Document Titled "Agreement (4.26.2007)"
2. Document Titled "China International Economic and Trade Arbitration Commission Arbitral Award (12.29.2009)"
3. Document Titled "Agreement (7.26.2007)"
4. Document Titled "Civil Judgment (7.21.2010"

is (are) complete and accurate translations of the original version to the best of my ability and knowledge

Signed on February 21, 2011in Los Angeles, California

Samuel Shen Chong
Federal Court Registered Interpreter (US District Courts)
CA Court Certified Interpreter (License No. 301138)
Abacus Consulting Services
401 N. Garfield Ave.
#1
Alhambra, CA 91801
Tel: 626-487-8909
Fax: 626-282-9252

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Virginia A. Phillips and the assigned discovery Magistrate Judge is David T. Bristow.

The case number on all documents filed with the Court should read as follows:

### EDCV11- 354 VAP (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [X] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
LEE TRAN & LIANG APLC
  Enoch Liang (212324)
  Daniel Yu (245091)
601 South Figueroa Street, Suite 4025
Los Angeles, CA 90017 / tel:  213-612-3737

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Changzhou AMEC Eastern Tools and Equipment Co., Ltd. | CASE NUMBER |
| PLAINTIFF(S) | EDCV11-0354  VAP  (DTBx) |
| v. | |
| Eastern Tools & Equipment, Inc, a California corporation, and Guoxiang Fan, an individual, | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Lee Tran & Liang, Enoch Liang_____, whose address is 601 South Figueroa Street, Suite 4025, Los Angeles, CA 90017_____.   If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____March 2, 2011_____      By: _____

CHRISTOPHER POWERS

Deputy Clerk

*(Seal of the Court)*

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Changzhou AMEC Eastern Tools and Equipment Co., Ltd. | Eastern Tools & Equipment, Inc., a California corporation, and Guoxiang Fan, an individual |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Lee Tran & Liang (Enoch Liang and Daniel Yu)<br>601 South Figueroa Street, Suite 4025, LA, CA 90017 / 213-612-3737 | Attorneys (If Known)<br>Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes   ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No    ☑ MONEY DEMANDED IN COMPLAINT: $ 5,892,245

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
9 U.S.C. Section 201 - New York Convention to confirm and enforce a foreign arbitral award

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☑ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

EDCV11-0354

FOR OFFICE USE ONLY:    Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| n/a | Changzhou City, Jiangsu Province, People's Republic of China |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| n/a | The arbitral award was awarded in Shanghai, People's Republic of China |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date  March 2, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |