LEE, TRAN & LIANG A Professional Law Corporation
  Enoch H. Liang (CA Bar No. 212324)
  Daniel Yu (CA Bar No. 245091)
601 South Figueroa Street, Suite 4025
Los Angeles, CA 90017
Tel: 213-612-3737
Fax: 213-612-3773
Email:  ehl@ltlcounsel.com // dy@ltlcounsel.com

Attorneys for Plaintiff Dai Xuchu, as bankruptcy administrator for
Changzhou AMEC Eastern Tools & Equipment Co., Ltd., and for
Counterdefendant Changzhou AMEC Eastern Tools & Equipment Co., Ltd.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| XUCHU DAI, as the bankruptcy administrator for CHANGZHOU AMEC EASTERN TOOLS AND EQUIPMENT CO., LTD.<br><br>        Plaintiff,<br><br>        v.<br><br>EASTERN TOOLS & EQUIPMENT, INC.,  a California corporation, and GUOXIANG FAN, an individual,<br>        Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No.  EDCV11-0354 VAP (DBTx)<br><br>**PLAINTIFF XUCHU DAI'S MOTION TO CONFIRM FOREIGN ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT THEREON**<br><br>[PURSUANT TO NEW YORK CONVENTION, 9 U.S.C. Section 201, *et. seq.*]<br><br>[Declarations Enoch H. Liang and James V. Feinerman and Proposed Judgment Filed Concurrently Herewith]<br><br>The Honorable Virginia A. Phillips<br><br>    *[Hearing Date to be Set by Court]* |

# **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ................................................................................1

II.   STATEMENT OF FACTS ..................................................................3

    A.    Background Facts regarding the Relevant Agreements.........................3

        1.    Pre-2007 Settlement Negotiations ...............................3

        2.    February 2007 Bankruptcy .........................................4

        3.    April 2007 Arrest, Negotiations, and Agreement......................4

        4.    The July 2007 Agreement..........................................5

    B.    Defendants' Collateral Attacks to the CIETAC Arbitration and the Arbitration Itself ...............................................6

        1.    Defendants' First Collateral Attack—in the Nantong Court........7

        2.    Defendants' Counterclaims and Participation in CIETAC ..........7

        3.    The Parties' Settlement Discussions after the CIETAC Hearing...............................................8

        4.    The CIETAC Award........................................9

        5.    Defendants' Second Collateral Attack—in the Shanghai Court ...............................................9

    C.    Plaintiff's Itemized Statement of Damages .........................10

III.  ARGUMENT ...............................................................................10

    A.    There is a Strong Public Policy in Favor of Enforcement of Foreign Arbitration Awards under the NY Convention .......................10

    B.    The Burden of Proof is on Defendants .........................11

    C.    Defendants Cannot Meet Their Burden of Proof—Hence, the Arbitration Award Should be Confirmed ............................12

        1.    As a Legal Matter, the Issue of Whether the July 2007 Agreement Is Enforceable Is an Issue to Be Determined by the Arbitrators—not this Court...................................13

        2.    As a Factual Matter, Irrespective of What Happened in April 2007, Defendants Freely Entered into the July 2007 Agreement...............................................14

        3.    Defendants Waived Objecting to the Enforceability of the July 2007 Agreement ...............................................15

4.   The Act of State Doctrine Precludes a Finding of Duress .........16

IV.   CONCLUSION ................................................................................19

PLAINTIFF'S MOTION TO CONFIRM ARBITRARTION AWARD

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Admart AG v. Stephen & Mary Birch Foundation, Inc.*,
     457 F.3d 302, 311 (3d Cir. 2006) ................................................................. 11

*Banco Nacional de Cuba v. Sabbatino*,
     376 U.S. 398,401 (1964) ........................................................................... 18

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
     622 F.3d 996, 1000 (9th Cir. 2010) ........................................................... 13

*Buckeye Check Cashing v. Cardegna*,
     546 U.S. 440 (2006) ................................................................................... 13

*China Nat'l Metal Products Import/Export Co. v. Apex Digital, Inc.*,
     379 F.3d 796, 799 (9th Cir. 2004) .............................................................. 11

*Glen v. Club Mediterranee, S.A.*,
     450 F.3d 1251, 1253 (11th Cir. 2006) ........................................................ 18

*Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*,
     969 F.2d 764, 770 (9th Cir. 1992) .............................................................. 10

*Plechner v. Widener College, Inc.*,
     418 F.Supp. 1282, 1294 (E.D.Pa. 1976) .................................................... 17

*Republic of Nicaragua v. Standard Fruit Co.*,
     937 F.2d 469, 478 (9th Cir. 1991) .............................................................. 10

*Riley v. Kingsley Underwriting Agencies, Ltd.*,
     969 F.2d 953, 958 (10th Cir. 1992) ............................................................ 10

*Transmarine Seaways Corporation of Monrovia v. Marc Rich & Co. A.G.*,
     480 F.Supp. 352, 358-59 (S.D.N.Y. 1979) ............................................... 11

*W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l.*,
     493 U.S. 400 (1990) ................................................................................... 18

