O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANGZHOU AMEC EASTERN TOOLS AND EQUIPMENT CP., LTD., <br><br> Plaintiff, <br><br> v. <br><br> EASTERN TOOLS & EQUIPMENT, INC., A CALIFORNIA CORPORATION, AND GOUXIANG FAN, AN INDIVIDUAL, <br><br> Defendants. | Case No. EDCV 11-00354 VAP (DTBx) <br><br> **ORDER DENYING MOTION TO CONFIRM** <br><br> **[Motion filed on April 23, 2012]** |

Before the Court is a Motion to Confirm Foreign Arbitration Award ("Plaintiff's Motion") filed by Plaintiff Xuchu Dai ("Plaintiff"), and a Motion for Order Denying Petition to Confirm Foreign Arbitral Award ("Defendants' Motion") filed by Defendants Eastern Tools & Equipment, Inc. and Guoxiang Fan (collectively, "Defendants").  After considering the papers in support of, and in opposition to, the Motions, the Court DENIES Plaintiff's Motion and GRANTS Defendants' Motion.

1                        **I. BACKGROUND**

2    **A.   Procedural Background**

3         On March 2, 2011, Changzhou AMEC Eastern Tools &

4    Equipment Co., Inc.[1] ("Joint Venture") filed a Complaint

5    against Defendant Eastern Tools & Equipment, Inc.

6    ("Eastern Tools") and Defendant Guoxiang Fan ("Mr. Fan")

7    seeking to confirm and enforce a foreign arbitration

8    award pursuant to the New York Convention, 9 U.S.C. §§

9    201, et seq.  (Doc. No. 1.)  Defendants filed an Answer

10   on April 4, 2011, in which they counterclaimed for

11   declaratory relief, arguing the contract at the heart of

12   the foreign arbitration award was signed under duress.

13   (Doc. No. 10.)

14

15        Plaintiff filed its First Amended Complaint ("FAC")

16   on April 28, 2011, alleging identical claims to enforce

17   the foreign arbitration award under the New York

18   Convention and under the Federal Arbitration Act ("FAA"),

19   but naming Plaintiff as the bankruptcy administrator for

20   the Joint Venture.  (Doc. No. 17.)

21

22        Defendants filed an Answer to the FAC ("Answer to

23   FAC") on May 16, 2011, in which they reiterated their

24   previous counterclaims that the foreign arbitration award

25   should not be confirmed and enforced because the

26   _____

27        [1]  Plaintiff Xuchu Dai serves as the bankruptcy
     administrator for the Joint Venture in this action.  (See
28   FAC at 1-2.)

                              2

1   arbitration agreement was procured by duress, fraud,

2   undue means, and collusion.  (Doc. No. 18.)

3

4      On April 23, 2012, Plaintiff filed its Motion to

5   Confirm, (Doc. No. 57), and submitted the following in

6   support:

7      1.   Declaration of Enoch H. Liang ("Liang

8           Declaration"), (Doc. No. 57-1); and

9      2    Declaration of James Feinerman ("Feinerman

10         Declaration"), (Doc. No. 57-2).

11

12     On April 23, 2012, Defendants also filed their Motion

13   to Deny Confirmation.  (Doc. No. 58.)  In support of

14   their motion, Defendants attached:

15      1.   Declaration of Guoxiang Fan ("Fan Declaration"),

16         (Doc. No. 58-1);

17      2.   Declaration of Jerome A. Cohen ("Jerome Cohen

18         Declaration"), (Doc. No. 58-2);

19      3.   Declaration of Myron Cohen (Myron Cohen

20         Declaration"), (Doc. No. 58-3); and

21      4.   Declaration of Rodney Bell ("First Bell

22         Declaration"), (Doc. No. 58-4).

23

24     On May 7, 2012, Defendants filed their Opposition to

25   Plaintiff's Motion ("Defendants' Opposition").  (Doc. No.

26   59.)  In support of their opposition, Defendants

27   submitted:

28

1    1.    Declaration of Guoxiang Fan ("Second Fan
2          Declaration"), (Doc. No. 59-1);
3    2.    Declaration of Penny Kole ("Kole Declaration"),
4          (Doc. No. 59-2);
5    3.    Declaration of Rodney W. Bell ("Second Bell
6          Declaration"), (Doc. No. 59-3); and
7    4.    Objections to Plaintiff's Evidence ("Defendants'
8          Objections"), (Doc. No. 59-4).
9

10   Also on May 7, 2012, Plaintiff filed an Opposition to
11   the Motion to Deny ("Plaintiff's Opposition").  (Doc. No.
12   60.)  In support of this Opposition, Plaintiff attached:
13   1.    Declaration of Enoch H. Liang ("Second Liang
14         Declaration"), (Doc. No. 60-1);
15   2.    Evidentiary Objections to Jerome Cohen
16         Declaration, (Doc. No. 60-2);
17   3.    Evidentiary Objections to Myron Cohen
18         Declaration, (Doc. No. 60-3); and
19   4     Evidentiary Objections to Fan Declaration
20         ("Plaintiff's Objections to Fan Declaration"),
21         (Doc. No. 60-4).
22

23   On May 14, 2012, Defendants filed their Reply in
24   support of their Motion ("Defendants' Reply").  (Doc. No.
25   61.)  In support of their Reply, Defendants submitted:
26   1.    Declaration of Rodney Bell ("Third Bell
27         Declaration"), (Doc. No. 61-1); and
28

4

2.    Response to Plaintiff's Evidentiary Objections
      to: Fan Declaration; Jerome Cohen Declaration,
      and Myron Cohen Declaration ("Defendants'
      Response to Plaintiff's Objections"), (Doc. No.
      61-2).

Also on May 14, 2012, Plaintiff filed a Reply in support of its Motion ("Plaintiff's Reply"). (Doc. No. 62.) In support of its Reply, Plaintiff attached:

1.    Reply to Defendants' Evidentiary Objections,
      (Doc. No. 62-1); and
2.    Declaration of Enoch H. Liang ("Third Liang
      Declaration"), (Doc. No. 62-2).

On May 31, 2012, the Court ordered the parties to resubmit their evidence in the format specified by the Court's Local Rules governing motions for summary judgment and this Court's standing order. (Doc. No. 65.) In accordance with this order, Plaintiff filed a Statement of Undisputed Facts in support of the Motion to Confirm ("Plaintiff's SUF") on June 18, 2012. (Doc. No. 66.) Defendants filed a Statement of Undisputed Facts in support of the Motion to Deny ("Defendants' SUF") on June 18, 2012, as well. (Doc. No. 67.)

1   On June 25, 2012, Defendants filed a Statement of
2   Genuine Issues in support of Defendants' Opposition
3   ("Defendants' SGI").  (Doc. No. 68.)  Defendants attached
4   to their SGI their Objections ("Defendants' Objections")
5   to Plaintiff's SUF.  (Doc. No. 68-1.)  Also on June 25,
6   2012, Plaintiff filed a Statement of Genuine Issues in
7   support of Plaintiff's Motion to Confirm ("Plaintiff's
8   SGI").  (Doc. No. 69.)
9
10   On July 2, 2012, Plaintiff filed a Reply Statement of
11   Undisputed Facts in support of the Motion to Confirm
12   ("Plaintiff's Reply SUF").  (Doc. No. 71.)  In support,
13   Plaintiff submitted a Reply to Defendants' Objections.
14   (Doc. No. 71-1.)  The same day, Defendants filed a Reply
15   Statement of Undisputed Facts in support of the Motion to
16   Deny ("Defendants' Reply SUF").  (Doc. No. 72.)
17
18   **B.   Preliminary Evidentiary Issues**
19   The Court addresses only those objections relating to
20   evidence the Court found necessary to consider in ruling
21   on the Motions.

1      **1.   Declaration of Guoxiang Fan**

2          Plaintiff objects to certain statements in Mr. Fan's

3    Declaration on the basis that these statements are

4    hearsay.[2]  Specifically, Plaintiff objects to:

5          1)   Paragraph 15: "the police supervisor told me

6               that the investigation had been finished.  He

7               told me that I would not be released until I

8               signed an agreement."

9          2)   Paragraph 18: "I was told by the police

10              supervisor that I would have to wire the money

11              to an account before I would be released."

12         3)   Paragraph 24: "I was told by the police

13              supervisor that I would have to wire $300,000 to

14              a certain account before I would be released."

15         4)   Paragraph 25: "I was not released from police

16              custody until the police confirmed that the

17              $300,000 had been received in the account."

18         5)   Paragraph 26: Mr. Fan's description of telephone

19              conversations with the Changzhou Public Security

20              Bureau and Officer Huang.

21   (Pl.'s Objections to Fan Decl. at 2-3.)

22

23         Defendants argue these statements are not hearsay

24   because they are not submitted for the truth of the

25   matter asserted, but instead to show Mr. Fan's state of

26   _____

27         [2] The Court addresses only those objections to
     statements which the Court considers as material in
28   ruling on the Motions.

7

mind and the voluntariness of his subsequent conduct. (Defs.' Response to Pl.'s Objections at 2-3.)

Hearsay is an out of court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Where a party attempts to introduce a statement that is offered not to prove the truth of the statement, but instead to show a party's state of mind, that statement is not hearsay. See United States v. Brown, 562 F.2d 1144, 1148 (9th Cir. 1977) (defendant's request that witness "[not] hurt him" was non-hearsay; admissible to show defendant's state of mind). Orders, instructions, or directives, "which by their nature are neither 'true' nor 'false,'" do not constitute hearsay if the statements are admitted to show the circumstantial intent of the declarant rather than a factual assertion. Mendez v. County of Alameda, No. C03-4485 PJH, 2005 WL 3157516, at *14 (N.D. Cal. Nov. 22, 2005); see also United States v. Shepherd, 739 F.2d 510, 514 (10th Cir. 1984); United States v. Keane, 522 F.2d 534, 558 (7th Cir. 1975), overruled on other grounds by, McNally v. United States, 483 U.S. 350 (1987). In these instances, the credibility and the reliability of the declarant is not at issue. Rather, the only credibility question presented is whether the statements were made at all and if so, under what circumstances.