*Wall Street Assocs., L.P. v. Becker Paribas Inc.*,

    27 F.3d 845, 849 (2nd Cir. 1994)...................................................................11

**<u>Statutes</u>**

9 U.S.C. § 201....................................................................................................11

9 U.S.C. § 203....................................................................................................11

9 U.S.C. § 207....................................................................................................11

Convention Article V.1.......................................................................................12

# I.  __INTRODUCTION__

Pursuant to the Court's March 29, 2012 Order, Plaintiff Xuchu Dai (as bankruptcy administrator for Changzhou AMEC Eastern Tools & Equipment Co., Ltd., hereafter "Plaintiff" or "AMEC") submits his moving papers to confirm the December 29, 2009 Arbitration Award issued by the China International Economic and Trade Arbitration Commission ("CIETAC").  CIETAC, one of the world's major arbitration institutions, arbitrated the dispute between AMEC and the Defendants based on a July 26, 2007 Agreement between the parties.

Defendants resist confirmation by arguing that the July 2007 Agreement was procured by duress.  But, the three CIETAC arbitrators unanimously rejected Defendants' argument in December 2009.  In July 2010, so did the Shanghai Intermediate People's Court No. 2, where the Defendants attempted to vacate the CIETAC Arbitration Award on the same grounds.  Now, Defendants try yet again, seeking their third bite at the apple.  Defendants cannot meet their heavy burden to resist confirmation for the following reasons.

First:  As a threshold legal matter, the U.S. Supreme Court and the Ninth Circuit held that when a party challenges an arbitration clause *standing alone*, then that is a question to be decided by the Court.  However, the high court and Ninth Circuit made clear that if a party argues that the contract *as a whole is unenforceable*, then the arbitrators decide the validity of the contract as a whole.  Here, it is clear that Defendants allege that the *entire* July 2007 Agreement is invalid for duress.  The CIETAC panel exercised their exclusive power in this regard, entertained the parties' arguments, and upheld the validity of the Agreement.  Under relevant case law, this Court should show deference to the CIETAC ruling.  The Award should be confirmed on this ground alone.

Second:  As a legal matter, Defendants waived objecting to the enforceability of the July 2007 Agreement.  Defendants initially challenged the CIETAC arbitration by initiating a collateral attack on the July 2007 Agreement in the

Nantong Intermediate People's Court.  Ultimately, Defendants voluntarily withdrew that challenge and proceeded to the CIETAC Arbitration.

At the CIETAC Arbitration, Defendants (i) selected an arbitrator, (ii) were represented by counsel; (iii) asserted counterclaims; and (iv) even entered into a mediation and settlement agreement (which ultimately never became effective). Defendants have therefore waived any objections to the CIETAC award.

Third:  As a factual matter, Defendants cannot show duress with respect to the July 2007 Agreement.  Though Defendant Fan was under residential surveillance in April 2007 on suspected contract fraud (by the Changzhou police), there is no dispute that Defendant Fan was not in custody in July 2007.

Indeed, the following facts show that Fan cannot show duress in July 2007: (i) he was not in custody – nor was he under the threat of renewed custody since he had already received proper discharge papers; (ii) he negotiated and made changes to the July 2007 Agreement before signing it; (iii) he was free to (and in fact did) travel throughout China prior to July 2007; and (iv) he was even free to leave China—going to Hong Kong and/or returning to the US to join his wife and children, where they had lived for over a decade.  Fan did none of those things, instead choosing to stay in China and choosing to sign the July 2007 Agreement.

Moreover, as a substantive matter, the July 2007 Agreement was quite similar to previous settlement discussions between the parties.  There was no duress.

Fourth:  The "Act of State" doctrine precludes a finding of duress here.  In order to establish duress, among other elements, Defendants have to establish a "wrongful act."  Here, the only "wrongful act" that Defendants allege is Defendant Fan being placed in "residential surveillance" in April 2007.  Assuming *arguendo* that the April 2007 timeframe were even relevant, that detention by the Changzhou police was an "Act of State" that this Court should not pass judgment upon.  Indeed, that April 2007 detention was a legitimate exercise of police power in China, who have proper jurisdiction to investigate suspected economic crimes, including

contract fraud.   Upon Fan's release, he received proper discharge paperwork, including a Notification of Release.   Fan was even given official notice of the closing of the investigation by the Changzhou police.   As such, these acts by the Chinese police cannot and should not be held as "wrongful" by this Court.

The CIETAC Arbitration Award should be confirmed.

## II.    STATEMENT OF FACTS

### A. Background Facts regarding the Relevant Agreements

Since 2003, AMEC and Defendant Eastern Tools & Equipment, Inc.  ("US Eastern") transacted business, whereby AMEC would supply power generators and other equipment to US Eastern, who would in turn distribute the products in the United States.[1]  [*See* Declaration of Enoch H. Liang ("Liang Decl."), Exh. 5 (Arbitration Award, p. 15); Liang Decl., Exh. A (Fan Tr., 28:12-29:19; 38:21-39:12)]. Defendant David Fan ("Fan") was at all relevant times the President and/or CEO of US Eastern.  [Liang Decl., Exh. A (Fan Tr., 27:1-17)].