1    Addressing each statement in turn, in paragraphs 15,
2    18, and 24, Mr. Fan describes warnings, orders, or
3    instructions which the declarant, the Changzhou police
4    supervisor, made to him while he was in detention.
5    Defendants offer these statements not to show the truth
6    of the statements - that the police would not release him
7    - but rather, to show Mr. Fan believed he would not be
8    released unless he signed the agreement and wired the
9    money.  These statements are therefore not hearsay and
10   are admissible.

11

12   Similarly, Defendants submit paragraph 25 not to
13   prove that $300,000.00 was in fact wired to the specified
14   account, but rather, to show that Mr. Fan believed he was
15   being released only after the police confirmed the
16   receipt of the wired money.  The only credibility
17   question concerns the truthfulness of Mr. Fan's statement
18   that this confirmation occurred.  Accordingly, the
19   statement is not hearsay.

20

21   In paragraph 26, Mr. Fan states that he was contacted
22   at least 10 times over the telephone by the Changzhou
23   Public Security Bureau between April and July 2007.  (Fan
24   Decl. ¶ 26.)  According to the declaration, Officer
25   Huang, one of the police officers in Changzhou, also
26   called Mr. Fan in July and told him to come back to
27   Changzhou to sign the agreement again.  (Id.)  Mr. Fan
28

asserts he did not want to sign the agreement, but knew
that if he did not, he would be taken back into custody.
(Id.)  For the same reasons as explained above, this
paragraph is not hearsay.  Mr. Fan's statement about
Officer Huang describes an order or instruction he
received.  Likewise, Mr. Fan's statements about his own
state of mind upon receiving telephone calls from the
Public Security Bureau and Officer Huang do not
constitute hearsay.[3]

>    **2.   China International Economic and Trade**
>         **Arbitration Commission ("CIETAC") Arbitration**
>         **Award**

Defendants object to certain statements of fact set
forth in the Arbitration Award as inadmissible hearsay.
(Defs.' Objections at 2-4.)  Specifically, Defendants
object to facts numbered 40, 41, 45, and 46 in
Plaintiff's SUF: "Defendants selected one member of the
three-person arbitration panel: Mr. Zhang Yuqing"; "Two
of the three arbitrators - Sun Nanshen (selected by

_____

[3] At the hearing, Plaintiff argued that under this
hearsay exemption Mr. Fan could claim the police told him
anything - no matter how incredible - and it would still
be admissible.  This argument, however, misconstrues the
method for presenting evidence in a summary proceeding
such as this.  Plaintiff had the opportunity to cross-
examine Mr. Fan during his deposition, and thus, could
have tested the credibility of Mr. Fan's statements then.
Plaintiff also could have disputed the facts stated in
Mr. Fan's declaration by submitting contradictory
declarations or deposition testimony from the Changzhou
police, Officer Huang, or Mr. Dai, as well as any other
relevant evidence.  Plaintiff did not do so.

Plaintiff) and Zhang Yuqing (jointly selected by the Defendants) - are well-known and respected arbitrators in the international arbitration community"; "The CIETAC arbitrators noted that all parties' counsel made arguments, answered the panel's questions, and cross-examined the evidence"; and "During the arbitration, Defendants' counsel 'confirmed in open court that they will no longer challenge the jurisdiction of [CIETAC Shanghai] on the case.'"  (Id.)

It is not the Court's role to review the arbitration award or the merits of its findings in ruling on whether a party has established a defense under Article V of the New York Convention.  See China Nat'l Metal Prods. Import/Export Co. v. Apex Digital, Inc., 379 F.3d 796, 799-800 (9th Cir. 2004) ("Our review of a foreign arbitration award is quite circumscribed.  Rather than review the merits of the underlying arbitration, we review de novo only whether the party established a defense under the Convention.") (citations and internal quotation marks omitted); see also Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc., 969 F.2d 764, 770 (9th Cir. 1992).  In determining whether to enforce an award, the Court may consider the facts as presented in the parties' motions, submitted deposition testimony, declarations, and documents to determine whether one of the defenses applies.  See Matter of

1   <u>Arbitration Between Trans Chemical Ltd. and China Nat.</u>

2   <u>Machinery Import and Export Corp.</u>, 978 F. Supp. 266, 309

3   (S.D. Tex. 1997) ("The Convention mandates a summary

4   procedure modeled after federal motion practice to

5   resolve motions to confirm."). Thus, to the extent

6   Defendants object to the admission of CIETAC's

7   determinations with respect to their duress counterclaim,

8   this objection is moot; and to the extent Defendants

9   object to CIETAC's findings regarding Defendants'

10  participation in the arbitration process, these

11  objections are also moot as the Court may consider

12  Article V defenses regardless of whether the parties

13  objected to arbitration.[4]  <u>See, e.g.</u>, <u>Slaney v. Int'l</u>

14  <u>Amateur Ath. Fed'n</u>, 244 F.3d 580, 592 (7th Cir. 2001)

15  (dealing separately with objecting party's arguments

16  concerning the arbitration panel's decision and the

17  party's Article V defenses).

18

19      Furthermore, under Article V, a successful defense

20  may result in a court refusing to recognize or enforce an

21  award.  Convention, art. V(1) ("Recognition and

22  enforcement of the award may be refused . . . .").

23

24      [4] The question of whether the parties agreed to
    arbitrate presents a distinct jurisdictional question.
25  <u>See</u> <u>China Minmetals Materials Imp. and Exp. Co. v. Chi</u>
    <u>Mei Corp.</u>, 334 F.3d 274 (3d Cir. 2003).  In cases where
26  courts consider the threshold issue of arbitrability,
    whether the party seeking denial of confirmation objected
27  throughout the arbitration proceeding may be relevant.
    <u>See, e.g.</u>, <u>id.</u> at 278; <u>Czarina, LLC v. W.F. Poe</u>
28  <u>Syndicate</u>, 358 F.3d 1286, 1294 (11th Cir. 2004).

1  Accordingly, if Defendants establish a defense of duress
2  under Article V, the Court may refuse to recognize the
3  arbitration award in its entirety.  CIETAC's findings
4  about the validity of the underlying agreement therefore
5  cannot control the Court's ruling on the merits of
6  Defendants' defense when considering whether the award
7  contravenes public policy under Article V.

8

9      **3.   Shanghai Court Judgment**

10  Defendants contend the July 21, 2010, Judgment of the
11  Shanghai City, Second Intermediate People's Court is
12  inadmissible because it lacks the proper authentication
13  under Rule 902.  (<u>See</u> Defs.' SGI ¶ 52.)  Plaintiff
14  responds that the deposition testimony of Mr. Dai
15  authenticates the judgment.  (Pl.'s Reply SUF ¶ 52.)

16

17      First, Plaintiff does not include the Shanghai Court
18  Judgment as an exhibit to any of the documents filed in
19  support of, or in opposition to, these Motions.[5]  Rather,
20  Plaintiff references an exhibit of a declaration attached

21

22

23  _____

24      [5] In its Order setting the briefing schedule, the
   Court made clear that the parties must cite to specific
25  page and line numbers in depositions and paragraph
   numbers in affidavits.  (May 31, 2012, Order (Doc. No.
26  65) at 4.)  The Court further noted that if either party
   failed to provide a pincite to the supporting evidence,
27  the Court would deem the proffered fact (or dispute)
   unsupported.  (<u>Id.</u> (citing <u>Christian Legal Soc. v. Wu</u>,
28  626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like
   pigs, hunting for truffles buried in briefs.")).)

1    to a discovery motion filed in November 2011.  (<u>See</u> Pl.'s

2    Reply SUF ¶ 52 (citing Doc. No. 44, Ex. D).)

3

4        Secondly, even if Plaintiff had filed the exhibit

5    properly, the document is not admissible.  As stated

6    above, under Rule 902(3), a foreign public document is

7    self-authenticating only if it is accompanied by a final

8    certification of either the signer or attester who

9    executed the document in his official capacity and is

10   authorized by the laws of that country to make the

11   attestation or execution, or of a foreign official whose

12   official position relates to the execution or

13   atttestation.  Fed. R. Evid. 902(3).  In fact, Plaintiff

14   admits the document is not self-authenticating, but

15   contends the testimony of Mr. Dai authenticates the

16   judgment.  (Pl.'s Reply SUF ¶ 52.)

17

18       Under Rule 901(a), extrinsic evidence in the form of

19   testimony may sustain a finding of authenticity, but only

20   if the testimony is "sufficient to support a finding that

21   the matter in question is what the proponent claims."

22   Fed. R. Evid. 901(a).  A court is not required to accept

23   the testimony as true, but rather, "must assess the

24   credibility of that testimony and determine whether the

25   balance of the evidence is sufficiently compelling" to

26   show the documents are what the party claims them to be.

27   <u>Vatyan v. Mukasey</u>, 508 F.3d 1179, 1185 (9th Cir. 2007);

28

14

1   see also <u>United States v. Perlmuter</u>, 693 F.2d 1290, 1292-

2   93 (9th Cir. 1982) (finding testimony of Immigration and

3   Naturalization Service agent insufficient).

5      Here, Plaintiff cites to statements Mr. Dai made

6   concerning litigation of the arbitration award.  (Pl.'s

7   SUF ¶ 52.)  Specifically when asked if "something about

8   the arbitration award" was litigated, he responded, "the

9   two respondents applied to Shanghai Second Intermediate

10  People's Court to withdraw, to withdraw -- to withdraw

11  this arbitration judgment."  (Dai Dep. 117:9-17.)  It is

12  not clear from the deposition testimony, however, whether

13  Mr. Dai was referring to a document containing the

14  judgment.  (<u>Id.</u>)  To the contrary, the testimony suggests

15  Mr. Dai was speaking generally from his memory as to

16  whether the parties litigated the arbitration award.