In the 2005-2006 timeframe, a dispute arose between the parties over outstanding invoices for products supplied by AMEC to US Eastern.   AMEC claimed that US Eastern owed it over $6.2M USD in outstanding invoices.  US Eastern refused to pay, claiming that the products supplied by AMEC were defective.  [Liang Decl., Exh. 5 (Arbitration Award), pp. 16-17].

### 1. Pre-2007 Settlement Negotiations

The parties to this matter—together with other AMEC shareholders (who are not parties to the instant action)—entered into several rounds of negotiations.

For example, in December 2006, Eastern agreed to pay AMEC $2M USD to satisfy the outstanding invoices; in return, Defendant Eastern would remain a

---

[1] In fact, US Eastern was one of the shareholders in Plaintiff AMEC, a joint venture. [Liang Decl., Exh. A (Fan Tr., 38:21-39:12); Liang Decl. Exh. B (Dai Tr., 20:24-21:7)].

shareholder in Plaintiff Changzhou AMEC.  [Liang Decl., Exh. A (Fan Tr., 59:19-60:19); Liang Decl., Exh. 3 (Dec. 2006 Settlement Agreement)].   According to Fan's lawyers at the CIETAC arbitration, this December 2006 settlement agreement was not signed because it was the end of the year, and all parties ran out of time prior to the New Year.  [Liang Decl., Exh. 5 (Arbitration Award, p. 8)].

## 2. February 2007 Bankruptcy

In or about February 2007, after receiving no payments from Eastern, AMEC filed for bankruptcy protection in China.  In the bankruptcy proceedings, Mr. Xuchu Dai was appointed the bankruptcy administrator for AMEC.  [*See* Nov. 18, 2011 Declaration of Xuchu Dai, Dkt. No. 44 ("Dai Decl."), at ¶1].

## 3. April 2007 Arrest, Negotiations, and Agreement

In April 2007, the Changzhou Public Security Bureau ("Changzhou Police") placed Fan under residential surveillance upon suspicion of contract fraud.  [Liang Decl., Exh. A (Fan Tr., 94:11-96:4)].   Though the parties' versions of what happened next differ, in the end, Fan signed an agreement to pay $2.5M USD to Plaintiff (over the course of 7 months) in order to satisfy the outstanding invoices, plus an additional $200,000 as a capital contribution to AMEC.  [Liang Decl. Exh. 9 (April 2007 Agreement)].  In return, AMEC agreed to waive the remaining amount due under the outstanding invoices (approximately $3.7M USD).  [*Id.*].

Fan admits that he negotiated the $2.5 million amount, the payment plan, and the amount of the first payment ($300,000).  In Fan's own words, at 88:3-25 [Liang Decl., Exh. A (Fan Tr.)]:

> Q. Would you agree with me that Exhibit 8 has the $2.5 million over a payment plan, instead of all at once; correct?
>
> MR. BELL: Objection; the documents speaks for itself.
>
> MR. LIANG: You can answer.
>
> THE WITNESS: Correct.
>
> Q.  BY MR. LIANG: Okay. And did you ask for a payment plan because you did not have $2.5 million on hand right away?

A. They requested me to pay more for the first payment, and then I responded that I did not have that much money, and they said that they will just average out for the future payments.

Q. So they initially wanted you to pay a more higher percentage of the $2.5 million on the first payment; correct?

A. Yes.

Q. And then when you told them that you couldn't afford to pay so much on the first payment, then it was determined that you would pay $300,000 in the first payment; correct?

A. Correct.

Like previous agreements, the April 2007 Agreement provided for arbitration before CIETAC should any disputes arise.  [Liang Decl., Exh. 9, ¶6].  Fan himself asked for this arbitration provision, choosing Shanghai as the locale in order to avoid local protectionism. [Liang Decl., Exh. B (Dai Tr., 93:20-94:18)].  However, the April 2007 Agreement would only be effective upon approval by AMEC's Creditor's Committee. [Liang Decl., Exh. 9, ¶5].

Pursuant to this April 2007 Agreement, the parties do not dispute that Eastern paid the first $300,000 USD in April 2007.

### 4.  The July 2007 Agreement

From April to July 2007, Fan was not under residential surveillance and in fact received release papers showing that the residential surveillance had ended. [Liang Decl., Exh. A (Fan Tr., 100:1-23).]  Thereafter, Fan freely traveled in China, visiting different factories and manufacturers.  [Liang Decl., Exh. A (Fan Tr., 102:5-14)].  And, Fan could have also easily left China if he wished, going for example, to Hong Kong.  [Liang Decl., Exh. C (Wu Tr., 49:16-50:17); Liang Decl., Exh. D (Zhu Tr., 32:18-33:18)].

However, in June 2007, the April 2007 agreement failed to be approved by AMEC's Creditors' Committee, who thought that US Eastern should pay more than $2.5 million.  [Liang Decl. Exh. B (Dai Tr., 74:5-76:12)].

Thereafter, on July 26, 2007, Fan again signed an agreement with AMEC whereby US Eastern again agreed to pay $2.1 million USD over the course of 6 months (Eastern had previously paid $400,000 USD).  [Liang Decl., Exh. 13, ¶3].  US Eastern also agreed to make an additional $200,000 capital contribution by November 30, 2007, for a total of $2.3M USD.  [Liang Decl., Exh. 13, ¶5].