17  (<u>Id.</u>)  Nothing in Mr. Dai's testimony therefore

18  establishes that Exhibit D is what Plaintiff claims it to

19  be.  As no credible extrinsic evidence authenticates the

20  Shanghai Court Judgment, and the document is not self-

21  authenticating, the Court finds it is not admissible for

22  purposes of ruling on these Motions.

## C.  Findings of Fact

The facts relevant to enforcing the arbitration award are not in dispute.[6]  The following material facts are supported adequately by admissible evidence and are uncontroverted.

This action arises from a contract dispute over the return of allegedly non-conforming goods.  Defendant Eastern Tools imports and distributes gasoline-powered generators and related equipment.  (Fan Decl. ¶ 4.)  Between 2003 and 2006, Eastern Tools purchased the majority of this equipment from the Joint Venture.  (Id. ¶ 7.)  According to Eastern Tools, it stopped purchasing from the Joint Venture after discovering the equipment did not conform to the contract specifications and had quality problems.  (Id.)  Eastern Tools then sought payment for the storing, shipping, and repairing of returned shipments of the allegedly non-conforming equipment.  (Id. ¶ 8.)  The Joint Venture in turn demanded Eastern Tools pay for these same shipments, denying the goods failed to meet specifications.  (Id.; Pl.'s SUF ¶ 4.)

---

[6] To the extent any facts in the SUFs, SGIs, or Reply SUFs are not mentioned in this Order, the Court has not relied on them in reaching its decision.

In an attempt to settle the dispute, the parties took part in a series of negotiations which culminated in the drafting of an agreement in December 2006.  (Fan Decl. ¶ 11; Pl.'s Mot. at 3.)  The draft agreement provided that Eastern Tools would keep the allegedly defective equipment and pay the Joint Venture $2 million for the merchandise.[7]  (Fan Decl. ¶ 11; Pl.'s Mot. at 3.)  The parties did not sign the agreement, however, and in February 2007, the Joint Venture filed for bankruptcy.  (Fan Decl. ¶ 11; Pl.'s Mot. at 4.)

### 1.  April 2007 Agreement

On April 17, 2007, Changzhou police arrested[8] Eastern Tools's President, Mr. Fan, in Changsu, People's Republic of China.[9]  (Fan Decl. ¶ 12.)  The police drove him to

---

[7] Mr. Fan asserts in his declaration that he was willing to make this agreement in order to help the Joint Venture - Eastern Tools's sole supplier - stay in business.  (Fan Decl. ¶ 11.)  He also believed Eastern Tools would be able to recover some of the funds by repairing and selling the equipment.  (Id.)

[8] Plaintiff refers to Mr. Fan's arrest by the euphemism "residential surveillance," and claims Mr. Fan's agreement to pay Plaintiff $2.5 million to secure his release was actually a Chinese version of a "negotiated plea agreement."  (Pl.'s Mot. at 4; Pl.'s Opp'n at 7.)  As discussed at length below, whether or not Mr. Fan's arrest was legal under Chinese law, a valid contractual agreement between two private parties is not formed when one party signs in order to secure his or her release from imprisonment, or signs under threat of imprisonment.

[9] Plaintiff argues the facts surrounding the April 2007 Agreement are irrelevant because the April 2007 Agreement is not at issue.  (See Defs.' Reply SUF ¶ 11.)

(continued...)

Changzhou and placed him in a detention facility. (<u>Id.</u>
¶¶ 12-13.)  The police told him that he was being held
for criminal fraud and asked him to give a statement
about the dispute between Eastern Tools and the Joint
Venture.  (<u>Id.</u> ¶ 14.)  The police also confiscated Mr.
Fan's phone.  (<u>Id.</u> ¶ 13; Defs.' Reply SUF ¶ 11c.)  The
police informed Mr. Zhu, Eastern Tools's China
representative, that Mr. Fan was being held for economic
fraud.[10]  (Zhu Dep. 8:20; 60:14-61:17.)

    On April 26, 2007, while Mr. Fan was still in police
custody, Plaintiff Xuchu Dai met with him to discuss a
new agreement to resolve the dispute between Eastern
Tools and the Joint Venture.  (Dai Dep. 37:10-24.)  Mr.
Dai testified that at the time he believed Mr. Fan was in
custody because one of the shareholders in the Joint

---

     [9](...continued)
As Defendants note correctly, however, whether Mr. Fan
signed the April 2007 contract in order to secure his
release from prison is relevant to show his state of mind
when the police directed him to return and sign the July
2007 Agreement.  (<u>See</u> <u>id.</u>)

     [10] Plaintiff argues Defendants' claim that Mr. Fan
was held without charges is false.  Yet Plaintiff does
not cite to any evidence demonstrating the Changzhou
Police actually charged Plaintiff with a crime.  (<u>See</u>
Pl.'s Opp'n at 6.)  Plaintiff provides only a
"Notification of Release," a document which does not
charge Mr. Fan with a crime, but states merely that Mr.
Fan was placed under "residential surveillance" on
"suspicion of contract fraud." (Third Liang Decl. Ex. 1
(English translation).)  In fact, the Notification of
Release acknowledges there was "insufficient evidence" to
warrant Mr. Fan's continued detention.  (<u>Id.</u>)  The
police's purported reason for arrest does not, on its
own, constitute a "charge."

1  Venture had accused Mr. Fan of contract fraud.[11]  (Dai
2  Dep. 51:1-14.)

3

4      The police permitted an attorney, Wu Jian, to visit
5  Mr. Fan briefly during his detention.  (Defs.' Reply SUF
6  ¶ 11g.)  The police monitored the visit and Mr. Wu
7  testified at his deposition that he was only allowed to
8  advise Mr. Fan to sign the April 2007 Agreement.  (Wu
9  Dep. 35:7-16.)  When Mr. Wu began to ask Mr. Fan about
10 the charges brought against him, the police told him to
11 stop, and then pushed him out of the room.  (Wu Dep.
12 35:7-25; 36:1-5.)

13

14     After four days, the police supervisor told Mr. Fan
15 the police had completed their investigation, but Mr. Fan
16 would not be released until he signed an agreement.[12]

17 _____

18     [11] Although Mr. Dai testified that he knew Mr. Fan
   was in detention and that the police were present during
19 his meeting with Mr. Fan, he asserts Mr. Fan negotiated
   freely the terms of the agreement and that Mr. Fan even
20 suggested the inclusion of the arbitration clause.  (Dai
   Dep. 38:19-39:6; 93:20-94:18.)  Whether Mr. Fan
21 negotiated voluntarily the terms of the agreement,
   however, is a matter of law, not of fact.

22     [12] Plaintiff claims Mr. Fan negotiated the terms of
23 the April 2007 Agreement.  (Pl.'s Mot. at 4-5; see Defs.'
   Reply SUF ¶ 11i.)  The cited deposition testimony,
24 though, does not support this.  (Pl.'s Mot. at 4-5.)
   According to Plaintiff, Mr. Fan testified that, after
25 reviewing the agreement the police gave him to sign, he
   told the police he did not have enough money to pay the
26 required initial payment.  (Id. (citing Fan Dep. 88:3-
   25).)  In response, the police determined he would pay
27 $300,000.00 as a first payment and the remainder would be
   averaged over the future payments.  (Id.)  This does not
28                                        (continued...)

(Fan Decl. ¶ 15; Fan Dep. 96:11-13.)  The agreement
provided that Eastern Tools would pay $2.5 million to
settle the dispute over the allegedly non-conforming
equipment; required an initial payment of $300,000.00 to
be paid to Plaintiff by April 30, 2007; and specified the
remaining amount would be paid in six monthly
installments of $350,000.00 from May 2007 to October
2007.  (Bell Decl. Ex. 3E.)  The agreement also
designated Mr. Fan as the "Guarantor" and obligated
Eastern Tools to pay $6,272,641.00 to Plaintiff if it did
not pay the $2.5 million on schedule.  (<u>Id.</u>)  The
agreement specified that all disputes arising from its
performance would be submitted to arbitration before
CIETAC in Shanghai, China.  (<u>Id.</u>)

     The police released Mr. Fan on April 29 or 30, 2007.
(Fan. Decl. ¶ 15.)  According to his testimony, Mr. Fan
believed he was released only after the police confirmed
they had received the initial payment of $300,000.00.
(Fan Dep. 100:11-16; Fan Decl. ¶ 15.)

---

[12](...continued)
amount to negotiation.  Moreover, Plaintiff does not
provide a certified copy of the above cited deposition
testimony in the Liang Declaration.  <u>See</u> <u>Orr v. Bank of</u>
<u>Am.</u>, 285 F.3d 764, 775 (9th Cir. 2002).  Thus, the Court
has no way to verify Plaintiff's assertion.

1    In June 2007, the creditors of the bankrupt Joint
2    Venture voted not to approve the April 2007 Agreement
3    because they thought Eastern Tools should pay more than
4    $2.5 million to settle the dispute.[13]  (<u>See</u> Pl.'s SUF ¶
5    23; Fan Dep. 102:23-25; Dai Dep. 84:11-13.)

6

7         **2.   July 2007 Agreement**

8    After release from prison, Mr. Fan remained in China
9    and traveled to various cities to conduct business.  (Fan
10   Decl. ¶ 26; Fan Dep. 102:5-14; Pl.'s SUF ¶ 20.)  He sent
11   a copy of the April 2007 Agreement to his lawyers in the
12   United States, but did not show the document to his
13   lawyer in China.[14]  (Fan Dep. 102:15-22.)  According to
14   Mr. Fan, the Changzhou Public Security Bureau contacted
15   him at least ten times between April and July 2007.  (Fan
16   Decl. ¶ 26.)  In July, Mr. Fan received a telephone call
17   from Officer Huang, a policeman from Changzhou.[15]  (<u>Id.</u>)

18   _____

19        [13] Neither party discusses why Xuchu Dai asked Mr.
     Fan to sign the nearly identical July 2007 Agreement
20   after the creditors had already rejected the earlier
     agreement's terms.  (<u>See</u> Dai Dep. 83:14-22.)