In return, AMEC agreed to waive the remainder of the outstanding $6.2M USD invoices. [Liang Decl., Exh. 13, ¶3].  Should Defendants fail to make these payments, then they would owe Plaintiff AMEC the full $6.2 million amount.  [*Id.*]  Fan admittedly made hand-written changes to the July 2007 Agreement before signing it.  [Liang Decl., Exh. 5 (Arbitration Award, pp. 11 and 39); Liang Decl., Exh. A (Fan Tr., 108:25-110:1)].

The July 2007 Agreement also provided for arbitration before CIETAC should any disputes arise.  [Liang Decl., Exh. 13, ¶7].  However, like the April 2007 Agreement, the July 2007 Agreement would only be effective upon approval by AMEC's Creditor's Committee.  [*Id.*]

**B.** **Defendants' Collateral Attacks to the CIETAC Arbitration and the Arbitration Itself**

In December 2007, the Creditor's Committee for AMEC approved the July 2007 Agreement.  [Liang Decl. Exh. B (Dai Tr., 82:25-83:13; Liang Decl. Exh. A (Fan Tr., 115:15-116:13)].  Despite repeated demands for payment, US Eastern only made one $250,000 USD payment to AMEC in February 2008.  [Liang Decl. Exh. A (Fan Tr., 116:14-117:3)].   Fan does <u>not</u> claim that he was under duress in February 2008.  [*Id.*]

Thereafter, US Eastern refused to make any further payments.  Having no other option, in May 2008, AMEC initiated arbitration before a three-person CIETAC panel against Defendants.  AMEC claimed that Defendants breached the July 2007 Agreement by failing to make payments, and sought the full $6.2M in

outstanding invoices (minus credit for the $650,000 in payments already made by US Eastern to AMEC).  [Liang Decl. Exh. 5 (Arbitration Award, pp. 1-2 and 5-6)].

## 1. Defendants' First Collateral Attack—in the Nantong Court

In December 2008, Defendants Eastern and Fan responded to Plaintiff's arbitration request by attacking the validity of the July 2007 Agreement.  [Liang Decl. Exh. 5 (Arbitration Award, p. 2)].  Defendants filed a challenge with the Nantong Intermediate People's Court of the People's Republic of China, arguing that Fan was placed under residential surveillance by the Public Security Bureau (the Chinese police, or "PSB") for 10 days in April 2007, during which time Fan was not free to go.  [Liang Decl. Exh. A (Fan Tr., 118:12-119:9); Liang Decl. Exh. 5 (Arbitration Award, p. 2)].

Fan testified before the Nantong Court in April 2009 regarding his claims of duress.  [Liang Decl. Exh. A (Fan Tr., 119:24-120:3)].  Then, in late April 2009, Fan withdrew his challenge in the Nantong Court.  [Liang Decl. Exh. A (Fan Tr., 121:24-122:13); Liang Decl. Exh. 16 (Nantong Court Ruling); Liang Decl. Exh. B (Dai Tr., 103:23-104:17).]

## 2. Defendants' Counterclaims and Participation in CIETAC

After withdrawing their challenge in the Nantong Court, Defendants chose to participate in the CIETAC arbitration, being represented by at least 3 separate law firms.  [Liang Decl. Exh. A (Fan Tr., 117:4-118:10).]  For example, Defendants selected one member of the three-person arbitration panel.  Indeed, two of the three arbitrators—SUN Nanshen (selected by Plaintiff) and ZHANG Yuqing (jointly selected by the Defendants)—are well-known and respected arbitrators in the international arbitration community.  [*See* Declaration of Professor James V. Feinerman ("Feinerman Decl."), ¶¶52-57] [Liang Decl., Exh. 5 (Arbitration Award at 2)].

Defendants also asserted counterclaims in the arbitration against AMEC, asking for $2.942 million.  [Liang Decl. Exh. 5 (Arbitration Award, p. 11)].

Defendants' counterclaims consisted of $2.292 million (to reimburse Defendants for their repair and storage costs for the allegedly defective products supplied by AMEC) and for the return of an additional $650,000 (as a refund for monies that Defendants had paid AMEC previously).  [Liang Decl. Exh. 5 (Arbitration Award, p. 11)].

On July 17, 2009, Plaintiff and the Defendants (through their counsel) appeared at CIETAC Shanghai for arbitration of their dispute.  [Liang Decl. Exh. 5 (Arbitration Award, p. 3)].  Though Fan was not present, Defendants concede that they gave powers of attorney to their counsel to represent them during the CIETAC arbitration.  [Liang Decl. Exh. A (Fan Tr. 63:14-19).]

The CIETAC arbitrators noted that all parties' counsel made arguments, answered the Panel's questions, and cross-examined the evidence.  [Liang Decl. Exh. 5 (Arbitration Award, p. 3)].  Moreover, during the arbitration, Defendants' counsel "confirmed in open court that they will no longer challenge the jurisdiction of [CIETAC Shanghai] on the case."  [Liang Decl. Exh. B (Dai Tr., 115:1-116:18); Liang Decl. Exh. 5 (Arbitration Award, p. 3) ("Respondents confirmed and said they would not raise objection to the jurisdiction of the [CIETAC Shanghai] over this case before the Tribunal")].