21        [14] Mr. Fan testified he did not tell anyone else
22   about the circumstances surrounding the agreement
     because, "this [was] an embarrassing incident in China."
23   (Fan Dep. 108:15-19.)

24        [15] Plaintiff argues Mr. Fan reversed his testimony in
     his declaration, contradicting the statements he made at
25   his deposition.  (<u>See</u> Pl.'s SGI ¶ 11q.)  This is not
     entirely accurate, however.  In his deposition, Mr. Fan
26   testified he did not receive calls from the police *after*
     he signed the July 2007 Agreement, but that he could not
27   remember if he received calls from Chinese police
     officers in 2008.  (Fan Dep. 16:5-11.)  This does not
28                                       (continued...)

1  Officer Huang directed Mr. Fan to return to Changzhou to

2  sign the April 2007 agreement again.  (Id.)  Mr. Fan

3  believed that if he did not return and sign the

4  agreement, the police would take him into custody again

5  and detain him until he signed.[16]  (Id.)

6

7      On July 26, 2007, Mr. Fan signed a second agreement

8  with terms nearly identical to those in the April 2007

9  Agreement.[17]  The agreement provided that Eastern Tools

10 would pay $2.5 million in monthly installments of

11 $350,000.00 to settle the dispute over the allegedly

12 nonconforming shipment of equipment.  (Bell Decl. Ex.

13 _____

14      [15](...continued)

15 contradict the statement in his declaration that the
   police contacted him at least ten times *between* April and

16 July 2007.  (Fan Decl. ¶ 26.)

17      [16] Plaintiff attempts to dispute this fact by arguing
   Mr. Fan could have left China after his release in April

18 2007.  (See Pl.'s SGI ¶ 11r.)  Whether Mr. Fan could have
   left China between April and July 2007, however, does not

19 contradict Mr. Fan's assertion that when Officer Huang
   directed him in July to return to Changzhou to sign the

20 agreement, he believed he would be taken into custody if
   he did not comply.  Mr. Fan is a Chinese citizen and

21 presumably would not have been free to leave China had
   the police decided to arrest him again.

22

23      [17] Plaintiff claims Mr. Fan "freely negotiated" the
   July 2007 Agreement and that Mr. Fan even admits he made
   changes to it.  (Pl.'s Mot. at 4-5; Pl.'s Opp'n at 9.)

24 Mr. Fan's deposition testimony, however, belies this
   claim.  Mr. Fan testified that Plaintiff drafted the

25 agreement, Plaintiff's representative, Yongkang Shi, then
   directed him to read the draft, to make certain

26 handwritten changes to the document, and to sign the
   agreement.  (Fan Dep. 109:9-17.)  Mr. Fan further

27 testified, "They didn't need me to review it.  I had to
   sign."  (Fan Dep. 110:19-22.)  As discussed below, this

28 does not constitute negotiation.

                              22

5E.)  The agreement credited the $400,000.00 Defendants had already paid.  (Id.)  If Eastern Tools failed to pay the monthly installments on time, it then would owe $6,272,641.00 to Plaintiff.  (Id.)  Mr. Fan was again listed as the guarantor and assumed joint responsibility under the agreement.  (Id.)  The July 2007 Agreement also included the same arbitration clause as the April 2007 Agreement.  (Id.)

In December 2007, the creditors for the Joint Venture approved the July 2007 Agreement and notified Defendants. (Pl.'s SUF ¶ 30.)

### 3.  February 2008 Payment

Eastern Tools made a payment of $250,000.00 to the Joint Venture in early February 2008.[18]

---

[18] Plaintiff asserts Eastern Tools made the $250,000.00 payment in February 2008 "voluntarily" and cites to the Arbitration Award at page 6.  (See Pl.'s SUF ¶ 31.)  First, whether the payment was "voluntary" for purposes of ruling on Defendants' duress defense is a matter of law not of fact.  Secondly, the cited page does not include a finding on whether the payment was "voluntary," but merely states the payment was made on February 5, 2008.  (See Liang Decl. Ex. 5 at 6.) Finally, Plaintiff asserts the police never called Mr. Fan after 2007; however, in response to the question, "Did you receive any calls from Chinese police officers in 2008?", Mr. Fan responded during deposition, "Should be no.  I don't remember."  (Fan Dep. 16:9-11.)  Thus, the Court does not conclude as a factual matter that the payment was made "voluntarily."

1    **4.  CIETAC Arbitration**

2       In May 2008, the bankruptcy estate for the Joint

3    Venture initiated the arbitration process.  (Pl.'s SUF ¶

4    34.)   In December 2008, Defendants filed an action in the

5    Nantong Intermediate People's Court of the People's

6    Republic of China challenging the validity of the July

7    2007 Agreement.  (<u>Id.</u> ¶¶ 35-36.)   In late April 2009, Mr.

8    Fan withdrew his challenge in the Nantong Court, and

9    participated in the CIETAC arbitration, but continued to

10   contest the validity of the July 2007 Agreement on the

11   grounds that he signed it under duress.  (<u>Id.</u> ¶¶ 39, 42;

12   Liang Decl. Ex. 5 at 14-18.)   On December 29, 2009, the

13   CIETAC panel ruled in favor of Plaintiff's claims and

14   denied Defendants' counterclaims.  (Pl.'s SUF ¶ 50.)

15

16                  **II. LEGAL STANDARD**

17       The United Nations Convention on the Recognition and

18   Enforcement of Foreign Arbitral Awards ("the Convention"

19   or "the New York Convention"), which has been ratified by

20   the People's Republic of China and the United States,

21   governs the "recognition and enforcement of arbitral

22   awards made in the territory of a State other than the

23   State where the recognition and enforcement of such

24   awards are sought. . . ."  Convention on the Recognition

25   and Enforcement of Foreign Arbitral Awards Status,

26   http://www.uncitral.org/uncitral/en/uncitral_texts/arbitr

27   ation/NYConvention_status.html (last visited July 16,

28

2012); Convention on the Recognition and Enforcement of
Foreign Arbitral Awards Treaty, June 10, 1958, 21 U.S.T.
2517, 330 U.N.T.A. 39 ("New York Convention").  The
United States Senate ratified the Convention on October
4, 1968, 9 U.S.C. §§ 201, et seq.; the Convention was
incorporated into the United States Code on July 31,
1970.

   In Article V, the Convention sets out five grounds
for refusal that may be raised by parties and two grounds
that may be granted by the court sua sponte.  Convention,
art. V.  Respondent has the burden of establishing a
defense against enforcement under the Convention because
there is a strong presumption in favor of confirmation of
arbitral awards.  See Polimaster Ltd. v. RAE Sys., Inc.,
623 F.3d 832, 836 (9th Cir. 2010) (citing Gould, 969 F.2d
at 770) ("[Respondent] has the burden of showing the
existence of a New York Convention defense.
[Respondent's] burden is substantial because the public
policy in favor of international arbitration is strong .
. . .").  The presumption in favor of confirmation is
based on the goal of the Convention, which is to
encourage the recognition of international arbitral
agreements.  See Scherk v. Alberto-Culver Co., 417 U.S.
506, 520 n.15 (1974).  Further, favoring the confirmation
of arbitral agreements, courts have adopted a narrow view
of the defenses enumerated in the Convention.  See

1  <u>Polimaster</u>, 623 F.3d at 836 ("New York Convention

2  defenses are interpreted narrowly."); <u>Gould</u>, 969 F.2d at

3  770; <u>Parsons & Whittemore Overseas Co. v. Societe</u>

4  <u>Generale de L'Industrie du Papier (RAKTA)</u>, 508 F.2d 969

5  (2d Cir. 1974).

6

7      "The Convention mandates a summary procedure modeled

8  after federal motion practice to resolve motions to

9  confirm."  <u>Matter of Arbitration Between Trans Chemical</u>

10 <u>Ltd. and China Nat. Machinery Import and Export Corp.</u>,

11 978 F. Supp. at 309.  As the party opposing confirmation,

12 Defendants bear the burden of proof of establishing an

13 Article V reason prohibiting confirmation.  <u>See</u> <u>Gould</u>,

14 969 F.2d at 770 (citing <u>La Societe Nationale Pour La</u>

15 <u>Recherche v. Shaheen Natural Res. Co.</u>, 585 F. Supp. 57,

16 61 (S.D.N.Y. 1983), <u>aff'd</u>, 733 F.2d 260 (2d Cir. 1984)

17 (per curiam)).  Absent a convincing showing that one of

18 these narrow exceptions applies, the arbitral award will

19 be confirmed.  <u>Fitzroy Eng'g, Ltd. v. Flame Eng'g, Inc.</u>,

20 No. 94C2029, 1994 WL 700173, at *3 (N.D. Ill. Dec. 13,

21 1994); <u>see also</u> <u>Biotronik Messund Therapiegeraete GmbH &</u>

22 <u>Co. v. Medford Medical Instrument Co.</u>, 415 F. Supp. 133,

23 136 (D.N.J. 1976); <u>Indocomex Fibres Pte., Ltd. v. Cotton</u>

24 <u>Co. Int'l, Inc.</u>, 916 F. Supp. 721, 726 (W.D. Tenn. 1996);

25 <u>Geotech Lizenz AG v. Evergreen Sys.</u>, 697 F. Supp. 1248,

26 1252 (E.D.N.Y. 1988).)