### 3.  **The Parties' Settlement Discussions after the CIETAC Hearing**

After the July 17, 2009 arbitration hearing, the parties reached a settlement agreement, whereby Defendants agreed to pay to AMEC $1.5 million in installments.  This was a total settlement of $2.15 million (including the $650,000 previously paid by US Eastern).  [Liang Decl. Exh. B (Dai Tr., 107:10-111:4); Liang Decl. Exh. 5 (Arbitration Award at 3); Liang Decl. Exh. 18 (July 2009 Settlement Agreement)].  However, because Defendants' lawyers failed to sign the settlement agreement in a timely manner, Plaintiff elected to proceed and obtain a judgment from the CIETAC arbitrators.  [*Id.*, Exh. B (Dai Tr. 107:10-111:4).

### 4.  **The CIETAC Award**

After counsel for both sides submitted their closing briefs, the CIETAC arbitrators issued their decision in December 2009.  The Panel denied granted all of Plaintiff's claims and denied all of Defendants' counterclaims, in ruling as follows:

- Defendant Eastern was to pay $5,622,641 (plus interest at a rate of 7.56% APR, to be calculated starting from May 8, 2008) to Changzhou AMEC;

- Defendant Eastern was to pay $200,000 (plus interest at a rate of 7.56% APR, to be calculated starting from May 8, 2008) to Changzhou AMEC;

- Defendant Fan was to be jointly liable with Eastern for the foregoing payments;

- Defendants Eastern and Fan were to pay RMB 473,312 to Changzhou AMEC for costs incurred in connection with the arbitration; and

- Defendant Eastern was to take nothing on its counterclaims [Liang Decl. Exh. 5 (Arbitration Award, pp. 47-48)].

### 5.  **Defendants' Second Collateral Attack—in the Shanghai Court**

Over six months after the CIETAC Arbitration Award, on June 18, 2010, Defendants Eastern and Fan petitioned to the Shanghai City, Second Intermediate People's Court to cancel the CIETAC Award.  [*See* Dai Decl., Dkt. No. 44, ¶4].  On July 21, 2010, however, the Shanghai City, Second Intermediate People's Court, upheld the CIETAC Award, rejecting Defendant' petition to cancel.  [*Id.*, ¶5,  Exh. D; Liang Decl. Exh. B (Dai Tr., 117:9-18).]

The Shanghai Court held that the Defendants "did not provide any effective proof to prove the fact that this Agreement was signed when [Defendant Fan] was under duress.  Thus, this Court cannot accept this claim."  [*See* Dai Decl., Dkt. No. 44, ¶5, Exh. D, at p. 00114].  The December 2009 CIETAC Award is now effective and enforceable in China.  [*Id.*, ¶¶9-10].

C. **Plaintiff's Itemized Statement of Damages**

Plaintiff seeks a judgment confirming the CIETAC Award, as follows:

(1)     $5,622,641 (five million six hundred twenty-two thousand six hundred forty-one dollars), plus interest calculated at 7.56% APR starting from May 8, 2008;

(2)     $200,000 (two hundred thousand dollars), plus interest calculated at 7.56% APR starting May 8, 2008;

(3)     RMB 473,312 or $69,604 (sixty nine thousand six hundred four dollars) at current exchange rates as arbitration costs; and

(4)     Attorneys' fees, costs, and/or any other relief that this Court deems just and appropriate.

The total amount sought by Plaintiff from Defendants (<u>not</u> including interest) is **$5,892,255 USD**.  Adding simple interest to the Award for 1446 days, or 3 years, 11 months, and 15 days (from May 8, 2008 to April 23, 2012) at a 7.56% APR makes the total award **$7.656 million**.

III.   **ARGUMENT**

A. **There is a Strong Public Policy in Favor of Enforcement of Foreign Arbitration Awards under the NY Convention**

The New York Convention (9 U.S.C. §§ 201-208) is part of the supreme law of the land and binding on both federal and state courts.  *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir. 1992).  "The public policy in favor of international arbitration is strong." (citation omitted)  *Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992).  "[B]ecause of the presumption of arbitrability established by the Supreme Court, courts must be careful not to overreach and decide the merits of an arbitrable claim."  *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991).

Moreover, there is "emphatic federal policy in favor of arbitral dispute resolution [which] applies with special force in the field of international commerce." *Id*. (citations omitted). "According to the Supreme Court, when international companies commit themselves to arbitrate a dispute, they are in effect attempting to guarantee a forum for any disputes. Such agreements merit great deference, since they operate as both choice-of-forum and choice-of-law provisions, and offer stability and predictability regardless of the vagaries of local law." *Id*.