27

28

**III. DISCUSSION**

The Convention governs the Court's confirmation of the award in this case because the purported agreement was made "in a territory of a State other than the State where the recognition and enforcement" of the award is being sought.  Convention, art. I(1).  The parties do not dispute that the four jurisdictional prerequisites were met here.[19]

Plaintiff seeks confirmation of the arbitral award, while Defendants argue the July 2007 Agreement was made under duress and the Court should therefore decline to recognize and enforce the award under Article V(1)(a), (2)(a), or (2)(b).

**A.  Review of the Underlying Contract's Validity**

At the outset, the Court must determine whether it can consider a contractual defense of duress in ruling on the confirmation of a foreign arbitral award under the Convention.  The Court finds that it can.  As Defendants contend correctly, a defense of duress can succeed as a

---

[19] A court may order arbitration if four conditions are met: (1) there is agreement in writing to arbitrate the dispute, (2) the agreement provides for arbitration in territory of signatory to the Convention, (3) the agreement to arbitrate arises out of a commercial legal relationship, and (4) there is a party to the agreement who is not an American citizen.  <u>Bautista v. Star Cruises</u>, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005). Plaintiff also brought its Motion to Confirm within the three year statute of limitations under the Convention. <u>See</u> 9 U.S.C. § 207.

1  defense to confirmation under Article V(1)(a), or (2)(b)
2  of the Convention.  Duress is not, however, a defense
3  under Article V(2)(a).

4

5      **1.  Article V(1)(a)**

6      Under Article V(1)(a), a court may refuse to enforce
7  an award if "the parties to the agreement . . . were,
8  under the law applicable to them, under some incapacity,
9  or the said agreement is not valid under the law to which
10 the parties have subjected it or, failing any indication
11 thereon, under the law of the country where the award was
12 made."  Convention, art. V(1)(a).  Plaintiff and
13 Defendants disagree on the law to which "the parties have
14 subjected" the arbitration agreement for purposes of
15 Article V(1)(a).  Defendants argue throughout their
16 papers that American arbitration law applies.  (See
17 Defs.' Mot.; Defs.' Opp'n.)  Plaintiff argues simply that
18 the Court must defer to the determination of CIETAC,
19 which made its findings based on Chinese law.  (Pl.'s
20 Mot. at 13.)

21

22     Although there is a dearth of case law addressing
23 defenses under Article V(1)(a), at least some courts have
24 found the "law to which the parties have subjected" the
25 agreement to be the law specified in the underlying
26 agreement's choice-of-law provision.  See, e.g., Am.
27 Constr. Mach. & Equip. Corp. v. Mechanised Constr. of

28

1  Pak., 659 F. Supp. 426, 428-429 (S.D.N.Y. 1987).  Here,
2  while the July 2007 Agreement does not include a choice-
3  of-law provision, CIETAC applied Chinese law in ruling on
4  the parties' claims and counterclaims.  (See Liang Decl.
5  Ex. 5 at 36.)  "[U]nder the New York Convention, the
6  rulings of the [arbitrator] interpreting the parties'
7  contract are entitled to deference."[20]  Karaha Bodas Co.,
8  LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi
9  Negara, 364 F.3d 274, 290 (5th Cir. 2004) (deferring to
10  arbitrator's choice-of-law determination); see also James
11  Ford, Inc. v. Ford Dealer Computer Servs., 56 Fed. Appx.
12  324, 325 (9th Cir. 2003) (giving broad deference to an
13  arbitrator's choice-of-law decision).  Since the CIETAC
14  arbitration panel applied Chinese law, there is no basis
15  to rule on a duress defense under American law "unless
16  the [arbitrator] manifestly disregarded the parties'
17  agreement or the law."  Id.; see also Carter v. Health
18  Net of Cal., Inc., 374 F.3d 830, 838 (9th Cir. 2004) ("As
19  federal courts of appeals have repeatedly held, 'manifest
20  disregard of the law' means something more than just an
21  error in the law or a failure on the part of the
22  arbitrators to understand or apply the law.  It must be

_____

25  [20] To clarify, the deference given to the
arbitrator's choice-of-law decision is distinct from the
26  deference given to the arbitrator's findings of fact with
respect to an Article V defense.  Here, the Court defers
27  to CIETAC's application of Chinese law solely for the
purpose of determining the "law to which the parties have
28  subjected" the agreement.

1  clear from the record that the arbitrators recognized the
2  applicable law and then ignored it.").

3

4      Here, the Court does not find CIETAC's application of
5  Chinese law in ruling on Defendants' duress defense was a
6  "manifest disregard" of the law.  The parties entered
7  into the agreement in China and provided that a Chinese
8  arbitration body would resolve any disputes arising out
9  of the contract.  It was therefore reasonable for CIETAC
10 to apply Chinese law in arbitrating the dispute.

11

12     The Court does not consider further whether a defense
13 of duress would be successful under Article V(1)(a),
14 however, as the Court denies confirmation under Article
15 V(2)(b).[21]

16

17     **2.  Article V(2)(a)**
18     Defendants next contend that the Court should deny
19 confirmation under Article V(2)(a), which provides that a
20 court may refuse confirmation if "the subject matter of
21 the difference is not capable of settlement by
22 arbitration under the law of that country."  (Defs.' Mot.
23 at 6.)  Defendants contend the "law of that country"
24 refers to the law of the country in which confirmation is
25 being sought, here the United States.  (Defs.' Mot. at

26 _____

27     [21] For this reason, the Court makes no findings as to
28 the merits of Defendants' duress defense under Chinese
   law.

6.)   Plaintiff does not object to this reasoning directly, but maintains that the law requires the arbitrator to decide whether the July 2007 Agreement is enforceable.  (Pl.'s Mot. at 13.)

    Article V(2)(a) provides an extremely limited defense to confirmation.  The provision only covers disputes which under domestic law would be "entrusted to the exclusive competence of the judiciary." <u>Parsons</u>, 508 F.2d at 974 (citing <u>American Safety Equip. Corp. v. J. P. Maguire & Co.</u>, 391 F.2d 821, 822 (2d Cir. 1968) (finding antitrust claims inappropriate for arbitration and denying confirmation of arbitration award)).  The July 2007 Agreement resolved a contract dispute over non-conforming goods – a subject matter entirely capable of "settlement by arbitration."

    **3.   Article V(2)(b)**
    Article V(2)(b) of the Convention states that a decision "may be refused" if "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."  Convention, art. V(2)(b). While the Court has not found any case in which a district court has declined to confirm a foreign arbitral award under Article V(2)(b) based on a defense of duress, courts have addressed whether the defense would undermine enforcement under Article V(2)(b) and concluded that it

would.[22]   For instance, in <u>Ameropa AG v. Havi Ocean Co.</u>
<u>LLC</u>, the court found that "[e]nforcement would violate
this country's 'most basic notions of morality and
justice' if the defendant's due process rights had been
violated - for example, if defendant had been subject to
coercion or any part of the agreement had been the result
of duress."   No. 10CIV3240 (TPG), 2011 WL 570130, at *2
(S.D.N.Y. Feb. 16, 2011) (interpreting Convention, art.
V(1), (2)(b)) (quoting <u>Parsons</u>, 508 F.2d at 974); <u>see</u>
<u>also</u> <u>Ministry of Def. and Support for the Armed Forces of</u>
<u>the Islamic Republic of Iran v. Cubic Def. Sys., Inc.</u>,
665 F.3d 1091, 1097 (9th Cir. 2011) (also quoting
<u>Parsons</u>); <u>Transmarine Seaways Corp. v. Marc Rich & Co. A.</u>
<u>G.</u>, 480 F. Supp. 352, 358 (S.D.N.Y. 1979) ("Agreements
exacted by duress contravene the public policy of the
nation, [citation], and accordingly duress, if
established, furnishes a basis for refusing enforcement
of an award under Article V(b)(2) of the Convention.")
(citing <u>Fluor Western, Inc. v. G. & H. Offshore Towing</u>
<u>Co.</u>, 447 F.2d 35, 39 (5th Cir. 1971) (discussing common-
law public policy against agreements formed under
unconscionably unequal bargaining positions)).   In

---

[22] Consistent with this interpretation, the Ninth
Circuit has found that a party's incapacity at the time
of the signing of the underlying contract - a defense
which also vitiates consent - "is a basis on which the
district court could refuse to enforce an arbitration
award under the New York Convention . . . ." <u>Seung Woo</u>
<u>Lee v. Imaging3, Inc.</u>, 283 Fed. Appx. 490, 493 (9th Cir.
2008).

1  <u>Transmarine Seaways</u>, the court stated categorically that

2  if the underlying agreement was exacted by duress, the

3  arbitration award could not stand.  480 F. Supp. at 358.

4

5      The Court also notes that considering duress as a

6  defense under Article V(2)(b) is consistent with the

7  Convention's provision on compelling arbitration under

8  Article II.[23]  See <u>Lindo v. NCL (Bahamas) Ltd.</u>, 652 F.3d

9  1257, 1262-63 (11th Cir. 2011) (noting the Convention's

10 corresponding stages of enforcement).  More often than

11 not the issue of enforceability comes before courts on a

12 motion to compel arbitration rather than on a motion to

13 confirm an arbitral award.  See <u>China Minmetals</u>

14 <u>Materials</u>, 334 F.3d at 281.  In those cases, the well-

15 established precedent is that a meritorious defense of

16 duress would undermine the enforcement of the arbitration

17 agreement under Article II(3) of the Convention.  <u>See</u>

18 <u>Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.</u>, 109 F.

19 Supp. 2d 1236, 1259 (S.D. Cal. 2000); <u>see also</u> <u>DiMercurio</u>

20 <u>v. Sphere Drake Ins. PLC</u>, 202 F.3d 71, 79 (1st Cir. 2000)

21 (fraud, mistake, duress, and waiver grounds to invalidate

22 arbitration clauses under Article II(3)); <u>Bautista v.</u>

23

24  _____

25      [23] "To implement the Convention, Chapter 2 of the FAA
    provides two causes of action in federal court for a
    party seeking to enforce arbitration agreements covered
26  by the Convention: (1) an action to compel arbitration in
    accord with the terms of the agreement, 9 U.S.C. § 206,
27  and (2) at a later stage, an action to confirm an
    arbitral award made pursuant to an arbitration agreement,
28  9 U.S.C. § 207."  <u>Lindo</u>, 652 F.3d at 1262-63.