### B. The Burden of Proof is on Defendants

Confirmation of a foreign arbitral award is a summary proceeding. *See Admart AG v. Stephen & Mary Birch Foundation, Inc.*, 457 F.3d 302, 311 (3d Cir. 2006). A district court "*shall confirm* the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (emphasis added); *see China Nat'l Metal Products Import/Export Co. v. Apex Digital, Inc.*, 379 F.3d 796, 799 (9th Cir. 2004). The Convention mandates enforcement of foreign arbitration awards unless the arbitration agreement is "null and void, inoperative or incapable of being performed." 9 U.S.C. § 201, note, art. II(3); 9 U.S.C. § 203.

Moreover, the burden is on the party challenging the award to show that *no proper basis for the award can be inferred* from the facts of the case. *Wall Street Assocs., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 849 (2nd Cir. 1994) (emphasis added). In the case of a duress defense, the burden borne by Defendants is a heavy one. *See Transmarine Seaways Corporation of Monrovia v. Marc Rich & Co. A.G.*, 480 F.Supp. 352, 358-59 (S.D.N.Y. 1979) (enforcing foreign arbitral award despite defendant's claims of duress, noting that the burden of showing duress is heavy).

Furthermore, even if the Court finds that the challenging party has established one of the defenses, the Court still has discretion to confirm the arbitration award anyway. Article V of the Convention provides that "[r]ecognition and enforcement of the award *may* be refused, at the request of the party against whom it is invoked,

*only if* that party furnishes to the competent authority where the recognition and enforcement is sought." Convention Article V.1. (emphasis added).  In other words, the objecting party establishing a defense under Article V is a necessary but not sufficient requirement for Court refusing to confirm an award.  Here, the facts of the case clearly show that the December 29, 2009 CIETAC Arbitration Award should be confirmed.

### C. <u>Defendants Cannot Meet Their Burden of Proof—Hence, the Arbitration Award Should be Confirmed</u>

Though Defendants also raise the affirmative defenses of failure to state a claim, waiver, release, unclean hands, laches and estoppels, their main defense to confirmation is as set forth in their July 25, 2011 interrogatory responses:

> In April 2007, Fan was detained by the Changzhou Municipal Bureau of Public Security and was not allowed to leave his confinement or to accept visitors.  During his confinement, Fan was presented with an agreement ("April 2007 Agreement") by a purported representative of AMEC's bankruptcy estate for signature.  Fan's release from captivity was expressly conditioned upon his signing of the April 2007 Agreement "as is" and without modifications.  In order to obtain his freedom from imprisonment, Fan signed the April 2007 Agreement and was released shortly thereafter.  In July 2007, Fan was against accosted by local law enforcement and forced to sign the July 2007 Agreement."   [Liang Decl. Exh. E ( (Defendants' July 25, 2011 Responses to Interrogatory No. 1)].

Apparently, it is Defendants' position that the July 2007 Agreement—when Fan was admittedly <u>not</u> in custody—was also procured by duress.[2]   However, Defendants cannot meet their heavy burden to establish duress.

---

[2] Plaintiff reserves its right to respond to any other affirmative defenses raised by Defendants, either in its Reply Brief to this Motion, or in Opposition to Defendants' Motion Opposing Confirmation.

As discussed in greater detail below, the Court should confirm the Arbitration Award.

### 1. As a Legal Matter, the Issue of Whether the July 2007 Agreement Is Enforceable Is an Issue to Be Determined by the Arbitrators—not this Court

"[W]hen a plaintiff argues that an arbitration clause, standing alone, is unenforceable-for reasons independent of any reasons the remainder of the contract might be invalid-that is a question to be decided by the court." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1000 (9th Cir. 2010).  However, "when a plaintiff's legal challenge is that a contract as a whole is unenforceable, *the arbitrator decides the validity of the contract, including derivatively the validity of its constituent provisions (such as the arbitration clause).*" *Id.* (emphasis added); *see also Buckeye Check Cashing v. Cardegna,* 546 U.S. 440 (2006) ("a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator").

Here, Defendants do not specifically challenge the arbitration clause of the July 2007 Agreement.  Instead, Defendants take the position that the July 2007 Agreement, in its entirety, is invalid and unenforceable because of Defendants' claimed duress.  [*See* Defendants' Answer to Plaintiff's Complaint, Dkt. No. 10, at ¶41].  In fact, Defendants cannot limit their challenge to just the arbitration clause itself.  Why?

Because in the past, it is undisputed Defendants always freely agreed to arbitration clauses designating CIETAC as the arbitral tribunal.  For example, when Plaintiff was formed in 2003, it was a joint venture, with Defendant US Eastern owning 40%.  [Liang Decl. Exh. B (Dai Tr., 20:24-21:7)].  In the establishment documents of Plaintiff AMEC, Fan agreed that any dispute would be resolved by CIETAC (in Beijing).  [Liang Decl. Exh. A (Fan Tr., 40:13-41:23, 42:25-43:12)].

Hence, the validity of the July 2007 Agreement is a question to be decided by the arbitrators—and not the Court.   As discussed above, the three CIETAC

arbitrators unanimously deemed the July 2007 Agreement valid and enforceable in issuing the December 2009 Arbitration Award, rejecting Defendants' claims of duress.  [Liang Decl. Exh. 5 (Arbitration Award, p. 39)].  And, their findings were affirmed by the Shanghai Court.  [*See* Dai Decl., Dkt. No. 44, ¶5, Exh. D, at p. 00114].