1    <u>Star Cruises</u>, 396 F.3d 1289, 1302 (11th Cir. 2005)

2    (standard breach-of-contract defenses "such as fraud,

3    mistake, duress, and waiver" apply under Article II(3)).

4    If an agreement is "null and void" under Article II(3),

5    the underlying agreement to arbitrate is unenforceable

6    and the Court cannot compel arbitration.  <u>Chloe Z</u>

7    <u>Fishing</u>, 109 F. Supp. 2d at 1258-59.  Several

8    "internationally recognized defenses" render a contract

9    "null and void" under Article II; duress is one such

10   defense.  <u>Id.</u> ("[I]t is well-established that . . .

11   internationally recognized defenses to contract formation

12   or public policy concerns of the forum nation . . .

13   make[] a valid agreement to arbitrate the subject of the

14   dispute unenforceable under Article II, section 3 of the

15   Convention."); <u>see also</u> <u>DiMercurio</u>, 202 F.3d at 79;

16   <u>Bautista</u>, 396 F.3d at 1302.

17

18       If a successful duress defense would undermine a

19   court's ability to compel arbitration under the

20   Convention, it would be unjust for the court to be unable

21   to consider this defense in confirming the award.

22

23              **a.   Applicable Law**

24       Absent any precedent on what law to apply to a

25   defense of duress under Article V(2)(b), the Court

26   considers the law courts have applied in ruling on

27   contractual defenses under Article II(3) of the

28

1   Convention – the provision which allows a party to raise
2   a defense of duress to motions to compel arbitration.
3   Similar choice-of-law issues arise in cases which concern
4   the validity of an arbitration agreement under Article
5   II.  Whether and how a court applies its domestic law to
6   determine if a valid agreement exists for purposes of
7   Article II(3) remains unsettled, however.  Some district
8   courts have applied domestic state law to determine the
9   issue of validity.  <u>See, e.g.</u>, <u>Javier v. Carnival Corp.</u>,
10  No. 09CV2003-LAB (WMc), 2010 WL 3633173, at *3-4, 10-12
11  (S.D. Cal. Sept. 13, 2010) (applying domestic law to rule
12  on fraud and unconscionability defenses in determining
13  validity of underlying agreement under Article II(3))
14  (citing <u>Davis v. O'Melveny & Myers</u>, 485 F.3d 1066, 1072
15  (9th Cir. 2007)).

16

17      At the same time, the inquiry into whether an
18  agreement is "null and void" under Article II(3) does not
19  begin with an analysis of state contract law.  In <u>Chloe Z</u>
20  <u>Fishing</u>, the court stated "it is well-established that it
21  is not state law, but internationally recognized defenses
22  to contract formation or public policy concerns of the
23  forum nation, which makes a valid agreement to arbitrate
24  the subject of the dispute unenforceable under Article
25  II, section 3 of the Convention."  109 F. Supp. 2d at
26  1258-59.  There, the court refused to consider the state
27  law defense of unconscionability – a defense not

28

1    articulated as one of the "internationally recognized

2    defenses" which would render an agreement unenforceable

3    under Article II(3).   Id. at 1259; see also DiMercurio,

4    202 F.3d at 79; Bautista, 396 F.3d at 1302.   While the

5    authorities cited clearly limit challenges to an

6    agreement's validity under Article II(3) to only those

7    "internationally recognized defenses," such as duress,

8    mistake, fraud, or waiver, the case law provides little

9    guidance on what law a court should apply to determine

10   whether one of these defenses is meritorious in a

11   particular case.

12

13        Perhaps more helpful is the line of cases addressing

14   the applicable law in determining the validity of

15   arbitration agreements with foreign choice-of-law

16   provisions.   In those cases, courts apply domestic law to

17   determine the threshold issue of validity.   For instance,

18   in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,

19   the Supreme Court clarified that "the first task of a

20   court asked to compel arbitration of a dispute is to

21   determine whether the parties agreed to arbitrate that

22   dispute."   473 U.S. 614, 626 (1985).   In this initial

23   determination, a foreign choice-of-law provision does not

24   control and courts are to apply domestic law.   Id. at

25   625; see also Sea Bowld Marine Group, LDC v. Oceanfast

26   Pty, Ltd., 432 F. Supp. 2d 1305, 1312 (S.D. Fla. 2006);

27   Kamaya Co. Ltd., v. Am. Prop. Consultants, Ltd., 91 Wash.

28

App. 703, 713-14 (Wash. Ct. App. 1998) (noting that despite choice of law and forum selection clauses, it is "axiomatic that courts must have some law to apply when initially determining whether the parties agreed to arbitrate a particular dispute" and finding that law in the analytical framework of the FAA).

Similarly, in <u>Britton v. Co-op Banking Group</u>, the Ninth Circuit held that a party who had not contracted to a valid agreement had no standing to compel arbitration. 916 F.2d 1405, 1413 n.9 (9th Cir. 1990) ("Standing, of course, is always a threshold issue.  When evaluating a motion to compel arbitration, the first determination is whether the parties intended to contract for arbitration.") (citing <u>Van Ness Townhouses v. Mar Industries Corp.</u>, 862 F.2d 754, 756 (9th Cir. 1988)).  On appeal after remand, the Ninth Circuit applied California contract law, finding the parties had not formed a valid arbitration agreement.  <u>Britton v. Co-Op Banking Group</u>, 4 F.3d 742, 745 (9th Cir. 1993) (citing <u>Martinez v. Socoma Cos., Inc.</u>, 11 Cal. 3d 394 (1974)).

Moreover, as this Court's subject matter jurisdiction arises under the Convention and Chapter 2 of the FAA, the law under which the case "arises" arguably applies to the question of whether these parties consented freely to the agreement.  <u>See Chloe Z Fishing</u>, 109 F. Supp. 2d at 1252;

1  <u>Filanto, S.p.A. v. Chilewich Int'l Corp.</u>, 789 F. Supp.
2  1229, 1234-36 (S.D.N.Y. 1992) (noting that the
3  "Convention, as a treaty, is the supreme law of the land,
4  U.S. Const. art. VI cl. 2, and controls any case in any
5  American court falling within its sphere of application"
6  such that "any dispute involving international commercial
7  arbitration which meets the Convention's jurisdictional
8  requirements, whether brought in state or federal court,
9  must be resolved with reference to that instrument");
10 <u>Coenen v. R. W. Pressprich & Co.</u>, 453 F.2d 1209, 1211 (2d
11 Cir. 1972) ("Once a dispute is covered by the [Federal
12 Arbitration] Act, federal law applies to all questions of
13 [the arbitration agreement's] interpretation,
14 construction, validity, revocability, and
15 enforceability."). As federal arbitration law applies
16 state law to rule on the merits of the defense of duress,
17 the Court follows this approach. <u>See Doctor's Assocs.,
18 Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996) ("generally
19 applicable contract defenses, such as fraud, duress, or
20 unconscionability, may be applied to invalidate
21 arbitration agreements without contravening [9 U.S.C. §
22 2]"); <u>see also Al-Safin v. Circuit City Stores, Inc.</u>, 394
23 F.3d 1254, 1257 (9th Cir. 2005).
24
25      Finally, the Court notes that applying Chinese
26 contract law in ruling on a defense of duress under
27 Article V(2)(b) would subvert the purpose of the
28

Convention.  "Article V(2) of the Convention provides
that a United States court is not required to enforce an
agreement if its subject matter is not capable of
arbitration in the United States, or if enforcement of
the arbitral award would be contrary to American public
policy."  Sarhank Group v. Oracle Corp., 404 F.3d 657,
661 (2d Cir. 2005) (internal citation omitted).  In order
to determine whether the award is contrary to American
public policy, the Court must apply federal arbitration
law.  Id.

     Accordingly, the Court applies California state
contract law in ruling on Defendants' duress defense.

               b.   Standard of Review
     The Court's review of a defense of duress under
Article V(2)(b) is highly circumspect.  The public policy
behind both the FAA and the Convention strongly favors
arbitration, and "the party opposing enforcement of an
arbitral award has the burden to prove that one or more
of the defenses under the New York Convention applies."
Encyclopaedia Universalis S.A. v. Encyclopaedia
Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005) (citing
Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156
F.3d 310, 313 (2d Cir. 1998)); see also Compagnie Noga
D'Importation et D'Exportation, S.A. v. The Russian
Federation, 361 F.3d 676, 683 (2d Cir. 2004).  "The

burden is a heavy one, as 'the showing required to avoid summary confirmance is high.'"  Id.  "Under the Convention, [a] district court's role in reviewing a foreign arbitral award is strictly limited." Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997) (internal quotation marks omitted). "A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law." Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004); see also Telenor Mobile Commc'ns AS v. Storm, LLC, 524 F. Supp. 2d 332, 344 (S.D.N.Y. 2007), aff'd, 584 F.3d 396 (2d Cir. 2009).

Despite the limited scope of this Court's review and the relative lack of guiding precedent, the Court nevertheless concludes that it can consider Defendants' defense of duress.

**B.  Duress**

Defendants argue that Mr. Fan was under duress in July 2007 because his fear of detention deprived him of his free will.  (Defs.' Mot. at 8-10; Fan Decl. ¶ 26.) Plaintiff contends the July Agreement was not made under duress because Mr. Fan could have left China between April and July 2007, but instead negotiated the July Agreement freely.  (Pl.'s SGI ¶ 11r; Pl.'s Mot. at 4-5; Pl.'s Opp'n at 9.)