Accordingly, as a matter of law, this Court has to defer to CIETAC's findings and cannot rule on the enforceability of the arbitration clause.

## 2.  <u>As a Factual Matter, Irrespective of What Happened in April 2007, Defendants Freely Entered into the July 2007 Agreement</u>

As detailed above, on July 26, 2007, the parties entered into a valid and enforceable contract.  However, Defendant Fan claims that in April 2007, he was placed under residential surveillance by police from the City of Changzhou, China, allegedly for a period of 10 days.  Fan claims that at that time, he was in custody and not free to go.  While in custody, Fan claims that he was forced to sign the April 2007 Agreement, and that shortly after signing, he was released.  [Liang Decl. Exh. E (Defendants' July 25, 2011 Responses to Interrogatory No. 1)].  However, the CIETAC arbitration *did not proceed* pursuant to the April 2007 Agreement.

Instead, the CIETAC arbitration proceeded under a separate agreement that Defendant Fan signed with Plaintiff in July 2007 (the "July 2007 Agreement"). [Liang Decl. Exh. 5 (Arbitration Award, p. 1)]. Defendant Fan claims that he was "accosted by local law enforcement and forced to sign the July 2007 Agreement." [Liang Decl. Exh. E (Defendants' July 25, 2011 Responses to Interrogatory Nos. 1, 4.)].   However, Defendants' attempts to link the April 2007 and July 2007 Agreements must fail, for at least the following reasons:

- Both Defendants admit that Fan was not in the custody of any law enforcement agency in China in July 2007 when he signed the second agreement. [Liang Decl. Exh. F (Defendants' July 25, 2011 Responses to RFA No. 12.)].

- Furthermore, Fan freely negotiated and made changes to the July 2007 Agreement. Indeed, the CIETAC arbitrators found that Fan made changes to the July 2007 Agreement prior to signing it.[3]  [Liang Decl. Exh. 5 (Arbitration Award, p. 39)].  Even Fan admits he made changes to the July 2007 Agreement and initialed every single page.  [Liang Decl. Exh. A (Fan Tr., 108:25-109:22; 110:24-111:13).]

- Between April and July 2007, Fan was free to go anywhere he wished in China.  In fact, Fan did exactly that, traveling around China for business.  [Liang Decl. Exh. A (Fan Tr., 102:5-14)].

- Indeed, Fan was free to leave China.  For example, he could have gone to Hong Kong.  [Liang Decl., Exh. C (Wu Tr., 49:16-50:17); Liang Decl., Exh. D (Zhu Tr., 32:18-33:18)].  Or, he could have come to the United States to join his family.  [Liang Tr. (Fan Tr., 102:5-14).]  Even Fan's employee Zhu Jianhua testified that he was aware that Fan "traveled to America regularly" in 2007.  [Liang Decl. Exh. D (Zhu Tr., 56:3-6).]  Instead, Fan chose to stay in China.  [Liang Decl. Exh. C (Wu Tr., 49:16-50:17); Liang Decl. Exh. D (Zhu Tr., 32:18-33:18)].

Fan's actions are not those of a person under duress or in fear.  Accordingly, there is no reason for this Court to even entertain Defendants' claim of duress.

### 3. Defendants Waived Objecting to the Enforceability of the July 2007 Agreement

Although Defendants now dispute the enforceability of the July 2007 Agreement, their actions following the execution of the July 2007 Agreement constitute a waiver of their current defense and claim of duress.

---

[3] The July 2007 Agreement originally stated that Defendants' installment payments to the Plaintiff would "begin on the opening date of [Plaintiff's] meeting of creditors."  However, this provision was changed by Fan to read that installment payments would "begin on the approval date of [Plaintiff's] meeting of creditors." [Liang Decl. Exh. 5 Arbitration Award, p. 39].

In February 2008—long after any possible duress that may have occurred in 2007—Defendants voluntarily made a first installment payment of $250,000 pursuant to the July 2007 Agreement.  [Liang Decl. Exh. 5 (Arbitration Award, p. 6); Liang Decl. Exh. A (Fan Tr. 116:14-117:3)].

More importantly, after Plaintiff initiated the CIETAC arbitration proceedings in May, Fan tried to invalidate the July 2007 Agreement on the grounds of duress, by initiating an action with the Nantong Intermediate People's Court. However, Fan later <u>voluntarily</u> withdrew that challenge in April 2009 and proceeded forward with the arbitration. [Liang Decl. Exh. 16 (Nantong Court Judgment)].

Furthermore, Defendants Eastern and Fan appeared on July 17, 2009 at CIETAC Shanghai for arbitration of their dispute over outstanding invoices for products supplied by Plaintiff to Eastern and were fully represented by counsel at the hearing.  [Liang Decl. Exh. 5 (Arbitration Award, p. 3)].  Indeed, Defendants even asserted counterclaims against Plaintiff in the CIETAC arbitration.  [Liang Decl. Exh. 5 (Arbitration Award, pp. 11-14)].