1    Under California law, a contract is voidable if the
2  agreement was made under duress.  California codified the
3  common law rule of duress in Civil Code Section 1569,[24]
4  but that standard has since been relaxed.  <u>In re Marriage</u>
5  <u>of Baltins</u>, 212 Cal. App. 3d 66, 84 (1989).  Today,
6  "[d]uress generally exists whenever one is induced by the
7  unlawful act of another to make a contract or perform
8  some other act under circumstances that deprive him of
9  the exercise of free will."  <u>Tarpy v. Cnty. of San Diego</u>,
10 110 Cal. App. 4th 267, 276 (2003).  A party must show
11 duress by a preponderance of the evidence.  <u>In re</u>
12 <u>Marriage of Balcof</u>, 141 Cal. App. 4th 1509, 1523 (2006).
13
14    A contract is also voidable if a party's assent was
15 the result of the threat of duress, or "menace."[25]  <u>See</u>
16 <u>Odorizzi v. Bloomfield Sch. Dist.</u>, 246 Cal. App. 2d 123
17 (1966).  There are various ways in which a threat may be
18 improper.  For instance, threats of criminal prosecution
19 or the use of the civil process constitute improper
20 threats to induce a party's assent to a contract.
21  _____

22    [24] "Duress consists in: (1) Unlawful confinement of
   the person of the party . . . ; (2) Unlawful detention of
23 the property of any such person; or (3) confinement of
   such person, lawful in form, but fraudulently obtained,
24 or fraudulently made unjustly harassing or oppressive."
   Cal. Civ. Code § 1569.
25
     [25] "Menace consists in a threat: (1) Of such duress
26 as is specified in Subdivisions 1 and 3 of [Cal. Civ.
   Code § 1569]; (2) Of unlawful and violent injury to the
27 person or property of any such person as is specified in
   [Cal. Civ. Code § 1569]; or, (3) Of injury to the
28 character of any such person."  Cal. Civ. Code § 1570.

1  Restatement 2d, Contracts § 176(1)(b)-(c); see Shasta
2  Water Co. v. Croke, 128 Cal. App. 2d 760, 764 (1954).  It
3  is also improper for a party to threaten to use its power
4  for illegitimate means if the resulting agreement is not
5  on fair terms.  Restatement 2d, Contracts § 176(2)(c).
6  Finally, a threat may be improper if a party's previous
7  unfair dealing increases significantly the chance of
8  inducing the other party's assent, and the agreement
9  benefits the threatening party unfairly.  Id.
10
11     In addition to statutory duress and menace,
12  California recognizes economic duress as a basis for
13  vitiating a coerced party's consent to an agreement.
14  CrossTalk Productions, Inc. v. Jacobson, 65 Cal. App. 4th
15  631 (1998).  This doctrine applies "when one party has
16  done a wrongful act which is sufficiently coercive to
17  cause a reasonably prudent person, faced with no
18  reasonable alternative, to agree to an unfavorable
19  contract."  Id. at 644.  To determine if a party had a
20  reasonable alternative depends on whether "a reasonably
21  prudent person would follow the alternative course, or
22  whether a reasonably prudent person might submit."  Id.
23
24     A party may also void a payment on a contract if such
25  payment was made while under duress.  See Berrien v. New
26  Raintree Resorts Int'l., LLC, 176 F.R.D. 355, 363 (N.D.
27  Cal. 2011).
28

1        Duress for this purpose is shown 'where, by
2        reason of the peculiar facts a reasonably
      prudent man finds that in order to preserve his
3        property or protect his business interests it is
      necessary to make a payment of money which he
4        does not owe and which in equity and good
      conscience the receiver should not retain.'

5   Steinman v. Malamed, 185 Cal. App. 4th 1550, 1558 (2010)

6   (quoting Western Gulf Oil Co. v. Title Ins. & Trust Co.,

7   92 Cal. App. 2d 257, 266 (1949)).

8

9       The circumstances surrounding the July 2007 Agreement

10   deprived Mr. Fan of his free will, and thus, Defendants

11   did not consent to the agreement.  In April 2007, just

12   three months before Mr. Fan signed the agreement, the

13   Changzhou police:

14   •  Arrested and detained Mr. Fan for at least

15        twelve days without charging him with a crime,

16        (Fan Decl. ¶¶ 12-13, 15; Fan Dep. 100:11-16; Zhu

17        Dep. 8:20; 60:14-61:17);

18   •  Barred Mr. Fan from speaking with an attorney

19        about his arrest, (Defs.' Reply SUF ¶ 11g; Wu

20        Dep. 35:7-25; 36:1-5);

21   •  Instructed an attorney that he could only advise

22        Mr. Fan to sign the April 2007 Agreement, (Id.);

23   •  Told Mr. Fan, after detaining him for four days,

24        that even though the police investigation had

25        been completed, they would not release Mr. Fan

26        until he signed the April 2007 Agreement, (Fan

27        Decl. ¶ 15; Fan Dep. 96:11-13); and

28

1      •    Released Mr. Fan only after confirming the first

2           payment on the April 2007 Agreement - totaling

3           $300,000.00 - had been received, which was at

4           least eight days after the police had closed

5           their investigation.  (Fan Decl. ¶ 15; Fan Dep.

6           100:11-16.)

7

8     Following Mr. Fan's arrest and up until he signed the

9 July Agreement, the Changzhou Public Security Bureau

10 contacted Mr. Fan at least ten times.  (Fan Decl. ¶ 26.)

11 Thus, when Officer Huang called Mr. Fan and directed him

12 to return and sign the July 2007 Agreement, Mr. Fan

13 believed reasonably that if he did not return and sign

14 the agreement, the police would detain Mr. Fan again

15 until he signed.[26]  (Fan Decl. ¶ 26.)

16

17     Additionally, the terms of the July 2007 Agreement,

18 when viewed in contrast with those to which the parties

19 agreed in December 2006, further indicate Mr. Fan did not

20 assent freely to the agreement.  In December, the parties

21 agreed Eastern Tools would retain the allegedly defective

22 equipment and pay $2 million to the Joint Venture.  (Fan

23 Decl. ¶ 11; Pl.'s Mot. at 3.)  The July Agreement's

24 terms, however, increased the amount Eastern Tools would

25 _____

26     [26] While Plaintiff argues Mr. Fan could have left
China, the Court declines to find a Chinese citizen, who
27 has legitimate business to conduct in China, (Fan Decl. ¶
26; Fan Dep. 102:5-14; Pl.'s SUF ¶ 20), must flee the
28 country in order to preserve a duress defense.

pay by $400,000.00; provided that if the monthly installments were not paid timely, then Defendants would owe $6,272,641.00; and held Mr. Fan personally liable for the entire amount.  (Bell Decl. Ex. 5E.)  The sharp contrast in the terms of the two agreements, coupled with the threatening circumstances surrounding Mr. Fan's signing of the July 2007 Agreement, suggest strongly that the agreement was not the result of the parties' free assent.

Plaintiff presents no evidence disputing the above facts.  At the hearing, Plaintiff argued the Court should decline to consider Mr. Fan's statements describing his detention, release, and the continued police contact, as these statements represent hearsay and lack credibility. As the Court notes above, however, Plaintiff had the opportunity to cross-examine Mr. Fan during his deposition, and thus, could have tested the credibility of Mr. Fan's statements then.  Plaintiff also could have disputed the facts stated in Mr. Fan's declaration by submitting contradictory declarations or deposition testimony from the Changzhou police, Officer Huang, or Mr. Dai, as well as any other relevant evidence.  But, Plaintiff did not present any evidence disputing Mr. Fan's statements.

1          **1.   Third Party Duress**

2          California allows an innocent party, whose assent was

3    induced by a third party's use of duress, to void that

4    contract under certain circumstances.[27]  For instance, "a

5    party who enters into a contract under duress may obtain

6    rescission against another contracting party, who,

7    although not responsible for the duress, knows that it

8    has taken place and takes advantage of it by enforcing

9    the contract, particularly a contract made with

10   inadequate consideration."  <u>Chan v. Lund</u>, 188 Cal. App.

11   4th 1159, 1174 (2010).  An innocent party may not void a

12   contract due to a third party's use of duress when the

13   other contracting party acted in good faith, without

14   reason to know of the third party's use of duress, and

15   relied materially on the contract.  <u>Id.</u> (citing

16   Restatement 2d, Contracts § 175, com. e, p. 479).[28]

17   _____

18       [27] "A party to a contract may rescind the contract in
     the following cases: (1) If the consent of the party
19   rescinding, or of any party jointly contracting with him,
     was given by mistake, or obtained through duress, menace,
20   fraud, or undue influence, exercised by or with the
     connivance of the party as to whom he rescinds, or of any
21   other party to the contract jointly interested with such
     party."  Cal. Civ. Code § 1689(b).

22       [28] "If a party's assent has been induced by the
23   duress of a third person, rather than that of the other
     party to the contract, the contract is nevertheless
24   voidable by the victim.  There is, however, an important
     exception if the other party has, in good faith and
25   without reason to know of the duress, given value or
     changed his position materially in reliance on the
26   transaction.  'Value' includes a performance or a return
     promise that is consideration . . . so that the other
27   party is protected if he has made the contract in good
     faith before learning of the duress."  Restatement 2d,
28                                            (continued...)

1     The law treats a contracting party's use of duress
2   and a third party's use of duress, where the contracting
3   party was aware of such duress, the same.   In <u>Leeper v.</u>
4   <u>Beltrami</u>, 53 Cal. 2d 195 (1959), the court stated that a
5   contracting party cannot take advantage of a third
6   party's use of duress knowingly.   <u>Id.</u> at 206.   There, in
7   an effort to stave off wrongful foreclosure proceedings,
8   the plaintiff conveyed her property for one-third of its
9   actual market-value.   <u>Id.</u> at 205.   The plaintiff sought
10  to rescind the conveyance but did not allege any active
11  wrongdoing on behalf of the purchaser.   <u>Id.</u>   The court
12  found the plaintiff stated a cause of action against the
13  purchaser because the purchaser was aware the plaintiff
14  needed to sell her property quickly, at less than actual
15  market-value, in order to protect herself from other
16  wrongful foreclosure proceedings.   <u>Id.</u> at 206.   In doing
17  so, the court indicated that mere knowledge of another
18  contracting party's predicament, <u>i.e.</u>, that such party's
19  assent was induced by another party's use of duress, is
20  sufficient to create a right of rescission.   <u>Id.</u>

21

22     Here, the following uncontroverted facts illustrate
23  Plaintiff was aware Mr. Fan signed the July 2007
24  Agreement under duress:

25

26

27  ─────────────────
        [28](...continued)
28  Contracts § 175, com. e, p. 479.