Finally, on July 21, 2010, the Shanghai Intermediate People's Court found that "the two Applicants [Defendants Eastern and Fan] did not provide any effective proof to prove the fact that this [July 2007] Agreement was signed when Applicant Guoxiang Chen [aka Defendant Fan] was under duress.  Thus, this Court cannot accept this claim."  [*See* Dai Decl., Dkt. No. 44, ¶5, Exh. D, at p. 00114].  This is nothing more than Defendants' attempt second bite at the apple on a defense/claim that they waived.

Accordingly, the Court should find that Defendants waived their right to assert duress as either a claim or defense.

## 4.  <u>The Act of State Doctrine Precludes a Finding of Duress</u>

In order to establish duress, Defendants must establish two essential elements: "(1) a wrongful act or threat by the opposite party to the transaction or by a third party of which the opposite party is aware and takes advantage, and (2) a state of

mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment." *Plechner v. Widener College, Inc.*, 418 F.Supp. 1282, 1294 (E.D.Pa. 1976).

Here, Defendants do not contend that Plaintiff engaged in any "wrongful act or threat." Instead, Defendants claim:

> In April 2007, Fan was detained by the Changzhou Municipal Bureau of Public Security and was not allowed to leave his confinement or to accept visitors. During his confinement, Fan was presented with an agreement ("April 2007 Agreement") by a purported representative of AMEC's bankruptcy estate for signature. Fan's release from captivity was expressly conditioned upon his signing of the April 2007 Agreement "as is" and without modifications. In order to obtain his freedom from imprisonment, Fan signed the April 2007 Agreement and was released shortly thereafter. In July 2007, Fan was again accosted by local law enforcement and forced to sign the July 2007 Agreement.[4] [Liang Decl. Exh. E, (Defendants' July 25, 2011 Responses to Interrogatory No. 1.)].

This statement is Fan's attorney-prepared response to Plaintiff's interrogatory requesting Fan to "[s]tate all facts known to [him] that evidence or support [his] contention that FAN was under duress at the time FAN signed either the April 2007 Agreement or the AGREEMENT." [*Id.*]

Clearly, the only wrongful act being alleged by Defendants are acts committed by Chinese law enforcement. However, the act of state doctrine prevents

---

[4] Defendants' response also fails to address the issue of Fan being "overwhelmed by fear." The absence of overwhelming fear is consistent with the facts that (i) Fan, as well as employees of Eastern, has continually traveled to China to conduct business, both before and after the alleged April 2007 residential surveillance; and (ii) Fan, as well as Eastern, has continually invested in both real estate and business ventures in China, including setting up several factories in China, both before and after the alleged April 2007 surveillance. However, for the purposes of this Motion, Plaintiff's argument will focus on the first element only.

1  this Court from deeming the acts of a foreign sovereign in its own territory as
2  "wrongful."

3      The act of state doctrine is a judicially-created rule of decision that "precludes
4  the courts of this country from inquiring into the validity of the public acts a
5  recognized foreign sovereign power committed within its own territory." *Banco*
6  *Nacional de Cuba v. Sabbatino*, 376 U.S. 398,401 (1964); *W.S. Kirkpatrick & Co.,*
7  *Inc. v. Environmental Tectonics Corp., Int'l.*, 493 U.S. 400 (1990) (act of state
8  doctrine prevents any court in the United States from declaring invalid an official
9  act of a foreign sovereign performed within its own territory); *Glen v. Club*
10 *Mediterranee, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006).

11     Here, the acts of the Chinese police cannot be deemed wrongful.  The April
12 2007 arrest was a legitimate exercise of police power in China, who have
13 jurisdiction to investigate economic crimes.  [Decl. of Feinerman, ¶¶69-83].  Upon
14 his release, Fan received proper discharge paperwork.  [Liang Decl. Exh. A (Fan
15 Tr., 100:1-23); Liang Decl. Exh. C (Wu Jian Tr., 79:22-81:22); Liang Decl. Exh. 1
16 (Notification of Release Record)].   And Fan was even given an official notice
17 closing the investigation.  [Liang Decl. Exh. C (Wu Jian Tr., 79:22-81:22); Liang
18 Decl. Exh. 1 (Notification of Release Record)].   As such, there was nothing
19 "wrongful" about the Chinese police exercising their authority to investigate
20 suspected economic crimes by Fan in April 2007.

21     And, assuming *arguendo* that Fan's April 2007 residential surveillance was
22 "wrongful," Defendants do not and cannot contend that there were <u>any</u> wrongful
23 acts in July 2007. Without a wrongful act, there can be no finding of duress.
24 Accordingly, the Court should grant this Motion and confirm the CIETAC
25 arbitration award.

26
27
28

## IV.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant this motion to confirm the December 29, 2009 arbitration award of CIETAC and enter judgment for Plaintiff in the amount of **<u>$7.656M USD</u>**.

Dated:  April 23, 2012

LEE, TRAN & LIANG A Professional

Law Corporation


By:  /s/ Enoch H. Liang
     Enoch H. Liang

Attorneys for Plaintiff Dai Xuchu, as
bankruptcy administrator for
Changzhou AMEC Eastern Tools &
Equipment Co., Ltd., and for
Counterdefendant Changzhou AMEC
Eastern Tools & Equipment Co., Ltd.