1        •    Mr. Dai met with Mr. Fan to discuss the dispute

2             between Eastern Tools and the Joint Venture

3             while Mr. Fan was in police custody, (Dai Dep.

4             51:1-14);

5        •    Mr. Dai testified that at the time he met with

6             Mr. Fan to negotiate the July 2007 Agreement he

7             believed Mr. Fan was in custody because one of

8             the shareholders in the Joint Venture had

9             accused Mr. Fan of contract fraud, (Dai Dep.

10            51:1-14.);

11       •    The July 2007 Agreement listed Mr. Fan in his

12           personal capacity as a guarantor assuming joint

13           responsibility for the entire agreement even

14           though Mr. Fan had not agreed to this in any of

15           the negotiated agreements before his detention,

16           (Fan Dep. 109:9-17; Bell Decl. Ex. 5E); and

17       •    Plaintiff's representative obtained Mr. Fan's

18           signature on the July 2007 Agreement without

19           allowing Mr. Fan to review the agreement, (Fan

20           Dep. 109:9-17; 110:19-22).

21

22    The uncontroverted facts show Mr. Fan was under

23 duress in July 2007 when he signed the agreement; thus,

24 he never consented freely to the agreement's terms.

25 Since Plaintiff knew of the circumstances undermining Mr.

26 Fan's capacity to assent freely, and nevertheless took

27 advantage of the situation to induce Mr. Fan to sign the

28

1   agreement, Defendants may void the agreement under
2   California law.

3

4       For purposes of ruling on the Motions, the Court
5   therefore finds Defendants have shown by a preponderance
6   of the evidence that the July 2007 Agreement was invalid
7   based on a defense of duress.

8

9       **2.   Ratification**
10      Plaintiff argues that even if Mr. Fan entered into
11  the July 2007 Agreement under duress, Defendants ratified
12  the agreement when Mr. Fan authorized the first payment
13  in February 2008.  (Pl.'s Opp'n at 11-12.)  Defendants
14  contend Mr. Fan remained under duress when he authorized
15  this payment.  (Defs.' Opp'n at 15.)

16

17      "A contract which is voidable solely for want of due
18  consent, may be ratified by a subsequent consent."  Cal.
19  Civ. Code § 1588.  Whether a party ratified a voidable
20  contract depends primarily on the party's intention, as
21  demonstrated by his or her declarations, acts, or
22  conduct.  Esau v. Briggs, 89 Cal. App. 2d 427 (1948).
23  The test for ratification is "whether the releasor with
24  full knowledge of material facts entitling him to rescind
25  has engaged in some unequivocal conduct giving rise to an
26  inference that he intended his conduct to amount to a
27  ratification."  Union Pac. R. Co. v. Zimmer, 87 Cal. App.
28

2d 524, 532 (1948).  "Whether the releasor has such
knowledge, or whether retention has been for an
unreasonable length of time, are normally questions for
the trier of fact."  <u>Aikins v. Tosco Refining Co., Inc.</u>,
No. C-98-00755-CRB, 1999 WL 179686, at *4 (N.D. Cal. Mar.
26, 1999) (applying <u>Zimmer</u> test).  In a summary
proceeding such as this, the Court decides questions of
fact based on the evidence submitted.  <u>See</u> <u>Matter of</u>
<u>Arbitration Between Trans Chemical Ltd. and China Nat.</u>
<u>Machinery Import and Export Corp.</u>, 978 F. Supp. at 309.

While Defendants bear the burden of presenting
evidence sufficient to establish a defense of duress,
Plaintiff must present some evidence showing Mr. Fan
ratified the agreement in order to sustain their
ratification argument.[29]  <u>See</u> <u>Aikins</u>, 1999 WL 179686, at
*6 (party asserting ratification did not present evidence
sufficient to show as a matter of law that opposing party
ratified agreement).  Plaintiff presents no evidence to
establish Plaintiff ratified the July 2007 Agreement.
The only facts Plaintiff cites in support of its
ratification argument are: 1) Defendants made the

---

[29] While "the party opposing enforcement of an
arbitral award has the burden to prove that one or more
of the defenses under the New York Convention applies,"
<u>Encyclopaedia Universalis</u>, 403 F.3d at 90, this does not
eviscerate completely the burden on Plaintiff to present
some evidence to support an asserted fact or legal
argument.

1   February payment; and 2) Mr. Fan was not contacted by
2   Chinese police after signing the July 2007 Agreement.

3

4       First, the fact that Defendants made the payment, on
5   its own, does not demonstrate Defendants ratified the
6   agreement.  Plaintiff does not show Mr. Fan had "full
7   knowledge of material facts entitling him to rescind,"
8   nor that his conduct when he made the payment created "an
9   inference that he intended his conduct to amount to a
10  ratification."  See Union Pac. R. Co., 87 Cal. App. 2d at
11  532.  If Mr. Fan remained under duress in February 2008,
12  the payment would not have been voluntary and would not
13  have constituted a ratification.  See Rakestraw v.
14  Rodrigues, 8 Cal.3d 67, 73 (1972) (no ratification if
15  adoption of contract is only a result of duress or
16  misrepresentation); Cf. Aikins, 1999 WL 179686, at *6
17  (noting evidence supported finding of ratification where
18  plaintiff *conceded* he accepted benefits under the
19  agreement *after* regaining mental functions and *after* he
20  understood terms of agreement, but holding defendant
21  still failed to show ratification as a matter of law).

22

23      Secondly, Mr. Fan's deposition testimony does not
24  entirely support Plaintiff's argument that the police
25  never contacted Mr. Fan after July 2007.  In response to
26  the question, "Did you receive any calls from Chinese
27  police officers in 2008?", Mr. Fan stated, "Should be no.
28

I don't remember."  (Fan. Dep. 16:9-11.)  Other than
citing this deposition testimony, Plaintiff presents no
evidence showing Mr. Fan's state of mind had shifted by
February 2008 so that he no longer feared being arrested
if he did not comply with the July 2007 Agreement.  (<u>See</u>
Pl.'s SUF.)

     The Court finds a sufficient temporal connection
existed between Mr. Fan's arrest in April 2007, the
telephone calls from the Public Security Bureau between
April and July 2007, the order from Officer Huang in July
2007, and the first payment in February 2008, to support
Defendants' claim that Mr. Fan continued to fear possible
detention if he did not authorize the first payment.  As
Plaintiff does not present evidence to show Mr. Fan had
full knowledge of the facts entitling him to rescind,
Plaintiff's ratification argument fails.

     **3.  Act of State**
     Plaintiff next argues the Court may not rule on
Defendants' duress defense because, under the act of
state doctrine, the Court cannot inquire into the
validity of the acts of the Changzhou Public Security
Bureau.  (Pl.'s Opp'n at 14.)  Defendants contend the act
of state doctrine has no application here.  (Defs.' Opp'n
at 16.)

1   "The act of state doctrine in its traditional
2   formulation precludes the courts of this country from
3   inquiring into the validity of the public acts a
4   recognized foreign sovereign power committed within its
5   own territory." Banco Nacional de Cuba v. Sabbatino, 376
6   U.S. 398, 401 (1964).  Here, however, the Court is not
7   ruling on the validity or legality of Mr. Fan's arrest.
8   The Court makes no findings as to whether his arrest was
9   legitimate under the laws of the People's Republic of
10  China.  The only holding the Court reaches is that, under
11  California law, Mr. Fan could not properly consent to an
12  agreement when he held a reasonable belief that he would
13  be detained if he did not sign.  Thus, the act of state
14  doctrine has no bearing on the Court's ruling in this
15  case.
16
17  **C.   Denying Enforcement**
18      Having found Mr. Fan entered into the July 2007
19  Agreement under duress, the Court denies confirmation of
20  the arbitral award under Article V(2)(b).  While it may
21  be unusual for a court to deny confirmation under Article
22  V(2)(b), it is equally unusual for a court to enforce
23  contracts created without one party's consent and
24  complied with out of fear of imprisonment.  The Court
25  will not wield its power to enforce contracts which would
26  be wholly unenforceable under domestic laws.  See
27  Diapulse Corp. of Am. v. Carba, Ltd., 626 F.2d 1108, 1110
28

1   (2d Cir. 1980) ("an award may be set aside if it compels
2   the violation of law or is contrary to a well accepted
3   and deep rooted public policy").  The Convention does not
4   mandate categorical confirmation of awards; rather, the
5   Article V(2) defenses contemplate courts will consider
6   domestic laws in confirming an award.  Article V(2)(b)
7   would lack any meaning if a court could not rule against
8   confirmation when the "defendant had been subject to
9   coercion or any part of the agreement had been the result
10  of duress." Ameropa AG, 2011 WL 570130, at *2.  Here,
11  the July 2007 Agreement was a result of duress and the
12  Court will not confirm the arbitral award.

13

14                    **IV. CONCLUSION**

15       For the foregoing reasons, the Court DENIES
16  Plaintiff's Motion to Confirm and GRANTS Defendants'
17  Motion to Deny Confirmation.

18

19  **IT IS SO ORDERED.**

20

21

22  Dated: July 30, 2012       _____
23                                  VIRGINIA A. PHILLIPS
                                 United States District Judge
24

25

26

27

28

                            54